# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

MARK S. BRANTLEY

        Plaintiff,

-against-

MUNICIPAL CREDIT UNION, THE NATIONAL
CREDIT UNION ADMINISTRATION as Conservator
of the Municipal Credit Union, THE NEW YORK
DEPARTMENT OF FINANCIAL SERVICES,
AND EISNERAMPER LLP,

        Defendants.

----------------------------------------------------------------x

Case No: 1:19-cv-10994

**AMENDED
COMPLAINT**

JURY DEMANDED

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-11-19

RECEIVED
DEC 1 1 2019
PRO SE OFFICE

## Jurisdiction

1. This court has jurisdiction under 28 U.S.C. § 1331 because of the federal questions
   regarding violations of 26 U.S.C. § 7434 and 42 U.S.C. § 1983; under 28 U.S.C. § 1346
   (Tucker Act);  also under 28 U.S.C. § 1332 because of diversity of citizenship and an
   amount in controversy greater than $75,000; and finally under 28 U.S.C. § 1367 for
   supplemental jurisdiction regarding state claims that are related and form part of the same
   case or controversy.

## Venue

2. Venue is proper pursuant to 28 U.S.C.§ 1391.

## Parties

3. Plaintiff Mark S. Brantley ("Plaintiff") resides in Chandler, Arizona, County of
   Maricopa, and is a member and shareholder of MCU in good standing. He served as a
   duly elected MCU Director from 2005 until his removal on or about June 22, 2018,

having been re-elected to a three (3) year term at the 2017 Annual Shareholders Meeting on May 10, 2017. Plaintiff held the office of acting Chair and Chair of the Board from 2009 to 2015 and built years of trust on behalf of the credit union through community public relations, written articles, and leadership.

4. Plaintiff is also a career public sector servant who served for thirty years as an employee of the New York State Unified Court System from 1985 to 2015.  He is currently employed with the State of Arizona in a position of trust.

5. Defendant Municipal Credit Union ("MCU") is a not-for-profit, member owned, state-chartered credit union with its principal place of business located at 22 Cortlandt Street, New York, New York. 10007.  MCU is the oldest and one of the largest credit unions in New York State.

6. Defendant The National Credit Union Administration ("NCUA") is an authority of the United States government and constitutes an agency of the United States that is responsible for administering the Federal Credit Union Act as well as regulating and supervising federal credit unions and insuring the deposits of all insured credit unions, both state and federal.  NCUA is the appointed conservator of Defendant MCU and was appointed by The New York Department of Financial Services on or about May 17, 2019. As conservator, NCUA is in control of the business and assets of MCU. 12 U.S.C. § 1786 et seq.  NCUA maintains its principal office at 1775 Duke Street, Alexandria, Virginia, 22314.

7. Defendant New York State Department of Financial Services ("DFS") is a state agency that regulates and supervises a variety of financial services institutions, including all New York state-chartered banking organizations—such as banks, trust companies, savings

banks, and credit unions and has its principal place of business located at One State Street, New York, New York 10004.

8. Defendant EisnerAmper LLP ("Eisner") is one of the largest accounting firms in the U.S that provides comprehensive audit, accounting, advisory, consulting, and tax services. Eisner's "clients are enterprises as diverse as sophisticated financial institutions and start-ups, global public firms and middle-market companies; as well as high net worth individuals, family offices, not-for-profit organizations, and entrepreneurial ventures across a variety of industries" (www.eisneramper.com/about-us).  EisnerAmper LLP maintains its principal place of business at 750 Third Avenue, New York, New York 10017.

## INTRODUCTION

9. Prior to removal without notice or a hearing, Defendant MCU had a volunteer Board of Directors ("Board") elected by the shareholders. The Board was responsible for the general management of the affairs, funds and records of the institution, and established policies for the financial institution.  Generally, the Board was composed of twelve (12) directors and each director was elected for a three (3) year term that were staggered such that four director vacancies were filled by election in any given year.  The then volunteer Board consisted of retired and/or current, civil servants and labor union employees, four of which were senior citizens.

10. Defendant MCU also had a Supervisory Committee ("SC"), an independent body that functioned separately from the Board, with its members elected directly by MCU membership. While the Board was charged with the general management of the affairs, funds and records of the corporation, the SC had the auditing and internal control responsibilities for the institution.

11. Both the Banking Law and MCU By-Laws mandated that one of the duties of the SC was to conduct audits of the credit union, and prepare and submit reports on such audits to the Board. Defendant MCU had five (5) members who served on its SC and these individuals also had three (3) year staggered terms of office. The SC had additional authority under Banking Law § 475 including the power to suspend directors.

12. Unlike for-profit corporate boards, Defendant MCU, a state-chartered cooperative financial institution did not have an audit committee comprised of directors. Rather, the SC served as the audit committee supervising a team of internal auditors and engaging the external auditor, Defendant Eisner for independent audits. NY Banking Law § 475. **(EXHIBIT A, pgs. A4-A6).**

13. Defendant MCU via its SC engaged Defendant Eisner as its outside accounting auditor to perform the independent audits of the credit union's financial statements and operations and Eisner provided services to MCU for more than a decade. Defendant Eisner also prepared the institution's federal Form 990s that contained the compensation for all Defendant MCU's officers. Defendant Eisner failed to report in its audits, statements, or other documents or bring to Plaintiff's attention any wrongdoing by Wong or by any other MCU official.

14. Defendant MCU employed in relevant part, the following paid professional employees: a Chief Executive Officer ("CEO"), Executive Vice-President/Chief of Member Services Officer ("EVP"), Chief Financial Officer ("CFO"), Chief Human Resources Labor Relations Officer ("CHRLRO"), Chief Credit Officer ("CCO"), Internal Auditors (with certified fraud examiner certifications), Bank Secrecy Act ("BSA") Officer, Compliance

Officer, Vice-President of Security and Fraud ("VP of Security and Fraud"), and General Counsel.

15. Pursuant to NY Banking Law § 471(1), Plaintiff in good faith relied on the reports of the SC, the internal auditors, Defendant Eisner, and the financial statements including expense reports presented by the aforementioned paid professional employees. Moreover, the same statutory provision stated, "Nothing in this section shall be deemed to require the directors to perform functions vested in any committee, officer or other person pursuant to the provisions of any other section of this chapter." Id.

16. Defendant DFS in its regulatory role conducts annual examinations of state-chartered credit unions.  Defendant NCUA as the federal regulator counterpart also conducts yearly examinations. Each year during Plaintiff's tenure as a member of the then Board (2005-2017), both Defendants DFS and NCUA in their oversight roles performed joint examinations of Defendant MCU.

17. During Plaintiff's tenure on the then Board of Defendant MCU and prior to the Wong embezzlement, none of the aforementioned officers, auditors (internal or external), or federal and state regulators reported any financial wrongdoing of any kind.  On the contrary, they issued clean audits and satisfactory examiner ratings.

## STATEMENT OF FACTS

18. On or about May 8, 2018, Kam Wong ("Wong"), the CEO and President of Defendant MCU, was arrested and charged by the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") with fraud, embezzlement, and aggravated identity theft offenses related to defrauding the credit union in a multi-million dollar fraud scheme. Wong later pleaded guilty and was sentenced to five and a half years in prison.

19. Prior to Wong's arrest, Defendant MCU received a Grand Jury Subpoena dated January 23, 2018, from the USAO-SDNY.  At a special meeting of the then Board, directors took immediate actions that included but were not limited to the following: 1) engaged outside counsel to assist in an internal investigation and advise on subpoenas), 3) formed special board committee to investigate any and all fraud (i.e., Oversight and Action Committee), 4) hired reputable accounting firm KPMG to conduct a forensic audit of the credit union, 5) engaged a private investigator for criminal matters, 6) placed CEO, CFO, and CHRLRO on administrative leave that led to terminations, and 7) provided corrective plan of action to NCUA and Respondent DFS.

20. Based on the Board's said internal investigation, Wong was placed on leave on or about February 22, 2018 upon the findings and recommendation of the Oversight and Action Committee. Ultimately, in or about June 2018, Wong was terminated from his position as CEO, preceded by terminations of the CFO and CHRLRO who were alleged co-conspirators in the fraud scheme.  Wong's termination would have occurred sooner , however on the advice of General Counsel it was delayed because Wong's contract contained a notice and hearing type provision we were advised to follow.

21. After complying with both federal and state authorities and making significant progress to unearth the multi-million dollar fraud scheme, Defendant DFS by Order of the Superintendent ("Order") dated June 22, 2018, summarily removed the Board including Plaintiff without due process and cited violations of NY Banking Law 470 and 471 (i.e., No Director Compensation and Breach of Fiduciary Duty, respectively).

22. In so doing, Defendants DFS and MCU cut off Plaintiff's access to any and all credit union emails, written correspondence, board minutes, reports, D&O coverage, and legal

representation.  Without a discovery process in a later filed CPLR Art. 78 proceeding,

Defendants DFS and MCU constructively forced Plaintiff and fellow petitioners to rely

on memory.  Notwithstanding, on or about August 16, 2018, Plaintiff and six (6) other

directors filed a CPLR Article 78 ("Art. 78") proceeding at the Supreme Court, New

York County, Civil Division seeking to: vacate and annul the Order of Defendant DFS,

reinstate Plaintiff and fellow petitioners-directors as board members, and enjoin

Defendant MCU from taking any action to conduct or hold an election.

23. The Art. 78 petition was dismissed on a rational basis determination in favor of DFS'

motion, the court not reaching the merits of the other due process arguments in the case.

As such, Plaintiff and fellow petitioners filed an appeal at the Appellate Division, First

Department on or about March 19, 2019 raising the issue that a full mandamus review

should have been given but wasn't by the lower court, namely that: the Order was a

violation of lawful procedure, was affected by errors of law, and an abuse of discretion.

24. On appeal, argument was noticed for the June term on May 14, 2019, however Defendant

DFS requested and was granted by the court permission to move argument to the

September term thereby extending its reply brief filing date of April 17, 2019 to August

7, 2019.

25. Interestingly, on or about May 17, 2019 before its reply brief was filed, Defendant DFS

took possession of Defendant MCU, appointing Defendant NCUA as conservator.  In

June 2019, the propriety of this takeover was questioned in an article entitled, *"The

Hamilton Question and New York's Municipal Credit Union's conservatorship by

NCUA"* **(EXHIBIT B, pgs. B1-B4)**.  The article's author is Chip Filson, a credit union

expert, former regulator, and a founding principal of Callahan and Associates whose

career included eight (8) years as a state regulatory supervisor, followed by a federal

oversight role as Defendant NCUA's former Director of the Office of Programs that

included exam policy as one of his responsibilities **(EXHIBIT B, pgs. B5)** .

26. The article pointed out that the March 2019 (i.e., about 2 months before the takeover) call

report data of Defendant MCU had a "net worth ratio of 7.6% **,** delinquency of .77%, and

an allowance account funded at 150% of total delinquencies.  No taxi medallion loans."

He further stated, "there appear[ed] to be no immediate financial safety and soundness

issues…"  "The credit union ha[d] received a bond settlement for loss as well." Finally,

he profoundly stated, "Moreover as in this case, the NCUA and the state had examined

the credit union annually from 2013 to 2018 while the misappropriations occurred, and

apparently found no wrongdoing. So the tendency is to shift the responsibility for the

situation to the bad actor and the lack of board oversight, not the possible shortcomings in

the exam process." **(EXHIBIT B, pgs. B1-B3).**

27. At the time of said state takeover, on or about May 17, 2019, Defendants DFS and MCU,

under Defendant NCUA's conservatorship posted on their respective websites press

releases entitled, Department of Financial Services Takes Possession of Municipal Credit

Union and Names NCUA as Conservator."

(www.dfs.ny.gov/reports_and_publications/press_releases/pr1905171, May 17, 2019)

and (www.nymcu.org/dept-of-financial-services-takes-possession-of-municipal-credit-

union-names-ncua-conservator.aspx, May 17, 2019).  Contained in those releases were

the following defamatory statements: "In 2017 DFS had uncovered deficiencies in board

oversight that had facilitated the multi-million-dollar embezzlement by the former CEO,

Kam Wong."  Id.

28. Moreover, Defendant DFS asserted in its appellate court reply brief filed after the state takeover, that Plaintiff and other board members engaged in substantial wrongdoing of its own by diverting MCU's assets from its members to the directors' pockets. (Note: lower state court and appellate proceedings are under court seal.)

29. After the takeover, Defendant DFS conveniently moved on mootness grounds as the primary basis for the appeal's dismissal and contended since there was no board for Plaintiff and fellow petitioners to return to, no relief could be granted. (Also note: Defendant MCU submitted no papers after its answer in the lower court proceeding and did not file any papers in the appeal despite knowing the facts regarding Plaintiff. Subsequently, the appellate court entered its decision on or about September 24, 2019 and dismissed the appeal on mootness grounds only.

30. At the time of the aforementioned press release, the then Board had only ten (10) members including Plaintiff, who was the longest serving and most visible director since 2005 and was Chair for about six (6) years.

31. On or about September 24, 2019, the same day of the appellate decision, Plaintiff received by certified mail a 2017 corrected Form 1099-Misc ("1099") with no explanation, cover letter or anything enclosed or attached (**EXHIBIT C, pg. C1**).

32. In response, Plaintiff sent a letter to Defendant MCU requesting an itemized list describing the charges totaling $12,028.55 - the amount in box 7 of the corrected 1099. The corrected 1099 was $8,974.31 more than the original $3,053.74 previously filed by Defendant MCU.

33. Melissa Jampol, Esq. ("Jampol Esq.") of Epstein Becker Green on behalf of Defendant MCU replied to Plaintiff's request by her letter dated October 8, 2019 with an attached

itemized list in Excel spreadsheet format.  The expense descriptions were vague and/or not recognizable as expenses Plaintiff incurred.  On October 11, 2019, Plaintiff returned via email said spreadsheet with justifications and/or explanations for each item and a cover letter requesting the amounts of the 2017 corrected 1099 and the 1099s filed in previous years be revised to reflect that Plaintiff received no compensation under the law, rules, and board policy for those years **(EXHIBIT C, pgs. C2-C12)**.

34. By email on October 21, 2019, Jampol Esq. informed me in relevant part that Defendant "MCU's tax accountants re-reviewed [my] 1099-MISC.... As such, at this point, MCU will be taking no further action" **(EXHIBIT C, pg. C13)**.

35. On October 25, 2019 also via email, Jampol Esq. acknowledged the 2017 corrected 1099 was filed with the IRS **(EXHIBIT C, pg. C15)**.

36. Despite Plaintiff's attempt to provide justifications under the law, rules, and board policy as well as explanations in some cases for items not incurred by Plaintiff, Defendant MCU under the control of conservator NCUA and with wilful disregard filed the fraudulent income returns with the IRS and refused to correct it.  Notwithstanding the board's exercise of its business judgment in duly approving Plaintiff's expense reimbursements pursuant to Banking Law 456, Defendant MCU refused to correct the amounts of the 1099s and the credit union's Form 990s.

37. On November 29, 2019, the day after Thanksgiving Plaintiff received notice from the U.S. Postal Service of a certified envelope.  Said envelope contained a 2018 Form 1099-MISC in the amount of $3,091.29 without a cover letter, itemization, or explanation sent by Defendant MCU under the conservatorship of Defendant NCUA.

38. Plaintiff by this proceeding does not seek the reversal of his removal without a hearing, reinstatement to the Board, an injunction enjoining Defendant MCU from holding another election, nor the overturn of the lower state court and appellate court judgments.

## CLAIM I

### DEFENDANT MCU WILFULLY FILED FRAUDULENT INFORMATION RETURNS IN VIOLATION OF 26 U.S.C. 7434

39. 26 U.S.C.§ 7434 provides in pertinent part, " If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return."

40. The Plaintiff's 1099s for 2017, 2018 and previous years (2013 -2016) are information returns as defined by 26 U.S.C.§ 6724(d)(1)(A).

41. Defendant MCU filed the fraudulent information return wilfully because after Plaintiff's attempt to provide legal justifications and sound explanations why the amounts on the 1099s are incorrect, Defendant MCU refused to correct the erroneous amounts in Box #7 of the information return. (**EXHIBIT C, pg. C13**)

42. Defendant MCU under the possession of Defendant DFS and the conservatorship and control of Defendant NCUA wilfully filed the fraudulent information return to further drive and bolster their defamatory narrative that Plaintiff was motivated by "unlawful compensation" thereby "facilitating the multi-million dollar embezzlement" committed by Wong.

43. Plaintiff detailed in his letter of September 24, 2019, the applicable laws, rules and board policy that excluded the items in question from compensation or provided explanations that the expense was not incurred by Plaintiff. Specifically, Plaintiff referenced NY

Banking Law 456(1), 12 CFR 703.33(b)(1), NCUA Letter to No. 05-FCU-02,  NCUA

Letter 11-0152 (March 2011) and the Defendant MCU Board Policy (**EXHIBIT C, pgs.

C16-C24**).

44. For example, the thirty-four (34) Fed Ex charges totaling $2,957.88 on Defendant MCU's

itemized list spreadsheet were never incurred by Plaintiff (**EXHIBIT C, pgs. C9-C11**).

Defendants MCU, DFS, and NCUA are well aware of the fact that Plaintiff's corporate

card was never used for FedEx purchases in 2017 or any other year, neither did Plaintiff

authorize those charges. The corporate card was the only means Plaintiff could charge

business expenses related to MCU.  On the contrary, Defendant MCU's office manager,

not Plaintiff, unilaterally utilized a FedEx account as a means to send mail to all

directors.

45. In another instance, the $678.79 Cox Communications charge represented the sum of

several monthly DSL reimbursements combined (**EXHIBIT C, pg. C9**). However, the

expenses were duly approved and the reimbursements excludable from compensation

pursuant to Defendant NCUA's opinion letter 03-1053 dated December 3,2003

referencing 12 C.F.R. §701.33(b)(1).  Said opinion letter provided the basis for credit

union "volunteer officials" to receive reimbursement for DSL Internet "high speed

transmission lines to board members for their homes" excludable as compensation. This

was an industry-wide accepted practice by the then Board and those directors that

preceded. (**EXHIBIT D**).

46. Both Defendants NCUA and MCU are well aware of this opinion letter and practice that

excludes DSL reimbursements as compensation. Defendant NCUA's then Associate

General Counsel drafted the aforementioned letter.

47. Neither Defendants MCU, NCUA, or DFS ever deemed Plaintiff's expense reimbursements and/or guest travel as compensation under the applicable law, rules, and policy until now as they are attempting to drive the false narrative that Plaintiff and other board members "facilitated a multi-million dollar embezzlement."

48. Plaintiff followed the law regarding his expense reimbursements that were duly approved by the board under its statute authorized business judgment.  The statute in relevant part provided, "reimbursement shall be determined by the board of directors to be appropriate in carrying out the official business of the credit union and shall be in accordance with written policies and procedures, including documentation requirements, established by the board of directors" Banking Law 456 (1).

49. Despite Defendant DFS' continued assertion in its appellate reply brief under seal that Plaintiff received "unlawful compensation," Plaintiff presented an affidavit that he received no compensation under the applicable laws, rules, and board policy that excluded reimbursements as compensation.

50. Furthermore, Defendant MCU was not consistent in its determination of who received compensation.  Based on the credit union's Form 990, Defendant MCU's accounting department did not issue 1099s, neither stated compensation in Box 7 for guest travel to certain directors because they did not provide their social security numbers (**EXHIBIT E, pg. E2**). Instead, those directors properly provided the social security numbers of their guests who were the recipients of the benefit.

51. Defendant MCU's accounting department and Defendant Eisner, the Form 990 preparer had a duty to be consistent and apply the guest travel to all guests' social security numbers, who were the recipients of the travel benefit as it did for other directors.

52. Defendant MCU under the control of Defendant NCUA as conservator, wilfully filed the fraudulent information returns of 2017 and 2018 as well as 2013-2016 refusing to correct them despite the information Plaintiff provided citing applicable laws, rules, and regulations.

## CLAIM II
### DEFENDANTS DFS AND MCU COMMITTED LIBEL, LIBEL PER SE AGAINST PLAINTIFF

53. Defendants DFS and MCU recklessly, wilfully, and without regard to the truth or facts posted on their respective websites a press release entitled, Department of Financial Services Takes Possession of Municipal Credit Union and Names NCUA as Conservator." (www.dfs.ny.gov/reports_and_publications/press_releases/pr1905171 May 17, 2019) that contained the following defamatory statement:  "In 2017 DFS had uncovered deficiencies in board oversight that had facilitated the multi-million-dollar embezzlement by the former CEO, Kam Wong."

54. Here, Defendants DFS and MCU in a conclusory, libelous manner wilfully published that the then Board's (including Plaintiff's) alleged oversight "deficiencies" facilitated a crime (i.e., the multi-million-dollar embezzlement).  Facilitation of a crime or Criminal Facilitation is either a misdemeanor or felony under NY law both defined as crimes.  NY Penal Law 115, NY Penal Law 10.

55. Defendants MCU's and DFS' libelous statements were also referenced and published verbatim by the Credit Union Times, a national trade publication on or about May 17, 2019 in the article entitled, "New York Regulator Conserves Municipal Credit Union." (www.cutimes.com/2019/05/17/new-york-regulator-conserves-municipal-credit-union/, May 17, 2019).

56. Defendants DFS and MCU published the defamatory statements despite the fact they were aware of the individuals who truly were facilitating Wong's embezzlement, therefore rendering their libelous statements as false. Defendants DFS and MCU had previous knowledge of those who were truly involved because of the internal investigation findings of the then Board, the findings of the USAO-SDNY, and the assertions that were made in the Art. 78 proceeding and subsequent appeal.

57. In a recently filed criminal complaint by the USAO-SDNY, a then SC member was arrested and charged among other things for conspiracy to embezzle from a credit union (i.e. Defendant MCU) and embezzlement from a credit union. (**EXHIBIT F - pgs. F1-F2**).  Moreover, the USAO-SDNY referenced in one of its press releases dated November 10, 2018 in relevant part, "In addition, WONG obtained controlled substances, for personal use, from a former Credit Union Supervisory Committee member" (www.justice.gov/usao-sdny/pr/former-chief-executive-officer-new-york-credit-union-pleads-guilty-manhattan-federal). This press release occurred months before the libelous statements of Defendants DFS and MCU and provided information and context contradicting their false narrative.  According to the criminal complaint filed, the SC member is just one of many parties alleged to have participated in the "multi-million dollar embezzlement."

58. The USAO-SDNY also arrested and filed a criminal complaint for conspiracy to obstruct justice and obstruction of justice against a former board member who resigned about two years prior to the then Board's removal.  Notwithstanding, said criminal complaint referenced a text message between Wong and a SC member known as "Member-1" that quoted the SC member saying, "[The Credit Union outside auditors] is also in a good

place with this" pertaining to fraudulent insurance payments that were part of the multi-million dollar embezzlement (**EXHIBIT G, pg. G3**).

59. Furthermore, the then Board's internal investigation uncovered that the CFO and CHRLRO were also part of the embezzlement scheme that included Wong's fraudulent reimbursements and were both terminated by the then Board. Additionally, it was the CFO who intentionally misled Plaintiff to rely on and approve fraudulent expense reports submitted by Wong after she certified the expenses were reviewed, receipted, researched, and ready to pay (**EXHIBIT H**). Defendants DFS and MCU possessed first hand knowledge of this fact.

60. Moreover, in direct contradiction to Defendants DFS' and MCU's defamatory statements, Plaintiff as former Chair was proactive and deliberate when he drafted and adopted a Human Resources Policy on or about November 20, 2014 barring the arrested SC member from assuming the title of VP of Security and Fraud after discovering the SC terminated the previous VP and he attempted to assume the title and position (**EXHIBIT I, pgs. I1-I4**).

61. On September 27, 2015, in a memo (Re: Board's Role and Fraud Risk) sent to the succeeding board chair, the board, Wong, and General Counsel, Plaintiff raised his deep concerns that the SC refused to fill the vacant position for more than one year after the SC member was barred from the position. Plaintiff also attached to said memo an excerpt of the credit union's Security Policy and an article entitled, The Board's Critical Role in Preventing Internal Fraud" (**EXHIBIT I, pgs. I5-I9**).

62. Said memo also contained Plaintiff's demand that his concerns be noted in the board's meeting minutes (**EXHIBIT I10-I12**). Defendant MCU had this information on its email

server, in the board meeting recordings, and the electronic or hard copy board minutes. Defendants DFS and NCUA also had unfettered access to this information prior to the defamatory statements when they conducted their annual examinations. In fact, Plaintiff's concerns should have prompted an investigation by both Defendants NCUA's and DFS' regulatory examiners. Unfortunately, Plaintiff's proactive and deliberate actions were ignored.

63. Defendants DFS and MCU wilfully conflated the compensation narrative and Wong's multi-party fraud scheme as the motive that Plaintiff was part of facilitating a "multi-million dollar embezzlement." Defendants MCU, NCUA, or DFS never deemed Plaintiff's expense reimbursements and/or guest travel as compensation under the applicable law, rules, and board policy until now as they are attempting to drive the false narrative that Plaintiff breached his fiduciary duty and accepted compensation in violation of law.

64. Plaintiff submitted expense reimbursements in compliance with law, regulations and board policy. The same governing rules provided "Such reimbursement shall be determined by the board of directors to be appropriate in carrying out the official business of the credit union and shall be in accordance with written policies and procedures, including documentation requirements, established by the board of directors." Banking Law 456(1). Plaintiff did not need nor had any motivation to facilitate an embezzlement when the law granted the then Board the authority to deem expenses as appropriate.

65. At the time the defamatory statements were published, Plaintiff was the longest tenured and most visible member of the Board, serving as its acting Chair and Chair from 2009-2015. Although, Defendants DFS' and MCU's libelous statement did not name Plaintiff,

the reader of the defamatory statements would and could easily infer that it involved, included, and was against Plaintiff.

66. Defendants DFS and MCU intentionally, recklessly and maliciously published the false statements against Plaintiff without any credible or substantiated evidence that they were true and having knowledge of the then board's internal investigation findings and the evidence that was provided in the Art. 78 proceedings.  The defamatory statements currently appear on Defendants DFS and MCU respective websites and continue to commit libel and/or libel per se, and should be removed.

67. As a proximate result and by reason of Defendants DFS' and MCU's libelous statements that Plaintiff's alleged oversight deficiencies facilitated a crime (i.e. embezzlement), Plaintiff's reputation has been damaged causing him great emotional distress, loss of future credit union speaking engagements, and loss of future board service.  Plaintiff's present employment in finance could also potentially be in jeopardy.  Prior to the events above, Plaintiff was well-known nationally in the credit union industry.  Plaintiff served on two national trade organization boards, wrote articles and white papers, and was invited to speak at various conferences.

## CLAIM III

**DEFENDANT EISNER COMMITTED PROFESSIONAL MALPRACTICE AND WAS NEGLIGENT AND/OR GROSSLY NEGLIGENT AS PLAINTIFF RELIED UPON THEIR AUDITING AND REPORTING.**

68. According to AICPA's Generally Accepted Auditing Standards ("GAAS), "The auditor must exercise due professional care in the performance of the audit and the preparation of the report." AU §150.02(3)

69. Defendant Eisner breached the duty of professional care owed to Defendant MCU and Plaintiff who relied on Defendant Eisner's auditing and financial reporting.

70. Defendant Eisner owed a duty of care to Plaintiff because pursuant to NY Banking Law 471(1), Plaintiff relied on Defendant Eisner's auditing and financial reporting.  The reporting included but was not limited to: Defendant MCU's annual financial statements, operational audits, Form 990 preparation, etc.

71. Defendant Eisner failed to detect inconsistencies in several Form 990s it prepared that incorrectly listed Plaintiff's excludable reimbursements including guest travel as compensation but did so correctly for other directors. (**EXHIBIT J**)

72. Defendant Eisner failed to affirmatively notify Plaintiff and the then Board of Wong's embezzlement including the substantially inflated bonuses of Defendant MCU's executive officers including Wong.

73. According to AICPA's GAAS,"The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.." AU §110.02

74. Defendant Eisner failed to detect the fraudulent activity of Wong including the multiple large sum, handwritten checks and the alleged activities of the aforementioned arrested SC member who was charged with embezzlement.

75. Defendant Eisner failed to report to Plaintiff, then board members, and shareholders the millions in losses arising out of the Wong embezzlement in Defendant MCU's Annual Report 2017 and at the Annual Meeting that occurred on or about May 2018 (**EXHIBIT K**) .

76. According to AICPA's GAAS, "The auditor must maintain independence in mental attitude in all matters relating to the audit." AU §150.02(2).

77. Upon information and belief, Defendant Eisner was grossly negligent, intentionally and /or recklessly failed to conduct its audits of Defendant MCU and failed to report to Plaintiff with the required independence.

78. A USAO-SDNY criminal complaint, also referenced a text message between Wong and a SC member known as "Member-1" that quoted the SC member saying, "[The Credit Union outside auditors] is also in a good place with this," pertaining to the fraudulent Wong insurance payments (**EXHIBIT G, pg. G3**).

79. As a proximate cause and by reason of Defendant Eisner's breach of the duty of care required in the accounting and auditing profession, malpractice, carelessness, recklessness, negligence, gross negligence, and its failure to report to Plaintiff any wrongdoing or irregularities and failure to detect Wong's embezzlement, the SC member's alleged embezzlement, and other bad actors malfeasance, Plaintiff suffered damages resulting in his board removal, defamation, emotional distress, litigation costs and attorney fees in this action, the state proceedings, as well as other losses.

## CLAIM IV

**DEFENDANT DFS DENIED PLAINTIFF DUE PROCESS UNDER 42 U.S.C. § 1983 BY CHARGING AND CONCLUDING HE VIOLATED NY BANKING LAWS 470 AND 471 AND ACCUSING PLAINTIFF OF CRIMINAL FACILITATION BY THE AGENCY'S DEFAMATORY STATEMENT WITHOUT PROPER NOTICE, A PRE-DEPRIVATION HEARING, AND AN OPPORTUNITY TO BE HEARD**

80. Defendant DFS' Order of the Superintendent ("Order") dated June 22, 2018 charged and determined in conclusory fashion, Plaintiff violated NY Banking Laws 470 and 471 and summarily removed him and others as board directors (**EXHIBIT L**) without due process. Plaintiff was also accused of facilitating a crime as a result of said violations.

81. Defendant DFS, an agency of the State of New York and under the color of state law violated 42 U.S.C. § 1983 and Plaintiff's constitutional due process rights under the Fourteenth Amendment of the U.S. Constitution because he was not provided proper notice, a pre-deprivation hearing and an opportunity to address the aforementioned charges of misconduct before his removal from the board of directors.

82. Defendant DFS also violated procedural due process under the Constitution of the State of New York, Article I, Section 6, the NY State Administrative Procedure Act § 301 et seq., NY Banking Law § 41, NY Financial Services Law § 304 et seq. and 305, and its own procedure proscribed by the Superintendent's Regulations, 3 N.Y.C.R.R. 2.1.

83. Plaintiff was also entitled to a pre-deprivation hearing because the Order was not "random and unauthorized," but was issued by the then Superintendent of Defendant DFS the highest "official with final authority over significant matters, which contravene[d] the requirements of a written municipal code, [and] can constitute established state procedure," Xu v. City of New York, 16-4079 (2d Cir. 2017).

84. NY State law and the credit union's bylaws created a "legitimate claim of entitlement" to Plaintiff's property interest in his position as director because he was duly elected by the membership in 2017 and had a three year statutory expectation to complete his term to 2020. NY NPC§ 703 et seq., NY BSC 703 et seq., Board of Regents v Roth, 408 U.S. 377 (1972), and MCU bylaws.

85. Defendant DFS knew Plaintiff did not receive compensation in violation of NY Banking Law 470 because the expense reimbursements were excluded from compensation under Banking Law 456(1), 12 CFR 703.33(b)(1), NCUA Letter No. 05-FCU-02, NCUA Letter 11-0152, and Defendant MCU's Board Policy (**EXHIBIT C**).

86. Additionally, Defendant MCU under the possession of Defendant DFS and under the control of Defendant NCUA as conservator, filed and sent Plaintiff a fraudulent information return (i.e., 2017 corrected 1099-MISC) to bolster the narrative he received compensation in violation of law.  Defendant MCU also filed fraudulent information returns in previous years for expenses that were not compensation under the applicable laws, rules, and board policy.

87. Defendant DFS also knew Plaintiff did not breach his fiduciary duty in violation of NY Banking Law 471.  On the contrary, Plaintiff in good faith and pursuant to NY Banking Law 471 relied on the financial statements and reporting of Defendant MCU's professional officers, internal auditors, the SC, Defendant Eisner, and the regulatory examiners.  Plaintiff also took proactive policy-based steps to prevent the self-appointment of the arrested and charged SC member as the VP of Security and Fraud (**EXHIBIT I, pgs., I1-I14**).

88. Defendant DFS also knew that the charged SC member and Defendant MCU's executive officers were allegedly part of a greater fraud scheme that was disclosed in the then Board's internal investigation and the eventual criminal complaint filed by USAO-SDNY.

89. Defendant DFS falsely claimed in the state court proceeding that the then Board took no action after the Wong embezzlement was discovered and withheld this pertinent and material information from the state court.  On the contrary, Plaintiff and the then directors took immediate action that included but was not limited to the following: 1) engaged outside counsel to assist in an internal investigation and subpoenas), 3) formed special board committee to investigate fraud (i.e., Oversight and Action Committee), 4) hired

reputable accounting firm KPMG to conduct a forensic audit of the credit union, 5) engaged a private investigator for criminal matters, 6) placed CEO, CFO, and CHRLRO on administrative leave that eventually led to their terminations, and 7) provided corrective plan of action to NCUA and Respondent DFS. The USAO-SDNY Ash criminal complaint confirmed the Board's internal investigation did take place by its mention in its official document. (**EXHIBIT G, pgs. G4-G6**).

90. Moreover, Defendant DFS in conclusory fashion accused the then Board of nepotism as an instance of wrongdoing in the state court proceeding. However, Plaintiff never employed a relative at anytime at the credit union. For arguendo, even if Plaintiff did have a relative employed, Defendant MCU's board policy permitted the employment of relatives in non-officer positions as long as the relative was qualified for the position and the relationship was disclosed (**EXHIBIT M**).

91. Defendant DFS also accused Plaintiff and the then Board of lavish trips for bona fide educational training conferences abroad and the Board's strategic planning conferences that were held in Las Vegas for several years. On the contrary, Plaintiff did not attend conferences abroad with the exception of a speaking engagement in which the credit union was reimbursed by the conference host. However, for arguendo, even if Plaintiff had attended conferences, usually they were held annually by the World Council of Credit Unions, an internationally recognized trade organization that annually selects venues abroad because the credit union industry is a global movement. Notwithstanding, the expense still had to be charged against the director's educational allocation in accordance with board policy.

92. Additionally, Defendants DFS and NCUA knew for several years that Las Vegas was the site for the board's annual strategic planning retreat and never objected to the location until after Wong's embezzlement.  A great number of credit union conferences and retreats are held in Las Vegas.  Even Defendant NCUA's past board chairs from time to time were invited to speak at credit union related Las Vegas venues (**EXHIBIT N**).

93. To Plaintiff's understanding, the board chose Las Vegas for two reasons: 1) at the time the venue was chosen, the state of Nevada was very distressed economically during the 2008 Great Recession and better hotel rates were negotiated by locking in for more than one year and the business would assist in the state's economic recovery, and 2) the site was an incentive for volunteer board members to attend who were working full-time and had to charge their personal vacation time.  Defendant NCUA recognized this concept of "incentive to volunteerism" in its OGC Opinion Letter - No. 11-0805 (**EXHIBIT O** ).

94. Plaintiff also points to Defendant NCUA's own board expenses that were subject to its Office of the Inspector General's scrutiny.  According to an article in the Washington Post ("WP"). a member of its board purchased two airline tickets for $11,000 to Vienna, likely the same WOCCU conference the then MCU board members were accused of attending and receiving compensation (**EXHIBIT P - pgs. 3-4**). Defendant NCUA responded to the WP strongly defending the officials by saying, "[They] did nothing wrong…. The claims for reimbursement were within the parameters of agency policy... There being no violation of the law, rule or regulation, no disciplinary action was warranted."

95. There, Defendant NCUA board officials' expenses were not conflated with the facilitation of Wong's embezzlement simply because the regulator was ultimately

charged with the regulatory oversight and examination of Defendant MCU. Neither were

those expenditures characterized as compensation and the motivation for Defendant

NCUA's "turning a blind eye" to Defendant MCU's malfeasance or the NYC credit

union taxi medallion crisis as Defendant DFS accused Plaintiff and others of doing at

Defendant MCU. Moreover, the NCUA officials were not removed without notice, a

hearing or an opportunity to be heard. On the contrary, the agency was afforded an

opportunity to respond to the Inspector General and to the WP with the assertion there

was no violation of the law, rule, or regulation.

96. Plaintiff also asserted there was no violation of law, rule, regulation, or policy in the state

court proceedings and asserts the same in this proceeding. However, Defendant DFS

decided Plaintiff's removal was warranted without notice and a hearing.

97. Finally, Plaintiff is not seeking to overturn the lower state court decision that dismissed

the Art. 78 proceeding despite it not reaching whether Plaintiff violated laws or the due

process claim on the merits. Plaintiff does not seek the relief that was requested in that

proceeding, namely: the reversal of Plaintiff's removal, the reinstatement of Plaintiff on

the board, nor injunctive relief against Defendant MCU holding or conducting an

election. Abdelal v. Kelly, No. 17-1166-cv (2nd Circuit 2018).

98. Plaintiff is not seeking the reversal of the state appellate court's dismissal on mootness

grounds despite the fact it also did not address whether Plaintiff violated the law neither

reached the due process claim on the merits.

99. Rather, Plaintiff seeks by this claim declaratory relief that he did not violate NY Banking

Law 470 and 471, and that he did not facilitate a multi-million dollar embezzlement.

Plaintiff also seeks damages for the deprivation of his constitutional rights in this

proceeding because the prior state court Art. 78 action was not the appropriate proceeding for an award of damages.  Davidson v Capuano, 792 F.2d 275 (2nd Circuit 1986).

100.    As a proximate cause of Defendants MCU's and DFS' constitutional due process violations, Plaintiff incurred damages that included damage to his property interest, his name and reputation, emotional pain and suffering, and costs including attorney's fees.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully demands judgment against Defendants MCU, NCUA as conservator of MCU, DFS, and Eisner as follows:

1.  Judgment against Defendant MCU under the control and conservatorship of Defendant NCUA, for compensatory damages of $5,000 or greater for damages sustained as a proximate result including the cost of this action for the fraudulent information returns, namely the 2017 corrected 1099 and the1099s for previous years as far back as 2013 and such other and further relief as the Court may deem just and proper . .

2.  Judgment against Defendants MCU and DFS awarding compensatory and punitive damages for libel per se or libel the amount to be determined at trial but in excess of the $75,000 jurisdictional requirement, costs and such other and further relief as the Court may deem just and proper.

3.  Judgment against Defendants MCU and DFS awarding compensatory and punitive damages for depriving Plaintiff of his constitutional due process rights under 42 U.S.C. § 1983, costs and such other and further relief as the Court may deem just and proper. .

4. Declaratory relief against Defendants MCU and DFS that Plaintiff did not violate NY Banking Laws 470 and 471, nor facilitated a multi-million dollar embezzlement.

5. Judgment against Defendant Eisner awarding Plaintiff compensatory and punitive damages for its breach of duty of professional care owed to Plaintiff, its recklessness, negligence, and gross negligence, the amount to be determined at trial but in excess of the $75,000 jurisdictional requirement, costs and such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: December 6, 2019

Mark S. Brantley
Plaintiff - Pro Se
4880 S Robins Way
Chandler, AZ 85249
Phone: (480) 869-4914
Email: Brantleyesq@gmail.com

# EXHIBITS

# EXHIBIT A

# MCU

# BY-LAWS

Rev. 6-19-17

A-1

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I | NAME and PURPOSES | 2 |
| Article II | MEMBERSHIP | 2 |
| Article III | MEETINGS of MEMBERS | 7 |
| Article IV | ELECTIONS | 11 |
| Article V | DIRECTORS | 22 |
| Article VI | OFFICERS and THEIR DUTIES | 27 |
| Article VII | LOAN OFFICERS | 31 |
| Article VIII | SUPERVISORY COMMITTEE | 33 |
| Article IX | SHARES | 36 |
| Article X | DIVIDENDS | 37 |
| Article XI | INVESTMENT OF FUNDS | 38 |
| Article XII | LOANS | 38 |
| Article XIII | ACCOUNTS | 39 |
| Article XIV | LIABILITY | 40 |

Rev. 6-19-17

1

A-2

## ARTICLE VIII

### *Supervisory Committee*

Section 1.

A.   The Supervisory Committee shall consist of five (5) members.

B.   At each annual meeting the members shall elect one or two members, as the case may be, of the Supervisory Committee to serve for a term of three (3) years and until his or her successor is elected and has qualified.

C.   The Supervisory Committee shall meet at least once every three (3) months to audit the books of this Credit Union and shall make reports of the same to the members at least once each year at the annual meeting.

Section 2.

A.   The Supervisory Committee members shall choose among their number a Chairperson and a Secretary.

B.   The Secretary of the Supervisory Committee shall prepare, maintain, and have custody of full and correct records of all actions taken by it.

33

A-3

C.   The offices of Chairperson and Secretary may be held by the same

person.

Section 3.

A.   The Supervisory Committee shall make, or cause to be made, such

audits, and to prepare and submit such written reports, as are

required by the law and applicable regulations.

B.   The Committee may employ and use such clerical and auditing

assistance as may be required to carry out its responsibilities as

prescribed by this article, and may request the Board to provide

compensation for such assistance.

C.   The Committee shall prepare and forward to New York State

Regulators, Federal Regulators, and the Board of Directors such

reports as may be required.

Section 4.   The Supervisory Committee shall, from time to time and not

less frequently than required by the law and applicable regulations,

cause the accounts of all members to be verified with the records of the

Treasurer.  The Committee shall maintain a record of such verification.

A-4

Section 5.

A.   By unanimous vote the Supervisory Committee may suspend for cause until the next meeting of the members any Director or Executive Officer.

B.   In the event of any such suspension, the Supervisory Committee shall call a special meeting of the members to act on said suspension which meeting shall be held not fewer than seven (7) nor more than fourteen (14) days after such suspension.

D.   The Chair of the Committee shall act as Chair of the meeting unless the members select another person to act as Chair.

Section 6.   By the affirmative vote of a majority of its members, the Supervisory Committee may call a special meeting of the members to consider any violation of the provisions of the law and applicable regulations, or of the charter or the By-Laws of this Credit Union, or to consider any practice of this Credit Union which the Committee deems to be unsafe or unauthorized.

Section 7.   The Supervisory Committee shall have the power to perform

35

A-5

all other duties and functions which are allowable to such committee under the Banking Law.

## ARTICLE IX

*Shares*

Section 1.  The number of shares which may be issued by this Credit Union shall be unlimited.

Section 2.  The par value of each share shall be $5.

Section 3.  Shares shall be paid for in full at the time of subscription.

Section 4.  An entrance fee to be fixed by the Board of Directors may be charged.

Section 5.   Shares may be transferred to any person eligible for membership, subject to approval by the Board of Directors. A transfer fee may be charged by the Board of Directors in payment of such transfer. No transfer shall be permitted if the transferor is indebted to this Credit Union.

A-6

# EXHIBIT B

10/28/2019                The Hamilton Question and New York's Municipal Credit Union's Conservatorship by NCUA – Just a Member

# JUST A MEMBER

Chip Filson

**JUNE 12, 2019 BY CHIP FILSON**

# The Hamilton Question and New York's Municipal Credit Union's Conservatorship by NCUA

The last song in the runaway hit musical **Hamilton** ends with a question:

*Let me tell you what I wish I'd known*
*When I was young and dreamed of glory*
*You have no control*
*Who lives, who dies, who tells your story?*

On May 17, 2019 NCUA was appointed conservator of the $3.03 billion state-charted Municipal Credit Union. The March 2019 call report data shows 588,000 members, a net worth ratio of 7.6%, delinquency of .77%, and an allowance account funded at 150% of total delinquencies. No taxi medallion loans.



The New York regulator had previously removed MCU's supervisory committee in May 2018 and the full board in June 2018. It designated an "on premises administrator", Mark Ricca, to oversee the general management. Mark had no credit union background.

When appointing NCUA conservator, the state also removed its chosen administrator. NCUA provided no information about who will be running the credit union and under what



guidance since there appears to be no immediate financial safety and soundness issues, but a leadership transition event.

The impetus for state action was the arrest in May 2018 of the former CEO Kam Wong. He pleaded guilty in November 2018 and in June 2019 was sentenced to five years in prison and ordered to forfeit $9.9 million to pay restitution to the credit union for the amount he had defrauded. The misuse of credit union funds extended from 2013 through 2018. The credit union has received a bond settlement for loss as well.

# What's next for the members?

On January 10th the Brookings Institution hosted a conference entitled **Ten Years Later: Lessons from the 2008-09 Financial Crisis**. One speaker was Lawrence Summers who was Treasury Secretary from 2009-2011, a PhD economist and former president of Harvard University,

During the Q&A he was asked why the government did not take over the direction of the troubled banks and insurance companies instead of TARP funding, much like the conservatorships of Freddie and Fannie. His answer was succinct: "it is my experience that government intervention in banks is a major destroyer of asset value." He further commented who wants to run or do business with a conserved government-directed institution?

NCUA's track record as a conservator is extremely mixed but on balance proves out Summer's conclusion. NCUA's conservatorship of the two largest corporates and then takeover of three more in a mass liquidation process destroyed solvent institutions that according to NCUA's own numbers today have estate surpluses of over $5.6 billion, of which $3.1 has been transferred into the NCUSIF.

By setting itself up to run a credit union as a conservator, NCUA has a conflict of interest. Does it act in the members' best interests or does it act in its own self-interest? As in all conservatorships, the members have no voice. The board is gone, and often the person appointed to lead has little or no background in the credit union, and is little more than a hired gun until some external resolution can be reached. Restoring the credit union to self-sufficiency rarely occurs, because in so doing it contradicts the logic that government

B-2

takeover was necessary in the first place. Moreover as in this case, the NCUA and the state had examined the credit union annually from 2013 to 2018 while the misappropriations occurred, and apparently found no wrong doing. So the tendency is to shift the responsibility for the situation to the bad actor and the lack of board oversight, not the possible shortcomings in the exam process.

## The Key to Success

Conservatorship or even replacing a CEO while leaving the board in place to ensure members' interests are represented, can be done successfully. During the financial crisis several noteworthy turnarounds were engineered by John Tippets at North Island Credit Union and Bill Connors and Andy Hunter at Silver State Credit Union in Nevada.

The key success factor is finding and supporting the right turnaround leader. The challenge is simple: Any jackass can kick down a barn, but it takes a carpenter to build one.

Will NCUA appoint a jackass or a carpenter? Someone to play caretaker until the agency elects a merger partner to resolve a leadership transition? Certainly there will be vultures a plenty looking to take the "problem" off NCUA's hands.

Or will the NCUA find someone with the experience, political skills and leadership to restore the credit union to its pivotal role in the New York and broader credit union community? The possibilities are out there. These could include proven, retired leaders such as Rudy Hanley, Gordan Dames, Gary Oakland, Jeff Farver, Steve Winninger or other equally capable and astute individuals whose reputation and knowledge of credit unions and the system would give them a running start. They would not be seeking another job, but have the energy and foresight to bring the credit union members confidence that their future was in good hands.

NCUA has provided no updates on this unprecedented conservatorship of a solvent credit union. But one will know the future when the next acting CEO is named. Will it be a caretaker following direction from examiners who are anxious to get rid of a problem, or will it be a proven credit union leader who can restore the credit union for its members? Chartered in 1916, Municipal is the oldest state charter in New York. Can NCUA make decisions that will sustain this cooperative now serving its fifth generation of members, or


B-3

will it just fulfill Summers' bleak assessment of what happens when government takes over a financial institution?

Municipal Credit Union faces Hamilton's challenge: *You have no control, who lives, who dies, who tells your story?* Every credit union today should care about this situation.

If a sound, long-established, and well-capitalized credit union can be dissolved without any role for members, what prevents the regulator/insurer from doing the same when your credit union faces a transition?

🗂 **NCUA**



# About Chip Filson

 A nationally recognized leader in the credit union industry, Filson is an astute author, frequent speaker, and consultant for the credit union movement. He has more than 40 years of experience in government, financial institutions, and business. Filson's breadth of experience makes him an authority on a range of topics, including analysis of credit union trends, credit union public and market-facing opportunities, and strategies for enhancing member value. His contributions to the cooperative movement have been demonstrated with his analysis and advocacy for the corporate credit union system, NCUA's Corporate Stabilization role, and the need for regulatory reform.

Chip co-founded Callahan & Associates. Filson has held concurrent positions at the National Credit Union Administration (NCUA) as president of the Central Liquidity Facility (CLF) and Director of the Office of Programs, which includes the NCUSIF and the examination process. He holds a magna cum laude undergraduate degree in government from Harvard University. After being awarded a Rhodes Scholarship, he earned a master's degree in politics, philosophy, and economics from Oxford University in England. He also holds an MBA in management from Northwestern University's Kellogg School in Chicago.

B-5

2/2

# EXHIBIT C

☒ CORRECTED (if checked)

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Rents $ | OMB No. 1545-0115 **2017** Form **1099-MISC** | **Miscellaneous Income** |
| | 2 Royalties $ | | |
| MUNICIPAL CREDIT UNION 22 CORTLANDT STREET NEW YORK, NY 10007 | 3 Other income $ | 4 Federal income tax withheld $ | **Copy 2** |
| 212-238-3330 | | | To be filed with recipient's state income tax return, when required. |
| PAYER'S federal identification number    RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | |
| 13-5261470    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 | $ | $ | |
| RECIPIENT'S name MARK BRANTLEY | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | |
| Street address (including apt. no.) | $       12028.05 | $ | |
| 4880 S. ROBINS WAY City or town, state or province, country, and ZIP or foreign postal code | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| CHANDLER, AZ 85249 | 11 | 12 | |
| Account number (see instructions)      FATCA filing requirement ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals    15b Section 409A income $               $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form **1099-MISC**          www.irs.gov/form1099misc          Department of the Treasury - Internal Revenue Service

☐ CORRECTED (if checked)

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Rents $ | OMB No. 1545-0115 **2017** Form **1099-MISC** | **Miscellaneous Income** |
| | 2 Royalties $ | | |
| | 3 Other income $ | 4 Federal income tax withheld $ | **Copy 2** |
| PAYER'S federal identification number    RECIPIENT'S identification number | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | To be filed with recipient's state income tax return, when required. |
| RECIPIENT'S name | 7 Nonemployee compensation $ | 8 Substitute payments in lieu of dividends or interest | |
| Street address (including apt. no.) | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City or town, state or province, country, and ZIP or foreign postal code | 11 | 12 | |
| Account number (see instructions)      FATCA filing requirement ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals    15b Section 409A income $               $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form **1099-MISC**          www.irs.gov/form1099misc          Department of the Treasury - Internal Revenue Service

C-1

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | 1 Rents | 2 Royalties | OMB No. 1545-0115 |
|---|---|---|---|---|
| MUNICIPAL CREDIT UNION<br>22 CORTLANDT STREET<br>NEW YORK, NY 10007<br><br>(212) 238-3330 | | $ | $ | **2018** |
| | | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Form 1099-MISC |
| | | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | Miscellaneous Income |
| PAYER'S TIN<br>13-5261470 | RECIPIENT'S TIN<br>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 | 7 Nonemployee compensation<br>$ 3091.29 | 8 Substitute payments in lieu of dividends or interest<br>$ | Copy B - For Recipient |
| RECIPIENT'S name<br><br>MARK BRANTLEY<br>4880 S. ROBINS WAY<br>CHANDLER, AZ 85249 | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ☐ | 10 Crop insurance proceeds<br>$ | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | | 11 | 12 | |
| | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| | | 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | |
| Account number (see instructions) | FATCA filing requirement ☐ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC        (keep for your records)        www.irs.gov/Form1099MISC        Department of the Treasury - Internal Revenue Service

## Instructions for Recipient - 1099-MISC (2018)

**Recipient's taxpayer identification number (TIN).** For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN). However, the issuer has reported your complete TIN to the IRS.

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**FATCA filing requirement.** If the FATCA filing requirement box is checked, the payer is reporting on this Form 1099 to satisfy its chapter 4 account reporting requirement. You also may have a filing requirement. See the Instructions for Form 8938.

**Amounts shown may be subject to self-employment (SE) tax.** If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub. 334 for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES (or Form 1040-ES(NR)). Individuals must report these amounts as explained in the box 7 instructions on this page. Corporations, fiduciaries, or partnerships must report the amounts on the proper line of their tax returns.

**Form 1099-MISC incorrect?** If this form is incorrect or has been issued in error, contact the payer. If you cannot get this form corrected, attach an explanation to your tax return and report your income correctly.

**Box 1.** Report rents from real estate on Schedule E (Form 1040). However, report rents on Schedule C (Form 1040) if you provided significant services to the tenant, sold real estate as a business, or rented personal property as a business. See Pub. 527.

**Box 2.** Report royalties from oil, gas, or mineral properties, copyrights, and patents on Schedule E (Form 1040). However, report payments for a working interest as explained in the box 7 instructions. For royalties on timber, coal, and iron ore, see Pub. 544.

**Box 3.** Generally, report this amount on the "Other income" line of Form 1040 (or Form 1040NR) and identify the payment. The amount shown may be payments received as the beneficiary of a deceased employee, prizes, awards, taxable damages, Indian gaming profits, or other taxable income. See Pub. 525. If it is trade or business income, report this amount on Schedule C or F (Form 1040).

**Box 4.** Shows backup withholding or withholding on Indian gaming profits. Generally, a payer must backup withhold if you did not furnish your taxpayer identification number. See Form W-9 and Pub. 505 for more information. Report this amount on your income tax return as tax withheld.

**Box 5.** An amount in this box means the fishing boat operator considers you self-employed. Report this amount on Schedule C (Form 1040). See Pub. 334.

**Box 6.** For individuals, report on Schedule C (Form 1040).

**Box 7.** Shows nonemployee compensation. If you are in the trade or business of catching fish, box 7 may show cash you received for the sale of fish. If the amount in this box is SE income, report it on Schedule C or F (Form 1040), and complete Schedule SE (Form 1040). You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare tax. If you believe you are an employee and cannot get the payer to correct this form, report the amount from box 7 on Form 1040, line 7 (or Form 1040NR, line 8). You must also complete Form 8919 and attach it to your return. If you are not an employee but the amount in this box is not SE income (for example, it is income from a sporadic activity or a hobby), report it on Form 1040, line 21 (or Form 1040NR, line 21).

**Box 8.** Shows substitute payments in lieu of dividends or tax-exempt interest received by your broker on your behalf as a result of a loan of your securities. Report on the "Other income" line of Form 1040 (or Form 1040NR).

**Box 9.** If checked, $5,000 or more of sales of consumer products was paid to you on a buy-sell, deposit-commission, or other basis. A dollar amount does not have to be shown. Generally, report any income from your sale of these products on Schedule C (Form 1040).

**Box 10.** Report this amount on Schedule F (Form 1040).

**Box 13.** Shows your total compensation of excess golden parachute payments subject to a 20% excise tax. See the Form 1040 (or Form 1040NR) instructions for where to report.

**Box 14.** Shows gross proceeds paid to an attorney in connection with legal services. Report only the taxable part as income on your return.

**Box 15a.** May show current year deferrals as a nonemployee under a nonqualified deferred compensation (NQDC) plan that is subject to the requirements of section 409A, plus any earnings on current and prior year deferrals.

**Box 15b.** Shows income as a nonemployee under an NQDC plan that does not meet the requirements of section 409A. This amount is also included in box 7 as nonemployee compensation. Any amount included in box 15a that is currently taxable is also included in this box. This income is also subject to a substantial additional tax to be reported on Form 1040 (or Form 1040NR). See "Total Tax" in the Form 1040 (or Form 1040NR) instructions.

**Boxes 16-18.** Shows state or local income tax withheld from the payments.

Future developments. For the latest information about developments related to Form 1099-MISC and its instructions, such as legislation enacted after they were published, go to www.irs.gov/Form1099MISC.

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | 1 Rents | 2 Royalties | OMB No. 1545-0115 |
|---|---|---|---|---|
| MUNICIPAL CREDIT UNION<br>22 CORTLANDT STREET<br>NEW YORK, NY 10007<br><br>(212) 238-3330 | | $ | $ | **2018** |
| | | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Form 1099-MISC |
| | | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | Miscellaneous Income |
| PAYER'S TIN<br>13-5261470 | RECIPIENT'S TIN<br>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 | 7 Nonemployee compensation<br>$ 3091.29 | 8 Substitute payments in lieu of dividends or interest<br>$ | Copy 2 |
| RECIPIENT'S name<br><br>MARK BRANTLEY<br>4880 S. ROBINS WAY<br>CHANDLER, AZ 85249 | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ☐ | 10 Crop insurance proceeds<br>$ | To be filed with recipient's state income tax return, when required. |
| | | 11 | 12 | |
| | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| | | 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | |
| Account number (see instructions) | FATCA filing requirement ☐ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC        www.irs.gov/Form1099MISC        Department of the Treasury - Internal Revenue Service

C-1a

EPSTEIN
BECKER
GREEN

Attorneys at Law

Melissa L. Jampol
t 212.351.4760
f 212.878.8600
MJampol@ebglaw.com

October 8, 2019

**VIA EMAIL AND FED EX**

Mark S. Brantley, Esq.
4880 S. Robins Way
Chandler, AZ 85249

Re:   Corrected 2017 Form 1099-MISC., Supporting Detail

Dear Mr. Brantley:

We are in receipt of your letter, dated September 24, 2019, in which you requested an itemized list of expenses and/or reimbursements determined to be additional nonemployee compensation in the 2017 tax year as related to your reissued 2017 Form 1099-MISC.

Attached to this letter, please find an Excel spreadsheet titled, "2017 Detail of Mark Brantley Reportable Expenses," which provides the detail supporting your reissued 2017 Form 1099-MISC. We expect that this spreadsheet is responsive to your request.

Should you have any additional questions related to this request please contact me at MJampol@ebglaw.com or 212-351-4760.

Very truly yours,

*Melissa L Jampol*

Melissa L. Jampol

cc: Jane Dobbs, EVP, MCU

C-2

*DRAFT FOR DISCUSSION PURPOSES ONLY*

**MCU**
**2017 Detail of Mark Brantley Reportable Expenses**

12,028.05

| Individual | Transaction Date | Vendor | Amount Reportable Box 1 W2 |
|---|---|---|---|
| | | | 1,200.40 |
| Mark Brantley | 5/2/2017 | Delta Airlines | 1,200.40 |
| Mark Brantley | 5/2/2017 | Delta Airlines | 678.79 |
| Mark Brantley | 11/16/2017 | Cox Communications, Chandler AZ | 592.94 |
| Mark Brantley | 9/19/2017 | Southwest Airlines | 455.00 |
| Mark Brantley | 11/16/2017 | Various | 329.26 |
| Mark Brantley | 9/1/2017 | Apple | 266.74 |
| Mark Brantley | 9/4/2017 | LexisNexis | 266.74 |
| Mark Brantley | 10/5/2017 | LexisNexis | 266.74 |
| Mark Brantley | 11/3/2017 | LexisNexis | 266.74 |
| Mark Brantley | 12/3/2017 | LexisNexis | 251.73 |
| Mark Brantley | 8/3/2017 | Best Buy Chandler Arizona | 211.61 |
| Mark Brantley | 10/10/2017 | FedEx | 211.61 |
| Mark Brantley | 10/10/2017 | FedEx | 175.60 |
| Mark Brantley | 12/12/2017 | Phoenix Links | 174.41 |
| Mark Brantley | 9/1/2017 | Various | 140.37 |
| Mark Brantley | 10/10/2017 | FedEx | 129.00 |
| Mark Brantley | 8/25/2017 | SourceMedia LLC | 124.89 |
| Mark Brantley | 3/27/2017 | FedEx | 115.15 |
| Mark Brantley | 8/11/2017 | FedEx | 70.00 |
| Mark Brantley | 4/30/2017 | Various | 97.10 |
| Mark Brantley | 3/1/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 93.78 |
| Mark Brantley | 10/10/2017 | FedEx | 90.56 |
| Mark Brantley | 6/12/2017 | FedEx | 89.87 |
| Mark Brantley | 9/11/2017 | Award Company of America | 89.85 |
| Mark Brantley | 9/6/2017 | WM Supercenter Chandler, AZ | 88.58 |
| Mark Brantley | 2/24/2017 | FedEx | 87.03 |
| Mark Brantley | 1/13/2017 | Cox Communications, Chandler AZ | 84.98 |
| Mark Brantley | 1/8/2017 | Cox Communications, Chandler AZ | 84.98 |
| Mark Brantley | 2/8/2017 | Cox Communications, Chandler AZ | 84.98 |
| Mark Brantley | 3/8/2017 | Cox Communications, Chandler AZ | 84.98 |
| Mark Brantley | 4/7/2017 | Office Max/Office Depot AZ | 77.53 |
| Mark Brantley | 8/13/2017 | FedEx | 76.64 |
| Mark Brantley | 5/19/2017 | Verizon wireless Chandler, AZ | 75.44 |
| Mark Brantley | 11/25/2017 | FedEx | 72.20 |
| Mark Brantley | 9/11/2017 | Various | 35.00 |
| Mark Brantley | 1/30/2017 | Various | 35.00 |
| Mark Brantley | 2/28/2017 | Apple Store Chandler, AZ | 69.00 |
| Mark Brantley | 8/10/2017 | FedEx | 65.44 |
| Mark Brantley | 11/9/2017 | LinkedIn | 65.31 |
| Mark Brantley | 1/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 2/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 3/20/2017 | LinkedIn | 65.31 |
| Mark Brantley | 4/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 5/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 6/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 7/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 8/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 9/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 10/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 11/22/2017 | LinkedIn | 65.31 |
| Mark Brantley | 12/22/2017 | LinkedIn | 60.52 |
| Mark Brantley | 10/19/2017 | FedEx | 60.35 |
| Mark Brantley | 6/10/2017 | Office Max/Office Depot AZ | 60.00 |
| Mark Brantley | 9/19/2017 | Southwest Airlines | 59.94 |
| Mark Brantley | 8/30/2017 | FedEx | |

C-3

| | | | |
|---|---|---|---|
| Mark Brantley | 11/17/2017 | FedEx | 58.51 |
| Mark Brantley | 1/19/2017 | Best Buy Chandler Arizona | 53.88 |
| Mark Brantley | 6/15/2017 | iTunes | 53.35 |
| Mark Brantley | 12/13/2017 | Duane Reade New York | 52.90 |
| Mark Brantley | 12/15/2017 | Cash - No Vendor | 50.00 |
| Mark Brantley | 10/8/2017 | WM Supercenter Chandler, AZ | 45.88 |
| Mark Brantley | 5/8/2017 | Staples Tempe, Arizona | 44.08 |
| Mark Brantley | 3/13/2017 | FedEx | 36.93 |
| Mark Brantley | 8/4/2017 | Consumer Credit Reports | 35.00 |
| Mark Brantley | 1/20/2017 | National Association of Corporate Directors Arizona Ch | 35.00 |
| Mark Brantley | 10/31/2017 | FedEx | 30.74 |
| Mark Brantley | 9/19/2017 | Southwest Airlines | 30.00 |
| Mark Brantley | 5/10/2017 | GogoAir | 29.95 |
| Mark Brantley | 11/16/2017 | FedEx | 29.28 |
| Mark Brantley | 9/21/2017 | FedEx | 27.92 |
| Mark Brantley | 12/18/2017 | FedEx | 27.59 |
| Mark Brantley | 7/15/2017 | iTunes | 27.21 |
| Mark Brantley | 10/14/2017 | Walgreens Las Vegas, NV | 26.84 |
| Mark Brantley | 10/3/2017 | FedEx | 24.84 |
| Mark Brantley | 7/25/2017 | Verizon wireless Chandler, AZ | 24.24 |
| Mark Brantley | 6/25/2017 | GogoAir | 20.00 |
| Mark Brantley | 3/4/2017 | USPS Chandler, AZ | 18.85 |
| Mark Brantley | 6/19/2017 | Duane Reade New York | 16.48 |
| Mark Brantley | 1/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 2/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 3/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 4/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 5/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 6/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 7/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 8/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 9/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 10/3/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 11/2/2017 | Adobe Pro Subscription | 16.32 |
| Mark Brantley | 12/2/2017 | Adobe Pro Subscription | 15.79 |
| Mark Brantley | 11/20/2017 | Arizona Republic magazine | 15.50 |
| Mark Brantley | 6/23/2017 | 302 Collections Atlantic City | 15.40 |
| Mark Brantley | 4/2/2017 | Office Max/Office Depot AZ | 15.39 |
| Mark Brantley | 1/10/2017 | Duane Reade New York | 15.00 |
| Mark Brantley | 1/23/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 2/20/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 3/20/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 4/17/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 5/15/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 6/12/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 7/10/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 8/7/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 9/4/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 10/2/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 10/31/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 11/28/2017 | NY Times Digital | 15.00 |
| Mark Brantley | 12/26/2017 | NY Times Digital | 13.99 |
| Mark Brantley | 9/22/2017 | Walmart.com | 13.36 |
| Mark Brantley | 6/25/2017 | Gift Shop Belmar, NJ | 12.75 |
| Mark Brantley | 7/1/2017 | USPS Chandler, AZ | 9.61 |
| Mark Brantley | 6/24/2017 | 306 Essentials Atlantic City | 9.38 |
| Mark Brantley | 10/16/2017 | Walgreens Las Vegas, NV | 9.32 |
| Mark Brantley | 10/20/2017 | Arizona Republic magazine | 8.55 |
| Mark Brantley | 8/31/2017 | Arizona Republic magazine | 8.50 |
| Mark Brantley | 1/11/2017 | GogoAir | 8.24 |
| Mark Brantley | 12/20/2017 | Arizona Republic magazine | 5.00 |
| Mark Brantley | 12/14/2017 | Duane Reade New York | 4.35 |
| Mark Brantley | 11/2/2017 | Chase | 2.17 |
| Mark Brantley | 1/14/2017 | iTunes | 1.98 |
| Mark Brantley | 12/1/2017 | Interest Charge on Cash Advances | 1.38 |
| Mark Brantley | 8/2/2017 | Interest Charged on Purchases | 0.99 |
| Mark Brantley | 1/9/2017 | iTunes | 0.99 |
| Mark Brantley | 2/9/2017 | iTunes | 0.99 |
| Mark Brantley | 4/10/2017 | iTunes | 0.99 |
| Mark Brantley | 5/9/2017 | iTunes | 0.99 |
| Mark Brantley | 6/9/2017 | iTunes | 0.99 |
| Mark Brantley | 7/9/2017 | iTunes | 0.99 |
| Mark Brantley | 8/9/2017 | iTunes | 0.99 |
| Mark Brantley | 9/9/2017 | iTunes | 0.99 |
| Mark Brantley | 10/9/2017 | iTunes | 0.99 |
| Mark Brantley | 11/9/2017 | iTunes | |

C-4

| Mark Brantley | 12/9/2017 | iTunes | 0.99 |
|---|---|---|---|
| Mark Brantley | 8/3/2017 | Apple iTunes.com | (27.21) |
| Mark Brantley | 11/16/2017 | Office Depot | (77.53) |

C-5

11/7/2019                              Gmail - Request to Correct 2017 Mark Brantley 1099-MISC

 Gmail                                    M B <brantleyesq@gmail.com>

## Request to Correct 2017 Mark Brantley 1099-MISC

**M B** <brantleyesq@gmail.com>                              Fri, Oct 11, 2019 at 12:04 PM
To: MJampol@ebglaw.com

Hi Melissa:

Please find attached a cover letter and Excel spreadsheet requesting the correction of my Form 1099s.  Please acknowledge receipt of this email and the attached documents.  Thank you..

Best regards,
Mark S. Brantley

**2 attachments**

 **MCU Letter to Correct 1099.pdf**
106K

**2017 Mark Brantley 1099 Exempt Business Justifications.xlsx**
16K

C-6

**MARK S. BRANTLEY**
**4880 S Robins Way**
**Chandler, AZ 85249**

October 11, 2019

Municipal Credit Union
22 Cortlandt Street
New York, NY 10007
Attn: Melissa L. Jampol

Dear Ms. Jampol:

In a follow up to my letter dated September 24 and in response to your letter dated October 8, 2019, please find attached an Excel spreadsheet that contains the "2017 Detail of Mark Brantley Reportable Expenses" and the justifications that support this formal request for a corrected 2017 Form 1099-MISC ("1099"). The corrected 1099 previously received by certified mail and issued by MCU on September 25, 2019 erroneously reported compensation of $12,028.05. Additionally, MCU incorrectly reported compensation for me in years preceding 2017 and corrections are needed for those 1099s as well.

Please know that for the 2017 tax year and prior that I received no compensation from the Municipal Credit Union and that the expenses listed on the above referenced spreadsheet should not be reported under my social security number as compensation for the following reasons:

1) NY Banking Law 456(1) provides in relevant part that "....directors and committee members may be reimbursed for reasonable and proper costs incurred while carrying out the responsibilities of their positions. Such reimbursement shall be determined by the board of directors to be appropriate in carrying out the official business of the credit union and shall be in accordance with written policies and procedures, including documentation requirements, established by the board of directors."

2) 12 CFR 703.33(b)(1) provides also in relevant part, "the term compensation specifically excludes: (i) Payment (by reimbursement to an official or direct credit union payment to a third party) for reasonable and proper costs incurred by an official in carrying out the responsibilities of the position to which that person has been elected or appointed, if the payment is determined by the board of directors to be necessary or appropriate in order to carry out the official business of the credit union, and is in accordance with written policies and procedures, including documentation requirements, established by the board of directors. Such payments may include the payment of travel costs for officials and one guest per official."

3) The original 1099 and the corrected 1099 previously sent by MCU included duly authorized and board approved expenses deemed appropriate to carry out the official

C-7

business of MCU, presented with receipts as documentation and were in accordance with written policies and procedures (i.e., the MCU Board Policy).  Also note: Some of the expenses listed were not incurred at all by me (e.g, Fed Ex charges).

4) Payment of guest travel permitted by 12 CFR 703.33 and NCUA Letter No. 05-FCU-02 excluded it as compensation though it "may be taxable income to the recipient." In this context, the recipient is the guest, not the director and the 1099 should have issued to my guest.  Consequently, MCU erroneously reported these non-compensatory payments to me and not to my guest (i.e., my wife under her social security number) for 2017 and prior years.

Therefore, I respectfully request that my 1099s for 2017 and each prior year be corrected as I have not received compensation under the law and rules.  Please acknowledge receipt of this letter.  Thank you.

Sincerely,

Mark S. Brantley

C-8

## Non-Taxable Expense Justifications

**Exempt Justifications (Non-Compensation)**

| | | | | |
|---|---|---|---|---|
| Mark Brantley | 05/02/17 | Delta Airlines | $1,200.40 | Official business expense for Director Teambuilding Retreat |
| Mark Brantley | 05/02/17 | Delta Airlines | $1,200.40 | Official business expense for Director Teambuilding Retreat |
| Mark Brantley | 11/16/17 | Cox Communications, Chandler AZ | $678.79 | Obvious error, this amount was never submitted as an expense from Cox Comm. |
| Mark Brantley | 09/19/17 | Southwest Airlines | $592.94 | Official business expense for Director Strategic Planning Retreat |
| Mark Brantley | 11/16/17 | Various | $455.00 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 09/01/17 | Apple | $329.26 | Obvious error, never purchased an Apple device. |
| Mark Brantley | 09/04/17 | LexisNexis | $266.74 | As chairman of the Diversity Committee, there was a need to research various laws, regs., etc.related to the duties of the Committee |
| Mark Brantley | 10/05/17 | LexisNexis | $266.74 | As chairman of the Diversity Committee, there was a need to research various laws, regs., etc.related to the duties of the Committee |
| Mark Brantley | 11/03/17 | LexisNexis | $266.74 | As chairman of the Diversity Committee, there was a need to research various laws, regs., etc.related to the duties of the Committee |
| Mark Brantley | 12/03/17 | LexisNexis | $266.74 | As chairman of the Diversity Committee, there was a need to research various laws, regs., etc.related to the duties of the Committee |
| Mark Brantley | 08/03/17 | Best Buy Chandler Arizona | $251.73 | Expense is not recognizable |
| Mark Brantley | 10/10/17 | FedEx | $211.61 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $211.61 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 12/12/17 | Phoenix Links | $175.60 | Director Networking Expense |
| Mark Brantley | 09/01/17 | Various | $174.41 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 10/10/17 | FedEx | $140.37 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $129.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 08/25/17 | SourceMedia LLC | $124.89 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 03/27/17 | FedEx | $115.15 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 08/11/17 | FedEx | $70.00 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 04/30/17 | Various | $97.10 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 03/01/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/10/17 | FedEx | $93.78 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 06/12/17 | FedEx | $90.56 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 09/11/17 | FedEx | $89.87 | Expense was not incurred by me and not recognizable, likely an error |

C-9

| Name | Date | Vendor | Amount | Description |
|---|---|---|---|---|
| Mark Brantley | 09/06/17 | Award Company of America | $89.85 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 02/24/17 | WM Supercenter Chandler, AZ | $88.58 | Office Supplies to carry duties of director, board approved. |
| Mark Brantley | 01/13/17 | FedEx | $87.03 | Expense was not incurred by me and not recognizable, likely an error. |
| Mark Brantley | 01/08/17 | Cox Communications, Chandler AZ | $84.98 | Board authorized DSL expense for board related duties. |
| Mark Brantley | 02/08/17 | Cox Communications, Chandler AZ | $84.98 | Board authorized DSL expense for board related duties. |
| Mark Brantley | 03/08/17 | Cox Communications, Chandler AZ | $84.98 | Board authorized DSL expense for board related duties. |
| Mark Brantley | 04/07/17 | Cox Communications, Chandler AZ | $84.98 | Board authorized DSL expense for board related duties. |
| Mark Brantley | 08/13/17 | Office Max/Office Depot AZ | $77.53 | Board authorized DSL expense for board related duties. |
| Mark Brantley | 05/19/17 | FedEx | $76.64 | Expense is not recognizable, likely an error |
| Mark Brantley | 11/25/17 | Verizon wireless Chandler, AZ | $75.44 | MCU iPad/iPhone accessories for business purposes, board approved. |
| Mark Brantley | 09/11/17 | FedEx | $72.20 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 01/30/17 | Various | $35.00 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 02/28/17 | Various | $35.00 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 08/10/17 | Apple Store Chandler, AZ | $69.00 | MCU iPad/iPhone accessories for business purposes, board approved. |
| Mark Brantley | 11/09/17 | FedEx | $65.44 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 01/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 02/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 03/20/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 04/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 05/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 06/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 07/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 08/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 09/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 10/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 11/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 12/22/17 | LinkedIn | $65.31 | As former MCU chairman and serving on national boards, a standing subscription for networking purposes and public relations to MCU's benefit. |
| Mark Brantley | 10/19/17 | FedEx | $60.52 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 06/10/17 | Office Max/Office Depot AZ | $60.35 | Official business expense, approved by board. |
| Mark Brantley | 09/19/17 | Southwest Airlines | $60.00 | Official business expense for Director Strategic Planning Retreat |
| Mark Brantley | 08/30/17 | FedEx | $59.94 | Expense was not incurred by me and not recognizable, likely an error |

C-10

| | | | |
|---|---|---|---|
| Mark Brantley | 11/17/17 | FedEx | $58.51 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 01/19/17 | Best Buy Chandler Arizona | $53.88 | MCU iPad/iPhone accessories for business purposes, board approved. |
| Mark Brantley | 06/15/17 | iTunes | $53.35 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 12/13/17 | Duane Reade New York | $52.90 | Official Business expense while in NYC attending meetings. |
| Mark Brantley | 12/15/17 | Cash - No Vendor | $50.00 | Cash Advance for incidental while traveling from AZ to NYC for MCU meetings. |
| Mark Brantley | 10/08/17 | WM Supercenter Chandler, AZ | $45.88 | Official business expense, approved by board. |
| Mark Brantley | 05/08/17 | Staples Tempe, Arizona | $44.08 | Official business expense, approved by board. |
| Mark Brantley | 03/13/17 | FedEx | $36.93 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 08/04/17 | Consumer Credit Reports | $35.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 01/20/17 | National Association of Corporate Directors Arizona Chapter | $35.00 | Director Standing Membership for director education, board approved. |
| Mark Brantley | 10/31/17 | FedEx | $30.74 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 09/19/17 | Southwest Airlines | $30.00 | Official business expense for Director Strategic Planning Retreat |
| Mark Brantley | 05/10/17 | GogoAir | $29.95 | Business expense for wifi service during travel on MCU business, board approved. |
| Mark Brantley | 11/16/17 | FedEx | $29.28 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 09/21/17 | FedEx | $27.92 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 12/18/17 | FedEx | $27.59 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 07/15/17 | iTunes | $27.21 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 10/14/17 | Walgreens Las Vegas, NV | $26.84 | Official business expense for Director Strategic Planning Retreat |
| Mark Brantley | 10/03/17 | FedEx | $24.84 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 07/25/17 | Verizon wireless Chandler, AZ | $24.24 | Likely phone accessory for MCU business phone, board approved expense. |
| Mark Brantley | 06/25/17 | GogoAir | $20.00 | Business expense for wifi service during travel on MCU business, board approved. |
| Mark Brantley | 03/04/17 | USPS Chandler, AZ | $18.85 | Official business expense, approved by board. |
| Mark Brantley | 06/19/17 | Duane Reade New York | $16.48 | Various is too vague, however expenses were board approved. |
| Mark Brantley | 01/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 02/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 03/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 04/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 05/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 06/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 07/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 08/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 09/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 10/03/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 11/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 12/02/17 | Adobe Pro Subscription | $16.32 | Editable PDF capability needed for director duties and board approved. |
| Mark Brantley | 11/20/17 | Arizona Republic magazine | $15.79 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 06/23/17 | 302 Collections Atlantic City | $15.50 | Official business expense for Director Teambuilding Retreat |
| Mark Brantley | 04/02/17 | Office Max/Office Depot AZ | $15.40 | Official business expense, approved by board. |
| Mark Brantley | 01/10/17 | Duane Reade New York | $15.39 | Official business expense, approved by board. |
| Mark Brantley | 01/23/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 02/20/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 03/20/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |

C-11

| | | | Amount | Description |
|---|---|---|---|---|
| Mark Brantley | 04/17/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 05/15/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 06/12/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 07/10/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 08/07/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 09/04/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 10/02/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 10/31/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 11/28/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 12/26/17 | NY Times Digital | $15.00 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 09/22/17 | Walmart.com | $13.99 | Official business expense, approved by board. |
| Mark Brantley | 06/25/17 | Gift Shop Belmar, NJ | $13.36 | Official business expense for Director Teambuilding Retreat |
| Mark Brantley | 07/01/17 | USPS Chandler, AZ | $12.75 | Official business expense, approved by board. |
| Mark Brantley | 06/24/17 | 306 Essentials Atlantic City | $9.61 | Official business expense for Director Teambuilding Retreat |
| Mark Brantley | 10/16/17 | Walgreens Las Vegas, NV | $9.36 | Official business expense for Director Strategic Planning Retreat |
| Mark Brantley | 10/20/17 | Arizona Republic magazine | $9.32 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 08/31/17 | Arizona Republic magazine | $8.55 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 01/11/17 | GogoAir | $8.50 | Business expense for wifi service during travel on MCU business, board approved. |
| Mark Brantley | 12/20/17 | Arizona Republic magazine | $8.24 | Periodical used for director duties, board approved expense. |
| Mark Brantley | 12/14/17 | Duane Reade New York | $5.00 | Official Business expense while in NYC attending meetings. |
| Mark Brantley | 11/02/17 | Chase | $4.35 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 01/14/17 | iTunes | $2.17 | Expense was not incurred by me and not recognizable, likely an error |
| Mark Brantley | 12/01/17 | Interest Charge on Cash Advances | $1.98 | Business related cash advance for business related travel incidentals |
| Mark Brantley | 08/02/17 | Interest Charged on Purchases | $1.38 | Business related charge for business related travel incidentals |
| Mark Brantley | 01/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 02/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 04/10/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 05/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 06/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 07/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 08/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 09/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 10/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 11/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 12/09/17 | iTunes | $0.99 | MCU business devices (iPad, iPhone) additional cloud storage for director duties and purposes. |
| Mark Brantley | 08/03/17 | Apple iTunes.com | -$27.21 | Credit to corporate card for unknown purchase above |
| Mark Brantley | 11/16/17 | Office Depot | -$77.53 | Credit to corporate card for business related purpose. |

C-12

Gmail

M B <brantleyesq@gmail.com>

# Request to Correct 2017 Mark Brantley 1099-MISC

**Melissa L. Jampol** <MJampol@ebglaw.com> Mon, Oct 21, 2019 at 12:25 PM
To: M B <brantleyesq@gmail.com>

Mr. Brantley:

I did receive your email, cover letter and Excel spreadsheet.

As I previously noted, MCU's tax accountants re-reviewed your 1099-MISC from that originally issued.

As such, at this point, MCU will be taking no further action.

Best,

Melissa

EPSTEIN
BECKER
GREEN

**Melissa L. Jampol | Bio**
t 212.351.4760 | f 212.878.8600
MJampol@ebglaw.com

250 Park Avenue | New York, NY 10177
t 212.351.4500 | www.ebglaw.com

*Think Green. Please consider the environment before you print this message. Thank you.*

[Quoted text hidden]

CONFIDENTIALITY NOTE: This communication is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this communication or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this communication in error, please call the Help Desk of Epstein Becker & Green, P.C. at (212) 351-4701 and destroy the original message and all copies. Pursuant to the CAN-SPAM Act this communication may be considered an advertisement or solicitation. If you would prefer not to receive future marketing and promotional mailings, please submit your request via email to ebgus@ebglaw.com or via postal mail to Epstein Becker & Green, P.C. Attn: Marketing Department, 250 Park Avenue, New York, NY 10177. Be sure to include your email address if submitting your request via postal mail.

C-13

11/7/2019                              Gmail - Request to Correct 2017 Mark Brantley 1099-MISC

 Gmail                                              M B <brantleyesq@gmail.com>

## Request to Correct 2017 Mark Brantley 1099-MISC

**M B** <brantleyesq@gmail.com>                                    Mon, Oct 21, 2019 at 4:19 PM
To: "Melissa L. Jampol" <MJampol@ebglaw.com>

Hi Melissa:

That's unfortunate their taking that position.  Can you tell me if they already filed the 1099-Misc with the IRS?  Thank you.

Sincerely,
Mark

On Monday, October 21, 2019, Melissa L. Jampol <MJampol@ebglaw.com> wrote:

Mr. Brantley:

I did receive your email, cover letter and Excel spreadsheet.

As I previously noted, MCU's tax accountants re-reviewed your 1099-MISC from that originally issued.

As such, at this point, MCU will be taking no further action.

Best,

Melissa

**Melissa L. Jampol | Bio**
t 212.351.4760  | f 212.878.8600
MJampol@ebglaw.com

250 Park Avenue | New York, NY 10177
t 212.351.4500 | www.ebglaw.com

*Think Green. Please consider the environment before you print this message. Thank you.*

**From:** M B <brantleyesq@gmail.com>
**Sent:** Friday, October 18, 2019 1:49 PM
**To:** Melissa L. Jampol <MJampol@ebglaw.com>
**Subject:** [EXT] Re: Request to Correct 2017 Mark Brantley 1099-MISC

Hi Ms. Jampol:

As I did not receive an acknowledgment that you received my email and attachments dated Oct. 11, 2019, I have
mailed the same to MCU to your attention with proof of delivery on Oct. 18, 2019 below.  Thank you.



11/7/2019

Gmail - Request to Correct 2017 Mark Brantley 1099-MISC

 Gmail

M B <brantleyesq@gmail.com>

## Request to Correct 2017 Mark Brantley 1099-MISC

**Melissa L. Jampol** <MJampol@ebglaw.com>
To: M B <brantleyesq@gmail.com>

Fri, Oct 25, 2019 at 4:51 AM

Mr, Brantley,
Yes, the corrected 1099 MISC was filed with the IRS.
Best,

Melissa L. Jampol
Epstein Becker Green
250 Park Ave.
New York, NY 10177

EPSTEIN
BECKER
GREEN

**Melissa L. Jampol | Bio**
t 212.351.4760  | f 212.878.8600
MJampol@ebglaw.com

250 Park Avenue | New York, NY 10177
t 212.351.4500 | www.ebglaw.com

*Think Green. Please consider the environment before you print this message. Thank you.*

[Quoted text hidden]
[Quoted text hidden]



# NCUA LETTER TO FEDERAL CREDIT UNIONS

## NATIONAL CREDIT UNION ADMINISTRATION
## 1775 Duke Street, Alexandria, VA 22314

**DATE:** **July 2005**                    **LETTER NO.: 05-FCU-02**

**TO:** **Federal Credit Unions**

**SUBJ:** **Tax Consequences of Payment of Travel Expenses for FCU Volunteer Officials and Their Guests**

Dear Board of Directors:

The National Credit Union Administration (NCUA) is issuing guidance on the possible tax implications of reimbursements of travel expenses to federal credit union volunteer officials and their guests. NCUA's rule on reimbursement permits federal credit unions to reimburse volunteer officials and one guest per official for reasonable and proper costs incurred in carrying out official responsibilities. 12 C.F.R. §701.33(b)(2)(i). The reimbursement rule also requires that payments must be determined to be necessary or appropriate in carrying out official business and are in accordance with written policies and procedures, including documentation requirements.

While the Federal Credit Union Act authorizes compensation for only one board officer for service as an officer of the board of directors, the other directors and volunteer officials of a federal credit union can be reimbursed for reasonable costs incurred in carrying out their positions. 12 U.S.C. §1761a. NCUA does not view payment of reasonable travel costs for a federal credit union official and one guest as compensation to the official or the guest. The reimbursement rule specifically excludes these payments from the definition of "compensation." 12 C.F.R. §701.33(b)(2). To comply with the reimbursement rule, a federal credit union board of directors must adopt a policy to pay the "reasonable and proper costs" incurred by an official in carrying out the responsibilities of the official's position. 12 C.F.R. §701.33(b)(2)(i). These costs may include travel expenses of an official and one guest to attend credit union related conferences and meetings.

While NCUA's rule does not address tax matters, federal credit unions must comply with any applicable Internal Revenue Service (IRS) reporting requirements. Whether the FCU must issue a Form 1099 or other tax form for the travel payments, and the resulting tax consequences a federal credit union

C-16

official or the guest of an official may incur, are matters the IRS regulates. 26 U.S.C. §274; 26 C.F.R. §1.162-2; IRS Publication 463.

Travel payments, while permissible under NCUA's reimbursement rule, nevertheless may be taxable income to the recipient.  The IRS definition of taxable income differs from NCUA's definition of compensation.  26 U.S.C. §63. Before the 1992 amendment to §701.33, which permitted payment of travel expenses for "one immediate family member," NCUA considered travel payments for an official's guest to be compensation under the Federal Credit Union Act.  57 F.R. 54499 (1992).  This policy was based in part on an IRS interpretation that the payment of travel expenses for a guest of an employee is only deductible as a business expense under certain circumstances.  57 F.R. 18837 (1992).  In determining to amend the reimbursement rule, NCUA found its policy unduly restrictive, stating that as long as a federal credit union adopts a written policy requiring travel reimbursements to be reasonable and proper, NCUA would not consider the reimbursement of guest travel expenses to be prohibited compensation under its rule.  Id.  The most recent amendment to the rule's language substituted "a guest" for "one immediate family member" in §701.33(b)(2)(i).  66 F.R 65628 (2001).  NCUA policy to exclude guest travel reimbursements from the definition of compensation under §701.33, however, does not affect IRS requirements.  Therefore, a federal credit union adopting a reimbursement policy under §701.33, as well as an official or an official's guest who benefits from the policy, should consult tax professionals for advice to ensure their practices comply with IRS requirements.

Sincerely,

//s//
JoAnn M. Johnson
Chairman

C-17

 An official website of the United States government


National Credit
Union Administration

NCUA.gov / Regulation and Supervision / Legal Opinions

11-0152 / March 2011

# Training Reimbursement to Credit Union Officials

Credit Union Executives Society

P.O.Box 14167, Madison, WI 53708-0167

Governance

Dear Mr. Johnson:

This responds to your recent letter requesting clarification of NCUA's position on the authority of federal credit unions (FCUs) to reimburse training expenses for "associate directors" or similar FCU officials who occupy volunteer positions established by the board of directors. In short, we agree that for individuals such as these who provide board designated services and who act in more than an honorary capacity, the restrictions in the FCU Act against compensation of board and committee members do not bar reimbursement or payment of appropriate training expenses and related travel expenses. An explanation follows.

The FCU Act provides that "no member of the board or of any other committee shall, as such, be compensated, except that reasonable health, accident, similar insurance protection, and the reimbursement of reasonable expenses incurred in the execution of the duties of the position shall not be considered compensation." 12 U.S.C. 1761(c). The Act also provides that, in addition to the supervisory committee and credit committee, an FCU's board of directors may "appoint ...any other committees to which it can delegate specific functions." 12 U.S.C. 1761b(13). Some FCUs use this authority to establish other committees, such as a committee of directors emeritus or a committee of individuals being groomed for possible future board seats (the latter are often referred to as "associate" board members.)

In previous opinions of this office, we have stated that volunteer members of non-voting, advisory committees, such as emeritus or associate directors, are not eligible to receive expense reimbursement or insurance benefits. See for example OGC Op. 10-0913 (October 29, 2010). Upon reconsideration, we are of the opinion that if the individuals in question provide services that are established by the board and that go beyond merely serving in an honorary capacity, the normal exceptions to the statutory bar on compensation should apply. This would include reimbursement for training and training-related expenses that are appropriate to the service being provided.

 1/2

As you noted, this interpretation is consistent with NCUA's regulations on reimbursement, which provide that an official includes any member of any volunteer committee established by the board and expressly authorize "payment (by reimbursement to an official or direct credit union payment to a third party) for reasonable and proper costs incurred by an official in carrying out the responsibilities of the position to which that person has been elected or appointed, if the payment
is determined by the board of directors to be necessary or appropriate to carry out the official business of the credit union, and is in accordance with the written policies and procedures, including documentation requirements, established by the board of directors." 12 C.F.R. 701.33 (a) and (b)(2)(i).

So long as the conditions addressed above are met, we agree that reimbursement of volunteer officials, such as associate board members, who provide board established services to an FCU and act in more than an honorary capacity is permissible pursuant to the same exceptions to the statutory ban on compensation applicable to other board and committee members.

Thank you for raising this issue, and please let me know if you have any questions.

Sincerely,
/S/
Hattie M. Ulan
Associate General Counsel

GC/RMF:bhs

C-19   2/2



# POLICY MANUAL

C-20



2.4

**Policy Manual**

Information regarding specific conferences will be included with the monthly Board packets prepared by the Executive Assistant to the Board.

The senior management officials of Municipal Credit Union will identify the professional associations and organizations recognized as educational resources for the Board of Directors and Supervisory Committee members

All new Directors and Supervisory Committee members will go through an orientation period. Within the first six (6) months of his/her election or appointment, each Director or Supervisory Committee member is expected to attend an outside training session or conference that will include fiscal report training.

Each Director and Supervisory Committee member is expected to attend at least one (1) conference and/or training session each year.

Any Director and Supervisory Committee member may attend additional conferences held outside New York State within the same calendar year expensed within their annual conference budget.  Attendance at Legislative and New York State conferences are encouraged since good working relations with the credit unions within the state are beneficial and are not charged against the members' allocation. Anyone exceeding the limits of his/her annual conference budget will bear all costs above the limit.

**The Directors and Supervisory Committee members are encouraged to bring meaningful materials or ideas back to the Credit Union from the conference/training attended.**

All Directors are encouraged to attend the New York State Credit Union League Conference and Convention.  Attendance at this meeting is important to MCU in its relations with other New York State credit unions and its voting participation as a member of the League.   Sufficient Directors should attend to satisfy delegate and alternate delegate requirements.

## 2.09   BOARD EXPENSE REIMBURSEMENT POLICY

The Expense Reimbursement Policy has been designed to allow the Credit Union to monitor, control, and reimburse expenses that have been incurred by members of the Board of Directors and Supervisory Committee members while operating on behalf of the Credit Union.   All reimbursable expense incurred by the Board or Supervisory Committee members must be reasonable and necessary in nature.

**2.09-1**

    A.    For attendance at conferences and training sessions, the Credit Union shall pay or reimburse members of the Board of Directors and Supervisory Committee members for registration fees, hotel room or lodging, meals, necessary expenses for transportation, standard tipping, business meeting expenses, telephone

C-21



**Policy Manual**

2.5

expenses, business supplies, and out-of-pocket expenses excluding the purchase of beauty supply, clothes, souvenirs, sporting equipment, gifts, etc.

B.   The expenses for the annual NYS Credit Union League, Strategic Planning and Legislature Conferences, and registration fees for other conferences are excluded from the individual Director's annual conference allotment.

C.   Personal entertainment expenses are limited to $500 for the entire conference.

D.   Networking expense is considered as a business expense and shall not be charged against entertainment allocations.

E.   "An immediate family member" shall be defined as the spouse, brother, sister, child or grandchild, or a significant other of the Director or Supervisory Committee member.

F.   "Significant other" is defined as an individual or family member who is adversely affected by the absence of a Director or Supervisory Committee member from the household.

G.   Friends, business associates and any other individuals not identified within the definition of family members are prohibited from accompanying Directors and Supervisory Committee members at credit union expense.

**2.09-2**

A.   An immediate family member accompanying the Director and Supervisory Committee member is covered for all of the reimbursements listed in section 2.09-1 which will be charged against the individual Director's or Supervisory Committee member's budget allocation. All expenses (or estimated expenses) incurred by a family member shall be reported on a separate section of the expense report by the directors and Supervisory Committee members whereby by the possible income tax liability can be clearly reflected. It should be noted that the exempt conference expenses listed in section 2.09-1B are also applied to expenses incurred by immediate family member(s) accompanying the Director(s) and Supervisory Committee members. However, the expenses may be subject to income tax reporting.

B.   Expenses incurred by the immediate family member which has no apparent business reasons for the attendance may be subject to income tax and reporting requirements, except in the case of Directors requiring assistance from the spouse or traveling companion due to his/her disability/medical condition.

C-22



2.6

**Policy Manual**

2.09-3 Car rentals must be justifiable and then coordinated through the Executive Assistant to the Board for approval by the Chair, President/Chief Executive Officer, or Treasurer prior to the conference or seminar. Obtaining prior approval will assist in cost control and ensure maximum utilization.

**2.09-4**

A.   Expense reimbursement form consistent with Board policy must be completed and filed with the Treasurer or Chief Financial Officer within the sixty (60) days subsequent to a conference or seminar.

B.   Documentary evidence must be attached to support expenditure.

C.   Expenditures over $50.00 will not be reimbursed without documentary evidence.

D.   Gratuities are exempt from the documentary evidence requirement.

**2.09-5** The hierarchy of approval for conference expense reimbursement is as follows:

| Expenses incurred by: | Authorization from: |
|---|---|
| Director | Chairman of the Board or Treasurer |
| Chairman of the Board | Treasurer or 1st Vice Chair |
| Supervisory Committee Chair | Chairman of the Board or Treasurer |
| Supervisory Committee Members | Supervisory Committee Chair |
| Treasurer | Chairman of the Board or 1st Vice Chair |
| CEO | Chairman of the Board or Treasurer |

**2.09-6**

A.   Corporate credit cards shall be limited to credit union business purposes only. No expenditure shall exceed the individual budget allocation. The corporate credit cards have a maximum line of credit of $10,000.

B.   Cash advances obtained with the corporate credit card are limited to $600 for each conference/seminar attended. The cash advance must be included in the expense report.

C.   Directors and Supervisory Committee members are responsible to review and verify the charges reflected on their corporate credit card statements. Questionable charges should be reported to the CFO immediately. Payments will not be made by the Accounting Department without the signature of the cardholder.

C-23



**Policy Manual**

2.09-7 Air travel class can be upgraded from the coach level to business class if flight is five (5) hours or longer. Various levels of lodging shall be determined by the event the Director is participating in. It should be noted that the increased travel costs due to flying business class will be charged against the Director's allocation. In all other situations, Directors should seek out reasonable levels of travel and lodging.

    a). The individual Director's conference costs (all inclusive) cannot exceed $20,000 per annum.

    b). Due to the increasing needs for the Chair of the Board to attend conferences, lobby credit union issues, and represent the Board to attend Director's discussion forums, the annual conference/seminar allotment for the Chair is $25,000.

2.09-8 Out of Pocket expenses for attending board and committee meetings (Board of Directors and supervisory committee members) are reimbursable. The limits and types of expenses are set forth as below: Meal allowance shall not exceed $35.

    Transportation including vehicle parking costs, estimated mileage, and tolls.

    Other out-of-pocket expenses up to $35, such as childcare expenses incurred due to attendance of meeting

2.09-9 The Administrative Assistant is responsible for:

A. Maintaining a list of all outstanding expense reports within the time frame set forth in this policy.

B. The submission of a quarterly status report of outstanding expense reports, and

C. Updating the policy.

2.09-10 Regarding all of the above, good judgment should be exercised on all matters involving the expense reimbursement policy.

A. Extenuating circumstances or exceptions to the policy may arise. Consultation and approval in advance are required. The Chairman of the Board shall have the authority to approve exceptions and extraordinary expenses on a case-by-case basis.

B. The CEO, designated by the Board, shall have the authority to waive immaterial overages in expenses incurred by the Board and Supervisory Committee members on a needed basis.

C-24

# EXHIBIT D

December 3, 2003

D. Kevin Jones, President/CEO
MidFlorida Federal Credit Union
P.O. Box 8008
Lakeland, Florida 33802-8008

Re: Federal Credit Union (FCU) Officials' Use of Business Equipment.

Dear Mr. Jones:

You have asked if an FCU's volunteer officials may use FCU-owned computers and cellular phones or receive reimbursement for personal equipment or Internet access when used to perform their official duties. Yes, officials may use FCU equipment or receive reimbursement from the FCU when using personal equipment if they are carrying out the responsibilities of their position and the reimbursed costs are reasonable and proper for performing their duties.

In the past few years, your FCU has relied on the Internet and cellular phones to communicate with and to transmit information to the board of directors. Due to the security software and memory needed to conduct secure transmissions over the Internet, the FCU has provided FCU-owned computers, printers, and high-speed transmission lines to board members for their homes. In addition, the FCU recently required all board members and senior managers to carry cellular phones. The FCU either provides the phone or reimburses the FCU for the base cost of a personal phone.

No official, other than the designated compensated official, "may receive compensation for performing the duties or responsibilities of the board or committee position to which the person has been elected or appointed." 12 C.F.R. §701.33(b)(1). The term "compensation," however, excludes:

[P]ayment (by reimbursement to an official or direct credit union payment to a third party) for reasonable and proper costs incurred by an official in carrying out the responsibilities of the position to which that person has been elected or appointed, if the payment is determined by the board of directors to be necessary or appropriate in order to carry out the official business of the credit union, and is in accordance with written policies and procedures, including documentation requirements, established by the board of directors.

12 C.F.R. §701.33(b)(2)(i). The board of directors, therefore, must determine if the cost of the equipment provided to officials for use in their homes is necessary or appropriate in carrying out their official duties and if such costs are reasonable and proper. The board also must have written policies that address the parameters of any reimbursements to officials.

For additional discussion of the issue of the permissibility of benefits for officials, you may find it helpful to review previous legal opinion letters available on NCUA's web site, www.ncua.gov, including the following letters issued by this office, OGC 91-0215, dated May 1, 1991 (meal reimbursement); OGC 92-0507, dated June 10, 1992 (impermissible reimbursement for baby sitting and vacation time); OGC 99-0621, dated November 8, 1999 (health insurance); and OGC 00-0508, dated May 24, 2000 (safe deposit boxes).

Sincerely,



Sheila A. Albin
Associate General Counsel

OGC/CJL:bhs
03-1053

D-2

# EXHIBIT E

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493311000314

| Form **990** | | **Return of Organization Exempt From Income Tax** | | OMB No 1545-0047 |
|---|---|---|---|---|
| | | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | | **2013** |
| Department of the Treasury Internal Revenue Service | | ▶ Do not enter Social Security numbers on this form as it may be made public  By law, the IRS generally cannot redact the information on the form ▶ Information about Form 990 and its instructions is at *www.IRS.gov/form990* | | **Open to Public Inspection** |

**A** For the 2013 calendar year, or tax year beginning 01-01-2013   , 2013, and ending 12-31-2013

| **B** Check if applicable | **C** Name of organization MUNICIPAL CREDIT UNION | | | **D** Employer Identification number |
|---|---|---|---|---|
| ☐ Address change | Doing Business As | | | 13-5261470 |
| ☐ Name change | Number and street (or P O  box if mail is not delivered to street address) | Room/suite | | **E** Telephone number |
| ☐ Initial return | 22 CORTLANDT ST 26TH FLOOR Suite | | | (212) 238-3336 |
| ☐ Terminated | City or town, state or province, country, and ZIP or foreign postal code NEW YORK, NY  10007 | | | |
| ☐ Amended return | | | | **G** Gross receipts $ 127,165,605 |
| ☐ Application pending | | | | |

| **F**  Name and address of principal officer KAM WONG 22 CORTLANDT STREET NEW YORK, NY 10007 | **H(a)** Is this a group return for subordinates? | ☐ Yes ☑ No |
|---|---|---|
| | **H(b)** Are all subordinates included? | ☐ Yes ☐ No |
| | If "No," attach a list  (see instructions) | |

**I**  Tax-exempt status:  ☐ 501(c)(3)  ☑ 501(c) ( 14 ) ◀ (insert no)  ☐ 4947(a)(1) or  ☐ 527

**J**  Website: ▶ WWW NYMCU ORG

**H(c)**  Group exemption number ▶

**K** Form of organization  ☑ Corporation  ☐ Trust  ☐ Association  ☐ Other ▶ | **L** Year of formation 1916 | **M** State of legal domicile NY

## Part I   Summary

| | | | |
|---|---|---|---|
| **1** | Briefly describe the organization's mission or most significant activities BUILD LIFETIME FINANCIAL RELATIONSHIPS WITH EACH MEMBER PROVIDING COMPETITIVE PRODUCTS AND EXCELLENT SERVICES | | |
| **2** | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | | |
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 18 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 18 |
| **5** | Total number of individuals employed in calendar year 2013 (Part V, line 2a) | **5** | 749 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 23 |
| **7a** | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 4,620,664 |
| **b** | Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 1,470,138 |

| | | **Prior Year** | **Current Year** |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| **9** | Program service revenue (Part VIII, line 2g) | 121,581,482 | 125,983,105 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 1,039,984 | 1,182,500 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 122,621,466 | 127,165,605 |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 213,141 | 237,289 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 54,735,813 | 58,803,062 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 63,126,167 | 65,082,504 |
| **18** | Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 118,075,121 | 124,122,855 |
| **19** | Revenue less expenses  Subtract line 18 from line 12 | 4,546,345 | 3,042,750 |

| | | **Beginning of Current Year** | **End of Year** |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 1,792,352,887 | 1,954,679,441 |
| **21** | Total liabilities (Part X, line 26) | 1,664,451,510 | 1,825,297,926 |
| **22** | Net assets or fund balances  Subtract line 21 from line 20 | 127,901,377 | 129,381,515 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2014-10-15 Date |
|---|---|---|
| | LINDA LAMBERT VP/ACCOUNTING Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name MARIE ARRIGO | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00058583 |
|---|---|---|---|---|---|
| | Firm's name ▶ EISNERAMPER LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 750 THIRD AVENUE NEW YORK, NY  100172703 | | | Phone no (212) 238-3334 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . . . . . ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. | Cat No 11282Y | Form **990** (2013)

Form 990 (2013)                                                                                                                        Page **7**

### Part VII Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . ⌐

### Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organization's tax year

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation  Enter -0- in columns (D), (E), and (F) if no compensation was paid

● List all of the organization's **current** key employees, if any  See instructions for definition of "key employee "

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

⌐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) MARK S BRANTLEY CHAIRMAN | 2 0 | X | | | | | | 2,295 | 0 | 0 |
| (2) SYLVIA ASH 1ST VICE CHAIR | 2 0 | X | | | | | | 5,237 | 0 | 0 |
| (3) C RICHARD WAGNER 2ND VICE CHAIR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (4) THOMAS E DIANA DIRECTOR EMERITUS | 2 0 | X | | | | | | 0 | 0 | 0 |
| (5) SHIRLEY JENKINS SECRETARY | 2 0 | X | | | | | | 0 | 0 | 0 |
| (6) S NANA OSEI-BONSU TREASURER | 2 0 | X | | | | | | 5,464 | 0 | 0 |
| (7) JOY SCHWARTZ ASSISTANT SECRETARY | 2 0 | X | | | | | | 1,041 | 0 | 0 |
| (8) JAMES DURRAH ASSISTANT TREASURER | 2 0 | X | | | | | | 0 | 0 | 0 |
| (9) MARIO MATOS DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (10) ANGEL AUDIFFRED DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (11) BERYL MAJOR DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (12) TESSA HACKETT-VIEIRA DIRECTOR | 2 0 | X | | | | | | 2,291 | 0 | 0 |
| (13) LORETTA JONES DIRECTOR | 2 0 | X | | | | | | 1,597 | 0 | 0 |
| (14) CAROLL DUNCANSON 3RD VICE CHAIR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (15) GIOVANNI PORCELLI SUPERVISORY CHAIRMAN | 2 0 | X | | | | | | 0 | 0 | 0 |
| (16) KAREN LUCAS SUPERVISORY SECRETARY | 1 0 | X | | | | | | 0 | 0 | 0 |
| (17) JOSEPH GAGLIARDO SUPERVISORY MEMBER | 1 0 | X | | | | | | 0 | 0 | 0 |



Form **990** (2013)

Form 990 (2013)

Page **8**

**Part VII** | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (18) CHERYL WRIGHT | 1 0 | | | | | | | | | |
| SUPERVISORY MEMBER | | X | | | | | | 0 | 0 | 0 |
| (19) ALMETA COAXUM | 1 0 | | | | | | | | | |
| SUPERVISORY MEMBER | | X | | | | | | 0 | 0 | 0 |
| (20) KAM WONG | 60 0 | | | | | | | | | |
| PRESIDENT/CEO | | | | X | | | | 1,675,830 | 0 | 135,365 |
| (21) ANA PUELLO | 60 0 | | | | | | | | | |
| EXECUTIVE VP/CFO | | | | X | | | | 498,454 | 0 | 143,548 |
| (22) NORMAN KOHN | 40 0 | | | | | | | | | |
| SVP/CHIEF CREDIT OFFICER | | | | | X | | | 531,833 | 0 | 32,000 |
| (23) CAROLE PORTER | 40 0 | | | | | | | | | |
| SVP/RETAIL BANKING | | | | | X | | | 340,653 | 0 | 133,238 |
| (24) RICHARD CASAMASSA | 40 0 | | | | | | | | | |
| SVP/MEMBER SERVICE OPERATIONS | | | | | X | | | 336,584 | 0 | 226,780 |
| (25) THOMAS SICILIANO | 40 0 | | | | | | | | | |
| GENERAL COUNSEL | | | | | X | | | 501,626 | 0 | 155,607 |
| (26) JANET PERKINS | 40 0 | | | | | | | | | |
| VP/CHIEF TECHNOLOGY | | | | | | X | | 329,980 | 0 | 86,285 |
| (27) PHILIP VELTRE | 40 0 | | | | | | | | | |
| DEPUTY GENERAL COUNSEL | | | | | | X | | 248,676 | 0 | 152,058 |
| (28) AHMED CAMPBELL | 40 0 | | | | | | | | | |
| VP/LOAN OPERATIONS | | | | | | X | | 222,219 | 0 | 76,687 |
| (29) KIM THOMPSON | 40 0 | | | | | | | | | |
| VP/HUMAN RESOURCES | | | | | | X | | 278,526 | | 60,360 |
| (30) AMY KONG | 40 0 | | | | | | | | | |
| VP/RISK DEPARTMENT | | | | | | X | | 209,666 | | 130,028 |

**1b**   **Sub-Total** . . . . . . . . . . ►

**c**   **Total from continuation sheets to Part VII, Section A** . . . ►

**d**   **Total (add lines 1b and 1c)** . . . . . . . . . ►   5,191,972    0    1,331,956

**2**   Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ►48

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . | **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . | **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . | **5** | | No |

**Section B. Independent Contractors**

**1**   Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization  Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| MAYORE ESTATES LLC,   1177 AVENUE OF THE AMERICAS NEW YORK NY 10036 | OFFICE LEASING | 4,599,692 |
| OCD MEDIA LLC,   8 EAST 36TH STREET NEW YORK NY 10016 | ADVERTISING | 3,642,405 |
| BROOKLYN BASEBALL CO LLC,   1904 SURF AVENUE BROOKLYN NY 11224 | OFFICE LEASING | 827,471 |
| EISNERAMPER LLP,   750 THIRD AVENUE NEW YORK NY 10017 | AUDITING FIRM | 505,015 |
| BROOKLYN RENAISSANCE PLAZA LLC,   118-35 QUEENS BLVD FOREST HILLS NY 11375 | OFFICE LEASING | 466,361 |

**2**   Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ►28

P-3

# EXHIBIT F

Approved: _____
EII J. Mark/Daniel C. Richenthal
Assistant United States Attorneys
Alona Katz
Special Assistant United States Attorney

Before:   THE HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge          19 MAG 9340
          Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :   **SEALED COMPLAINT**

          - v. -                    :   Violations of
                                        18 U.S.C. §§ 371, 657,
                                    :   1344, 1349, and 2; 21
JOSEPH GUAGLIARDO,                      U.S.C. §§ 841, 846
     a/k/a "Joseph Gagliardo,"      :

          Defendant.                :   COUNTY OF OFFENSE:
                                        NEW YORK
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     LAVALE JACKSON, being duly sworn, deposes and says that he
is a Special Agent with the United States Attorney's Office for
the Southern District of New York ("USAO-SDNY"), and charges as
follows:

COUNT ONE
(Conspiracy to Embezzle from a Credit Union)

     1.    From at least in or about 2009, up to and
including at least in or about May 2018, in the Southern
District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a
"Joseph Gagliardo," the defendant, and others known and unknown,
willfully and knowingly did combine, conspire, confederate, and
agree together and with each other to commit an offense against
the United States, to wit, embezzlement, in violation of Title
18, United States Code, Section 657.

     2.    It was a part and object of the conspiracy that
JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, an
officer, agent and employee of an institution, the accounts of
which are insured by the National Credit Union Administration
Board, would and did embezzle, abstract, purloin and willfully
misapply money, funds, credits, securities, and other things of

F-1

value belonging to such institution, in violation of Title 18, United States Code, Section 657, to wit, GUAGLIARDO, then a Supervisory Committee member of Municipal Credit Union (the "Credit Union"), agreed to embezzle and willfully misapply money from the Credit Union by arranging payments to (1) a purported security company that he controlled ("Security Company-1") and (2) a non-profit organization that he controlled ("Organization-1"), among other expenditures of Credit Union money for GUAGLIARDO's benefit.

<u>Overt Act</u>

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York:

a.    On or about December 7, 2017, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, emailed an invoice on behalf of Security Company-1 to a Vice President of the Credit Union requesting payment of $10,584 for purported services inspecting Credit Union ATMs.

(Title 18, United States Code, Section 371.)

<u>COUNT TWO</u>
(Embezzlement from a Credit Union)

4.    From at least in or about 2009, up to and including at least in or about May 2018, in the Southern District of New York and elsewhere, JOSEPH GUAGLIARDO, a/k/a "Joseph Gagliardo," the defendant, an officer, agent and employee of an institution, the accounts of which are insured by the National Credit Union Administration Board, embezzled, abstracted, purloined and willfully misapplied money, funds, credits, securities, and other things of value belonging to such institution, to wit, GUAGLIARDO, then a Supervisory Committee member of the Credit Union, embezzled and willfully misapplied money from the Credit Union by arranging payments to Security Company-1 and Organization-1, among other expenditures of Credit Union money for GUAGLIARDO's benefit.

(Title 18, United States Code, Sections 657 and 2.)

2

F-2

# EXHIBIT G

Approved: _Eli J. Mark/Daniel C. Richenthal_
            Eli J. Mark/Daniel C. Richenthal
            Assistant United States Attorneys
            Alona Katz
            Special Assistant United States Attorney

Before:   THE HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

# 19 MAG 9341

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :   **SEALED COMPLAINT**

      - v. -                  :   Violations of
                                 18 U.S.C. §§ 371,
SYLVIA ASH,                   :   1512(c), 1519, and 2

             Defendant.        :   COUNTY OF OFFENSE:
                                   NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     LAVALE JACKSON, being duly sworn, deposes and says that he
is a Special Agent with the United States Attorney's Office for
the Southern District of New York ("USAO-SDNY"), and charges as
follows:

<div align="center">

COUNT ONE
(Conspiracy to Obstruct Justice)

</div>

     1.   From at least in or about January 2018, up to and
including at least in or about July 2018, in the Southern
District of New York and elsewhere, SYLVIA ASH, the defendant,
and others known and unknown, willfully and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit offenses against the United States, to wit,
obstruction of justice, in violation of Title 18, United States
Code, Sections 1519 and 1512(c).

     2.   It was a part and object of the conspiracy that
SYLVIA ASH, the defendant, would and did knowingly alter,
destroy, mutilate, conceal, cover up, falsify, and make a false
entry in a record, document, and tangible object with the intent
to impede, obstruct, and influence the investigation and proper
administration of a matter within the jurisdiction of a
department and agency of the United States and in relation to

G-1

20.    Based on my review of Kam Wong's text messages, which were obtained from the Wong Cellphone, I have further learned that the following day, January 19, 2018, Wong and SYLVIA ASH, the defendant, exchanged additional text messages. Specifically:

a.    Between 9:03 a.m. and 9:05 a.m., Wong and ASH exchanged the following text messages: First, Wong texted ASH, "Hi Sylvia: Are you coming?  When you come and if I'm not here, just wait for me."  Then, at 9:04 a.m., ASH replied, "Just walking into the building," and at 9:05 a.m., Wong responded, "Oh, ok."

b.    Approximately a half hour later, at 9:33 a.m., Wong texted ASH, "Oh, Sylvia: I forgot to tell you the AirPod which is the Apple's Bluetooth wireless earphones are very good!!!  I'll get you one because they go really nice and work great with the X."  At approximately 10:08 a.m., ASH replied, "You're the Best".

21.    Based on my review of records from Apple obtained by a judicially-authorized search warrant and associated with SYLVIA ASH, the defendant, I have learned that ASH had a calendar entry, dated January 19, 2018, with the subject "iPhone X," and the location of "MCU."

22.    Based on my review of Kam Wong's text messages, which were obtained from the Wong Cellphone, I have learned that the same morning, January 19, 2018, between 9:35 a.m. and 9:43 a.m., after SYLVIA ASH, the defendant, and Kam Wong, had arranged to meet, Wong exchanged a series of text messages with a then-current Supervisory Committee member ("Member-1"), regarding, in part, Wong's recent meeting with ASH, and ASH's willingness to sign an affidavit memorializing a purported prior conversation Wong and ASH had regarding LTD offset payments.  In particular, Wong and Member-1 exchanged the following messages:

Wong:          I had a good conversation with Sylvia

Member-1:      Good.

               . . .

               Ok. Hopefully I'll hear from her.
               Today.  I'd like to give you some peace
               of mind

G-2

ASAP

| | |
|---|---|
| Wong: | Hear fro [sic] Sylvia? |
| Member-1: | Yes.  Of Course. She's looking for PBA cards[6] |
| | Hahahhaha. |
| Wong: | Sylvia remembers our conversation. |
| | She said if anyone asks for an affidavit for our conversation, she'll sign it. |
| Member-1: | It's all good Kam. |
| | She understands |
| Wong: | I just said to her that someone is giving me trouble for the LTD insurance offsets. |
| Member-1: | She and I have a good enough relationship that if you can't talk to her or anyone else. |
| | I'll be able to intervene without a problem |
| Member-1: | [The Credit Union's outside auditors] is also in a good place with this. |
| Wong: | Ok, that's great. |
| Member-1: | Thank you for the trust. ! |

---

[6]    Based on my review of text messages from a cellphone seized from Member-1's residence, pursuant to a judicially-authorized search warrant, I know that on or about February 5, 2018, SYLVIA ASH, the defendant, texted Member-1 a photograph of multiple New York City Police Benevolent Association ("PBA") cards, and what appeared to be a parking placard and cards associated with a certain organization of retired New York City Police Department officers, for which the placard and cards identified Member-1 as its vice president.

G-3

SYLVIA ASH, the defendant, "Sylvia: I have the AirPods.  Do you want me to send someone to bring that to you?"[7]

27.  On or about January 23 and 24, 2018, in Manhattan, Kam Wong provided me with two substantively identical documents that appeared to have been signed separately by the Credit Union's then-current Treasurer and Supervisory Committee Chair; and on or about the following day, Wong provided me in Manhattan with a third substantively identical document that appeared to have been signed by SYLVIA ASH, the defendant (the "January Memorandum").  The January Memorandum was dated January 22, 2018, had the subject "Long Term Disability Insurance for the CEO," and was addressed from Wong to ASH.  The January Memorandum recounted a supposed June 2015 meeting during which ASH purportedly agreed to the payout to Wong of "approximately $3.7 million (net of applicable taxes)" in order to cancel and void a provision in Wong's employment contract that provided Wong with LTD insurance coverage.  The January Memorandum requested that the recipient (ASH) sign the memorandum if the memorandum was "accurate" and that ASH had "agreed" with the "payout approach" detailed in the memorandum.[8]

28.  Based on my review of text messages from a cellphone issued by the Credit Union to Member-1 and recovered during a judicially-authorized search of Member-1's residence (the "Member-1 Cellphone"), I have learned that between January 25, 2018 -- the date Kam Wong provided me with the January Memorandum that appeared to have been signed by SYLVIA ASH, the defendant -- and May 16, 2018, Member-1 and ASH exchanged more than 250 text messages, including numerous messages about Wong, the Credit Union's internal investigation, and the federal criminal investigation, including:

a.  On January 25, 2018, Member-1 texted ASH: "Gentle reminder I'm on the Pba cards I was just waiting for

---

[7]    Based on my review of Apple's website, I know that AirPods are a wireless headphone compatible with an iPhone X.

[8]    As noted above, in connection with Kam Wong's written plea agreement, Wong admitted to endeavoring to obstruct and impede and obstructing and impeding the administration of justice with respect to the criminal investigation into this matter, and agreeing with one or more others to do the same, including by supplying me with false and misleading documents.

C-4

b.   Prior to serving the Second Subpoena, the USAO-SDNY requested in writing that Google preserve the Ash Gmail Account (the "First Preservation Request"), which, on or about June 13, 2018, Google did, preserving both the log-in information and content as of that date (the "First Preservation").

c.   The Internet Protocol ("IP") logs for the Ash Gmail Account indicate that the last log-in made to this account before the Second Subpoena was on or about June 5, 2018, and that there were no log-ins to this account again until on or about June 23, 2018, which was a few days after ASH received the Second Subpoena, and approximately the same time as when she contacted Apple regarding wiping her iPhone X.

41.   Based on my review of the content of the Ash Gmail Account, including the First Preservation, and the content as of the date of the search warrant (the "Unpreserved Content"), I have learned that subsequent to the date of the First Preservation and subsequent to the Second Subpoena, which called for, among other things, email messages between SYLVIA ASH, the defendant, and Member-1, all email messages between ASH and Member-1 were deleted from the Ash Gmail Account. Specifically, I have learned that:

a.   The Ash Gmail Account and certain email accounts associated with Member-1 (collectively, the "Member-1 Email Accounts") exchanged approximately more than 30 messages from on or about March 1, 2018 through on or about May 23, 2018 (the "Deleted Member-1 Emails"), which were found in the First Preservation but did not exist in the Unpreserved Content from the Ash Gmail Account.

b.   The Deleted Member-1 Emails included email messages about the federal investigation, the Credit Union's internal investigation, allegations of misconduct against Board members and the General Counsel, and other topics, none of which was produced by ASH in response to either of the federal subpoenas she was sent.

c.   Approximately 98 percent of emails between January 1, 2018 and June 13, 2018 had been deleted subsequent to the Second Subpoena, whereas less than 30 percent of emails from January 1, 2015 through December 31, 2017 had been deleted. For example:

i.   On February 26, 2018, Member-1 sent ASH an email addressed to "my MCU Famiglia" regarding Kam Wong, the

22

G-5

internal investigation and the federal investigation.  In the email, Member-1 stated, among other things, "Had Kam Wong been given the Counsel he was entitled to at the very beginning, this would have been over. Had [the Credit Union's outside counsel] been a true counsel to all of the volunteers, this would have been over. . . . Had the [Supervisory Committee] been assigned this investigation . . . this would have been over."

   ii. On March 1, 2018, ASH emailed Member-1, "FYI: Got a call from the Justice Dept. today. Wants me to come in to 'informally' talk to me."

   iii. On April 2, 2018, ASH emailed Member-1, "Even though you may be the Lone Ranger in this nightmare fiasco, on behalf of the Membership you have to remain vigilant and not give up. I am proud of you!!!"

   iv. On April 13, 2018, Member-1 forwarded to ASH an email chain from NYS-DFS regarding a planned meeting with the Supervisory Committee, and wrote to ASH, "[p]lease call."[11]

### ASH's Second Interview with the USAO-SDNY

  42.  On July 9, 2018, at the USAO-SDNY's offices in Manhattan, in the presence of her counsel, SYLVIA ASH, the defendant, was interviewed regarding Credit Union-issued Apple devices she had received from Kam Wong, and her production of materials to the USAO-SDNY, among other things.  During this interview, ASH provided the following information, in substance and in part:

   a. ASH repeated her earlier claim that she resigned from the Board because she was elevated to be the presiding judge of the Commercial Division.  ASH further stated that because the Credit Union had foreclosure matters before the courts, the New York State Office of Court Administration had advised her to step down.

   b. ASH recalled travelling to the Credit Union to receive the iPhone X from Wong in his office.  After receiving the iPhone X, Wong asked her to sign the January

---

[11] Based on my review of phone records, I have learned that later that day, April 13, 2018, after this email, the Ash Cellphone Number and the Member-1 Cellphone participated in at least one call that lasted more than 12 minutes.

G-6

# EXHIBIT H

6172    TZG    1   7  6   130810 0      PAGE 1 of 3     1 0  5124   0000   NO01   O1AA6172

# MCU
## MUNICIPAL CREDIT UNION

**Cardholder Name**
KAM WONG

**Account Number**
XXXX-XXXX-XXXX-2360

**VISA**

Page 1 of 3

To report a card lost or stolen,
please call 800-449-7728



## Save Your Stamps For Birthday Cards.
### Save time – and trees – with MCU's
### Free Online Banking with Bill Pay.
### Visit nymcu.org

MCU
OA6172AI

| Account Information | | Account Summary | |
|---|---|---|---|
| Statement Closing Date | 09/10/2013 | Previous Balance | $2,343.63 |
| Credit Limit | $10,000.00 | – Payments | $2,343.63 |
| Available Credit | $8,591.00 | + Other Credits | $0.00 |
| Cash Credit Limit | $2,500.00 | + Purchases | $802.06 |
| Available Cash | $0.00 | + Cash Advances | $2,500.00 |
| | | + Other Debits | $0.00 |
| | | + Fees Charged | $0.90 |
| | | + Interest Charged | $105.15 |
| | | = New Balance | $3,408.11 |

RESEARCHED

RECEIVED SEP 11 2013

ACCOUNTS PAYABLE

OK TO PAY

VISA

| Payment Information | | New Balance: $3,408.11 |
|---|---|---|
| | Minimum Payment Due: $88.15 | |

Payment Due Date: 10/06/2013
**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a **$25.00** late fee.
**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. The table is based on your standard minimum payment and does not include any past due and overlimit amounts. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 12 Years | $6,033.00 |
| $120.00 | 3 Years | $4,332.00 (Savings = $1,701.00) |

If you would like information about credit counseling services, call 1-877-847-2155.

✓ **Remit Payment to:**
MUNICIPAL CREDIT UNION
PO BOX 37603 PHILADELPHIA, PA 19101-0603

✉ **Mail Inquiries To:**
CUSTOMER SERVICE PO BOX 31112 TAMPA, FL 33631-3112

☎ **Questions?**
Call Customer Service: 800-481-7338
Lost or Stolen Card:    800-449-7728

**Why use mail?  Pay your bill online!**

Detach the bottom portion and return payment using enclosed envelope to be received no later than by 5:00 p.m. on the due date. Please use blue or black ink.

MUNICIPAL CREDIT UNION
PO BOX 992 PECK SLIP
NEW YORK, NY 10272-0992

Account Number    XXXX-XXXX-XXXX-2360

New Balance    $3,408.11

Minimum Payment Due    $88.15

Do not forget to include your
account number on your check.

☐ New address, phone number or e-mail?
Check the box to the left and print changes on back.

VISA
PO BOX 37603
PHILADELPHIA, PA 19101-0603

KAM WONG
22 CORTLANDT ST
NEW YORK NY 10007-3107



Payment Due Date
October
S M T W T F S
1 2 3 4 5
6 7 8 9 10 11 12
13 14 15 16 17 18 19
20 21 22 23 24 25 26
27 28 29 30 31

Amount
Enclosed $ ☐☐☐,☐☐☐.☐☐

4060550005992360000088150034081 13

H-1

6172      TZG        1   7  6   130910 0         PAGE 3 of 3        1 0 5124  0000  NO01  O1AA6172

| Transactions (continued) | | | | |
|---|---|---|---|---|
| Post Date | Trans Date | Reference | Description | Amount |
| 09/10 | 09/10 | | Interest Charge on Cash Advances | $30.15 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$105.15** |

NEW YORK RESIDENTS MAY CONTACT THE NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES TO OBTAIN A COMPARATIVE LISTING OF
CREDIT CARD RATES, FEES AND GRACE PERIODS.
NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
1-877-226-5697 OR http://www.dfs.ny.gov

| 2013 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2013 | $2.07 |
| Total interest charged in 2013 | $378.49 |

### Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| Type of Balance | APR % | Balance Subject To Interest Rate | Interest Charge | Remaining Balance |
|---|---|---|---|---|
| Purchases | 12.90% | $0.00 | $0.00 | $877.96 |
| Cash Advances | 17.90% | $2,050.09 | $30.15 | $2,530.15 |

Days in Billing Cycle: 30
See reverse side of page one for explanation of Interest Charge calculation. Credit Purchases calculated using Method G. Cash Advance Charges calculated using Method A.

## ACCOUNT INQUIRIES

 **Customer Service:** (800) 481-7338

 **To Report a Card Lost or Stolen:** (800) 449-7728 (TOLL-FREE)

 **Please Direct Written Inquiries to:** CUSTOMER SERVICE PO Box 31112, Tampa, FL 33631-3112

 **To View Your Account Online:** www.nymcu.org

 New York residents may contact the New York State Banking Department to obtain a comparative listing of credit card rates, fees, and grace periods by calling 1-800-522-3330.

 MCU MUNICIPAL CREDIT UNION

0A6172AG



6172      TZG      1    7  8   130910 0        PAGE 2 of 3      1 0  5124  0000  NO01  O1AA6172

| Cardholder Name | Account Number | **VISA** | Page 2 of 3 |
|---|---|---|---|
| KAM WONG | XXXX-XXXX-XXXX-2360 | | |

## Transactions

| Post Date | Trans Date | Reference | Description | Amount |
|---|---|---|---|---|
| KAM WONG | | XXXX-XXXX-XXXX-2360 | | |
| 08/12 | 08/09 | 24801666ZLQB8LAJ7 | AROME DELI II NEW YORK  NY | $20.00 |
| 08/12 | 08/11 | 74898026Z2NGLMK81 | HONG KONG ECONOMIC J C HONG KONG  HK | $90.02 |
| | | 3224     698.00 344   0.128966481 | | $0.00 |
| 08/13 | 08/13 | F51240072000PY226 | PAYMENT-THANK YOU | $2,343.63- |
| 08/14 | 08/13 | 248016671WGND68WZ | AROME DELI II NEW YORK  NY | $17.00 |
| 08/14 | 08/13 | 248016671WGND88Y9 | AROME DELI II NEW YORK  NY | $11.58 |
| 08/15 | 08/14 | 248016672WGND68XE | AROME DELI II NEW YORK  NY | $11.91 |
| 08/15 | 08/14 | 7292115573005PTSN5 | MCU/22 CORTLANDT ST. NEW YORK  NY | $500.00 |
| 08/16 | 08/14 | 248016673LQB8LD5X | AROME DELI II NEW YORK  NY | $17.25 |
| 08/16 | 08/15 | 248016673WGND68X5 | AROME DELI II NEW YORK  NY | $12.80 |
| 08/16 | 08/16 | 7292115574003NGSP5 | MCU/22 CORTLANDT ST. NEW YORK  NY | $500.00 |
| 08/18 | 08/16 | 248016674WGND88XY | AROME DELI II NEW YORK  NY | $25.81 |
| 08/19 | 08/19 | 7292115577003L62R9 | MCU/22 CORTLANDT ST. NEW YORK  NY | $500.00 |
| 08/20 | 08/19 | 248016677WGND88Y1 | AROME DELI II NEW YORK  NY | $25.64 |
| 08/20 | 08/19 | 2439121785SESQ2JL | RESTORANT MALAYSIA INC FLUSHING  NY | $35.15 |
| 08/20 | 08/20 | 7292115578003ZFFG9 | MCU/22 CORTLANDT ST. NEW YORK  NY | $500.00 |
| 08/21 | 08/20 | 7292115790041BPWP | MCU/22 CORTLANDT ST. NEW YORK  NY | $500.00 |
| 08/23 | 08/21 | 24801667ALQB8LQT0 | AROME DELI II NEW YORK  NY | $28.17 |
| 08/23 | 08/21 | 24388947AKG8FZL84 | NYC\DOT PARKING METERS LONG ISLAND C NY | $7.00 |
| 08/25 | 08/22 | 24801667BLQB8LQYY | AROME DELI II NEW YORK  NY | $13.00 |
| 08/25 | 08/23 | 24906417B02N5FBPA | HLU*HuluPlus 54860891 HULU.COM/BILL CA | $7.99 |
| 08/26 | 08/23 | 24801667DLQB8LB5M | AROME DELI II NEW YORK  NY | $11.87 |
| 09/06 | 09/04 | 24692167R00G3F2KG | MILLENIUM HOTEL  61Q40 NEW YORK  NY | $455.00- |
| 09/08 | 09/05 | 24801667TLQB8LDLP | AROME DELI II NEW YORK  NY | $11.87 |

## Fees

| 08/12 | 08/11 | 74898026Z2NGLMK61 | FOREIGN TRANSACTION FEE | $0.90 |
|---|---|---|---|---|
| | | | **TOTAL FEES FOR THIS PERIOD** | **$0.90** |

## Interest Charges

| | | | | |
|---|---|---|---|---|
| 08/15 | 08/15 | | *FINANCE CHARGE* CASH ADVANCE FEE | $15.00 |
| 08/16 | 08/16 | | *FINANCE CHARGE* CASH ADVANCE FEE | $15.00 |
| 08/19 | 08/19 | | *FINANCE CHARGE* CASH ADVANCE FEE | $15.00 |
| 08/20 | 08/20 | | *FINANCE CHARGE* CASH ADVANCE FEE | $15.00 |
| 08/21 | 08/21 | | *FINANCE CHARGE* CASH ADVANCE FEE | $15.00 |
| 09/10 | 09/10 | | Interest Charge on Purchases | $0.00 |



visit nymcu.org  **NYMCU** MUNICIPAL CREDIT UNION

OA6172AH

H-3

Page 1 of 3

# Cardmember Activity

**CARDMEMBER STATEMENT DATED:**
**08/14/2013 through present**
**This is not a Billing Statement.**

3783-590924-01003   Active
KAM H WONG
MUNICIPAL CREDIT UN

As of   Thu Sep 05 06:59:57 MST 2013 Total Balance is $27,122.71
Total balance includes all unpaid transactions (billed and unbilled).



RECEIVED
SEP - 5 2013
ACCOUNTS PAYABLE

RESEARCHED
OK TO PAY 9/5/13
Amex Wong

9/5/13

### Balance Summary

| Opening Balance | Total Credits | Total Debits | Closing Balance |
|---|---|---|---|
| $14,589.42 | -$14,655.08 | $27,320.37 | $27,254.71 |

### Billing Details

| | |
|---|---|
| 09/03/2013 | $132.00 |
| ASIAN JEWELS SEAFOOD FLUSHING NY 853535432 USFC11354 09/03/13 | 36101-0110 |
| 08/30/2013 | -$65.66 |
| BROOKSTONE 203 BROOK MERRIMACK NH REF# 62617970000 603-8809500 08/30/13 | 23102-0100 |
| 08/30/2013 | $417.10 |
| AMERICAN AIRLINES IN ATLANTA GA TKT# 00173029733925 AIRLINE/AIR C 08/30/13 | 23102-000 |
| 08/30/2013 | $35.00 |
| REGENT GARAGE CORP NEW YORK NY REF# 84988943243 212-732-3399 08/30/13 | 36102-0110 |
| 08/30/2013 | $18.77 |
| Travel Insurance Pol Richmond US REF# 21000103989 INSURANCE SALES 08/30/13 | 23100-0100 |
| 08/29/2013 | $77.97 |
| AMAZON.COM AMZN.COM/BILL WA REF# FBF3RFJXL18 MERCHANDISE 08/29/13 | 2700-0110 |
| 08/28/2013 | $118.00 |
| ASIAN JEWELS SEAFOOD FLUSHING NY 853535432 USFC11354 08/28/13 | 36101-0110 |
| 08/28/2013   23102-0100   R | $797.80 |
| VIRGIN AMERICA SAN FRANCISCO CA TKT# 98421363674975 AIRLINE/AIR C | Teasha Air fare LV |

H-4

# EXHIBIT I



CHAIRMAN

# MEMO

TO:        BOARD EXECUTIVE OFFICERS

FROM:    MARK S. BRANTLEY

CC:        KAM WONG, THOMAS SICILIANO

SUBJECT:  HUMAN RESOURCES POLICY DRAFT

DATE:      NOVEMBER 6, 2014

---

At our recent Strategic Planning (SP) Retreat in Las Vegas, the Board in a closed session had a discussion regarding the termination of MCU's Vice-President of Security and Fraud (VPSF) and the temporary replacement of the same by a member of the Supervisory Committee (SC).   In addition to assuming the duties of the former VPSF, said SC member had also assumed the title of Vice-President (see attached memo).  At the SP session, the Board agreed: 1) that a meeting should take place between the President/CEO, SC Chair, and the Board Chair and 2) the Policy Manual should be revised to address the concerns of the Board as it was suggested by a fellow director.  The meeting between the President/CEO, SC Chair, and the Chair (1st Vice-Chair attended in my stead due to medical reasons) has already taken place.  Therefore, it is my hope to assist in addressing said concerns by the following proposed policy draft and justification.

Banking Law §470 (1) states, *"The board of directors of every credit union shall have the general management of the affairs, funds and records of the corporation."*  There is no doubt that human resources are part of the "affairs" of the credit union and fall under the Board's "general management" purview. Furthermore, MCU Bylaws Art.5, Sec.3 not only restates the above provision of the Banking Law, but also more specifically grants the Board the power *"to fix the salaries or compensation of all officers and employees including counsel and attorneys"* under Sec.4.  Note: the Board has delegated this power to the President/CEO but has not relinquished this authority.

I-1

Finally, MCU Policy Sec.14.58, entitled "Human Resources – Salary Administration", cites *"the policy of the Credit Union to pay wages and salaries which are based upon the nature of the job performed…"*
There is no question that Human Resources fall under the auspices of the Board's oversight role in the areas of strategic planning, budgeting, and policy.

To that end, I recommend the following as a draft provision under Section 14 entitled "Human Resources":

**"For the purpose of avoiding any breaches in the fiduciary duty of loyalty, conflicts of interests, and/or appearances of impropriety, no volunteer of the Municipal Credit Union (e.g., director, supervisory committee member, etc.) is eligible for paid employment (i.e., by wage or compensation) at the Credit Union, neither is any volunteer eligible to assume the title of any compensated officer of the Credit Union unless such volunteer has resigned from his/her volunteer position for a period of not less than two (2) years." This policy provision shall take effect immediately.**

Please submit your questions, comments, suggestions, etc., if any regarding the above and **let me know if you are for or against the same.**

At this time, this memo is only for eyes of those officers addressed herein. Therefore, said memo is confidential and should not be forwarded to any other party.

MSB:

I-2

 **M** Gmail

M B <brantleyesq@gmail.com>

## FW:
1 message

**Mark Brantley** <mbrantley@nymcu.org>
Wed, Feb 7, 2018 at 8:16 PM
To: "brantleyesq@gmail.com" <brantleyesq@gmail.com>

Mark S. Brantley, Esq.
Director
Municipal Credit Union
22 Cortlandt Street, 27th Floor
New York, N.Y. 10007
(347) 835-2047

From: Mark Brantley
Sent: Thursday, November 20, 2014 9:48 AM
To: #Board_of_Directors
Cc: Kam Wong; Thomas G. Siciliano; Monique Smith
Subject:

TO THE BOARD OF DIRECTORS:

Please find attached an updated policy amendment addressing volunteers seeking paid employment at MCU. This policy revision is in direct response to directors' concerns and recommendations voiced during the Board's Strategic Planning retreat. A version of the policy update was originally sent to Executive Officers of the Board who unanimously approved the proposed amendment. Note: this final version includes refinements that were made in collaboration with General Counsel. Please review it for discussion this evening at the Board's Executive Session. Copies of the proposed policy will be handed out again at the Executive Session. Thank you.

Mark

Mark S. Brantley, Esq.
Chairman
Municipal Credit Union
22 Cortlandt Street, 27th Floor
New York, N.Y. 10007
Mbrantley@nymcu.org
(347)-835-2047

 **MCU Human Resources Policy Amendment.doc**
23K

I-3

For the purpose of avoiding breaches of fiduciary duty, conflicts of interests, improprieties or any appearances thereof, Municipal Credit Union volunteers (e.g., Director, Supervisory Committee member, Nominating Committee Member, etc.) shall not be eligible for consideration for paid employment with the Credit Union (even if he or she has the necessary job qualifications) during the term of such volunteer's service, and for a period of not less than two (2) years after the termination of the volunteer's service."  Furthermore, no volunteer shall (by reason of or through his or her volunteer position) assume the title, position or responsibilities of or represent himself/herself as an operating officer or employee (e.g., President, Vice-President, Manager, etc.) of the Credit Union. This policy provision shall take effect immediately.

I-4

11/7/2019                                 Gmail - Fwd: MCU Board's Role and Fraud Risk

 **Gmail**

                                                                        M B <brantleyesq@gmail.com>

___

## Fwd: MCU Board's Role and Fraud Risk

**Mark Brantley** <mbrantley@nymcu.org>                                 Thu, Jan 25, 2018 at 8:33 AM
To: "brantleyesq@gmail.com" <brantleyesq@gmail.com>

Sent from my iPad

Begin forwarded message:

From: Mark Brantley <mbrantley@nymcu.org<mailto:mbrantley@nymcu.org>>
Date: September 27, 2015 at 2:02:02 PM MST
To: Sylvia Ash <sash@nymcu.org<mailto:sash@nymcu.org>>
Cc: #Board_of_Directors <#Board_of_Directors@nymcu.org<mailto:#Board_of_Directors@nymcu.org>>, Kam Wong
<kwong@nymcu.org<mailto:kwong@nymcu.org>>, "Thomas G. Siciliano" <TSiciliano@nymcu.org<mailto:T
Siciliano@nymcu.org>>, Monique Smith <Mosmith@nymcu.org<mailto:Mosmith@nymcu.org>>
Subject: Board's Role and Fraud Risk

Hi Madam Chair:

Please find attached an article related to a discussion we had during our Board meeting this past Thursday regarding the
vacancy of the Vice-President of Security and Fraud position. I would like the Board meeting minutes to reflect that
Director Brantley expressed his deep concern that said Security and Fraud position has been left vacant for over a year
and the same has not been filled by the Supervisory Committee.

In addition, I would like to bring to your attention that MCU's Outlook address book (see below) still lists Michael Rosano
as VP of Security and Fraud as well as a member of the Supervisory Committee also as VP of Security and Fraud.

| Bryant Olaya | bolaya | 2356 | Security and Fraud | Sr. Fraud Analys... | MCU |
| Joseph A. Guagliardo | jaguagliardo | 3597 | Security and Fraud | Vice President S... | MCU |
| Kevin Aquino | kaquino | | Security and Fraud | Admin Assistant | MCU |
| Marcos Otero | motero | 3515 | Security and Fraud | Assistant Vice P... | Municipal Credit... |
| Matthew Bustamante | mbustamante | 2398 | Security and Fraud | Security and Fra... | MCU |
| Michael Dalmeto | mdalmeto | 2369 | Security and Fraud | Security and Fra... | MCU |
| Michael Rosano | mrosano | | Security and Fraud | VP/Security and ... | Municipal Credit... |

As you well know, MCU is a $2.1 billion asset sized institution and as such is vulnerable to fraud risk internally and
externally if preventive measures are not in place. According to our policy manual (also attached), the President/CEO
delegated security responsibility into the hands of the VP of Security and Fraud as well as the Manager of General
Services (facilities). Presently, we do not have a VP of Security and Fraud; this is the basis of my concern. I have
included on this email the Board, Kam, and Tom Siciliano. Thank you.

Mark


Mark S. Brantley, Esq.
Director
Municipal Credit Union
22 Cortlandt Street, 27th Floor
New York, N.Y. 10007
(347) 835-2047

___

**4 attachments**

 **MCU BOARD'S ROLE AND FRAUD RISK.pdf**
76K

 **ATT00001.htm**
1K

 I-5

11/7/2019                                    Gmail - Fwd: MCU Board's Role and Fraud Risk

 **MCU SECURITY POLICY 2014.pdf**
413K

 **ATT00002.htm**
1K

J-6



# The Board's Critical Role in Preventing Internal Fraud

*By Joette Colletts*
*Senior Manager, Risk Management*
*CUNA Mutual Group*

For a perfect mini-seminar on how a board of directors can allow internal fraud to sink a credit union, take an hour or so to peruse the NCUA's "material loss reviews." These summarize investigations into why credit unions failed, resulting in losses to the National Credit Union Share Insurance Fund.

Investigators directly link many failures to internal fraud, usually citing "a failure of the Board to perform its duties related to oversight of the Credit Union."

Consider the following details from 2014 and 2013 reviews.

In a credit union that "failed primarily due to management fraudulently overstating assets, specifically cash on deposit, and understating shares"[1]:

- Board meeting minutes were missing for some months. The board had not signed off on some minutes and board discussion notes regarding audit/exam results and follow-up were limited.
- The board didn't challenge treasurer's financial reports showing large swings in income, projections, and operating results.
- No record of substantive discussion of policy reviews, risk management, or strategy.

In a credit union that failed due to years of allegedly fraudulent over-statement of assets, enabled by "weak supervisory committee oversight" and "weak board of directors oversight"[2]:

- The supervisory committee failed to get supervisory committee audits for three consecutive years.
- The board failed to keep complete and accurate minutes or to obtain board packets with sufficient information.

Here are typical results from a few other material loss reviews involving employee fraud:

- A board and its supervisory committee didn't follow up on recommendations from examiners and an external CPA firm that the credit union needed segregation of duties to prevent fraud.[3]
- Voluminous board packets were delivered late, giving directors little time to read and understand the details and trends.[4]
- The board didn't heed red flags related to acquiring a CUSO run by someone related to a top executive.[4]

## Four lessons to take from loss reviews

### 1. Attend board meetings and take good minutes

These lessons go together because if board members can't attend meetings, good minutes will catch them up. It's not unusual for board members to miss a meeting occasionally, but a pattern of missing meetings is a red flag.

### 2. Insist on comprehensive board packets delivered in timely fashion

Packets should include all topics on the next meeting's agenda, plus the relevant financial statements, minutes from the previous meetings, and any pertinent news about credit union staff or operations. You should have enough time to read the packet and make notes to prepare for the meeting.



Fraud is often hidden through doctored financial statements and incomplete reports to the board. Carefully reading your packet can reveal discrepancies and red flags.

Packets not only keep you informed, they document the board's oversight and governance practices. This can be critical in establishing liability.

### 3. Ask questions and follow through until you get complete answers

If you don't understand something in your packet or something presented at a board meeting, speak up. If the matter can't be clarified during the meeting, request that the appropriate staff or board member follow up promptly.

### 4. When necessary, hire outside resources to investigate and advise

A volunteer credit union board may not have the experience and expertise to detect and prevent certain types of internal fraud. But ignorance doesn't release your fiduciary duties.

Get the outside help you need to assess your internal controls, look for vulnerabilities in policies and procedures, and investigate red flags you can't address internally.

## Two important tools: written credit union fraud policy and whistleblower policy

If your credit union doesn't have a written, up-to-date policy addressing employee dishonesty, your board and executive team should work with legal counsel to produce one as soon as possible. The policy should spell out the procedures your credit union will follow to deter, detect, investigate, and punish fraudulent acts.

Require employees to read and sign the policy annually.

Another basic protection a credit union board can establish is a whistleblower policy to protect employees who come forward with allegations about wrong-doing. In addition to setting a safe reporting procedure for employees to follow, the policy should protect whistle-blowers from retaliation.

Credit union board members aren't expected to be professional fraud investigators. But creating a culture of due diligence, documentation, and zero-tolerance for fraud—from the top down—is one of the most effective methods of prevention.

---

[1] NCUA's Material Loss Review of Taupa Lithuanian Credit Union (record number OIG-14-06), 3/26/14
[2] NCUA's Material Loss Review of G.I.C. Federal Credit Union (OIG-13-13), 12/2/13
[3] NCUA's Material Loss Review of El Paso's Federal Credit Union (OIG-13-09), 8/26/13
[4] NCUA's Material Loss Review of Telesis Community Credit Union (OIG-13-05), 3/15/13

CUNA Mutual Group is the marketing name for CUNA Mutual Holding Company, a mutual insurance holding company, its subsidiaries and affiliates. Insurance products offered to financial institutions and their affiliates are underwritten by CUMIS Insurance Society, Inc. or CUMIS Specialty Insurance Company, members of the CUNA Mutual Group. Some coverages may not be available in all states. If a coverage is not available from one of our member companies, CUNA Mutual Insurance Agency, Inc., our insurance producer affiliate, may assist us in placing coverage with other insurance carriers in order to serve our customers' needs. For example, the Workers' Compensation Policy is underwritten by non-affiliated admitted carriers. CUMIS Specialty Insurance Company, our excess and surplus lines carrier, underwrites coverages that are not available in the admitted market.

©CUNA Mutual Group, 2014 All Rights Reserved.
CUPBO-995365.1-0814-0916



CUNA
MUTUAL
GROUP

I·8



**Policy Manual**

16.1

# SECTION 16
## SECURITY AND PRIVACY POLICY

### 16.01  SECURITY POLICY

The President/CEO has delegated the responsibility of security to the Vice President of Security and Fraud and the Manager of General Services.   They are the designated Security Officers of the Credit Union.

It is the policy of the Credit Union that the security procedures and manual are reviewed periodically, at least annually. The review shall include a security survey covering all offices of the Credit Union and the adequacy of the security systems and controls.

Testing of security devices (such as bells, money clips, contract devices, etc.) shall be performed periodically, and at least semiannually, in conjunction with the firm(s) providing security services to the Credit Union.   Rules and regulations issued by the regulatory agencies must be reviewed annually, or as modified, to ensure that the Credit Union's security policies and procedures remain in compliance. Proposed changes to the security manual should be presented to the Board of Directors for approval as deemed appropriate.

### 16.01-1   Opening Branch Policy

Only certain individuals, selected by the Vice President of Branch Operations/Member Service Operations or designee, are authorized to open or close an MCU branch. The names of these individuals must be on file with our outside security company (the ADT Protection Company). At least two of these individuals must always be present during the opening process.   No other employees are to have knowledge of alarm codes, vault combinations or access to duplicate sets of keys. In addition, each branch is required to maintain a daily record of the opening and closing activity by completing a premises and vault record.

Important:

If, after opening the branch, the individual charged with opening finds unusual or suspicious circumstances, that individual should leave immediately and call the police.

In the event of an emergency, the Vice President or designee will be authorized to open a particular branch.

*        See Branch Operations Procedure Manual for details.

I-9

11/7/2019                                Gmail - Fwd: Board's Role and Fraud Risk

 Gmail                                    M B <brantleyesq@gmail.com>

---

## Fwd: Board's Role and Fraud Risk
1 message

**Mark Brantley** <mbrantley@nymcu.org>                     Thu, Jan 25, 2018 at 8:36 AM
To: "brantleyesq@gmail.com" <brantleyesq@gmail.com>

    Sent from my iPad

    Begin forwarded message:

    From: Mark Brantley <mbrantley@nymcu.org<mailto:mbrantley@nymcu.org>>
    Date: September 28, 2015 at 7:28:55 AM MST
    To: Joseph Guagliardo <jguagliardo@nymcu.org<mailto:jguagliardo@nymcu.org>>, Richard Wagner
    <rwagner@nymcu.org<mailto:rwagner@nymcu.org>>
    Cc: Sylvia Ash <sash@nymcu.org<mailto:sash@nymcu.org>>, #Board_of_Directors <#Board_of_Directors@nymcu.org
    <mailto:#Board_of_Directors@nymcu.org>>, Kam Wong <kwong@nymcu.org<mailto:kwong@nymcu.org>>, "Thomas G.
    Siciliano" <TSiciliano@nymcu.org<mailto:TSiciliano@nymcu.org>>, Monique Smith <Mosmith@nymcu.org<mailto:Mosm
    ith@nymcu.org>>, Almeta Coaxum <acoaxum@nymcu.org<mailto:acoaxum@nymcu.org>>, Cheryl Wright
    <chwright@nymcu.org<mailto:chwright@nymcu.org>>, Karen Lucas <klucas@nymcu.org<mailto:klucas@nymcu.org>>,
    "Karen Lucas (external)" <queenkl1@aol.com<mailto:queenkl1@aol.com>>
    Subject: RE: Board's Role and Fraud Risk

    The intent of my email was not an attack, rather to perform a fiduciary duty as follows:

    1) Inform my Board colleagues as policymakers their role in helping to mitigate fraud risk (see attached article).
    2) Convey to the Chair of the Board my right to have my concern and name noted in the minutes.
    3) Bring to the attention of the CEO that the address book for MCU's Outlook needs to be updated.

    I believe I have performed my duty as a director and therefore there is no need to continue further on this issue.

    Mark

    Mark S. Brantley, Esq.
    Director
    Municipal Credit Union
    22 Cortlandt Street, 27th Floor
    New York, N.Y. 10007
    (347) 835-2047

    ---

    From: Joseph Guagliardo
    Sent: Monday, September 28, 2015 7:36 AM
    To: Richard Wagner
    Cc: Mark Brantley; Sylvia Ash; #Board_of_Directors; Kam Wong; Thomas G. Siciliano; Monique Smith; Almeta Coaxum;
    Cheryl Wright; Karen Lucas; Karen Lucas (external)
    Subject: Re: Board's Role and Fraud Risk

    It is sad that all the work the Supervisory Committee is doing is marred by Marks continuous attacks on the sight of my
    name.

    Every supervisory committee meeting reveals the achievements of the committee in this area. For those board members
    that inquire have heard and seen, where we were, where we are and where we are going. As does the CEO, External
    Auditors and the Regulators and the employees we come in contact with daily.

    I pray that the intentions in Puerto Rico are to relay what we are doing and not to be attacked so the work we have done
    to build bridges is not again diminished.

    The Supervisory Committee makes decisions everyday to keep us "ahead of the curve". Attacks on the committee,
    because of an old secret vendetta, is unfair to the challenges we take on regularly. Many of the committee members have
    not only attended meetings and made decisions we have gone the next step of achieving certifications, to serve as a

                                                                                                    I-10

11/7/2019
Gmail - Fwd: Board's Role and Fraud Risk

better volunteer.

While we are all volunteers and should be working together as we have. Our responsibilities are of an independent nature, by law it must be independent. But in past years as in future it should not stop us from alienating each other.

The Committee functions under the watchful eye of the regulators, management and our own employees. And we are being attacked for what is in a phone book. Or in a data base.

We function in transparency. I can't keep up with what gossip jackals are doing by making phones calls or hiding conversations in executive session. After 23 years serving MCU members, I'd think I've earned the benefit of the doubt and the courtesy of transparency.

I ask all volunteers to recognize we are all here for the right reason. Let's please not take this to the gutter. please don't buy into old baggage, secret meetings and back stabbing.

As Willie James used to say: "that which happens in darkness will come to light"
Let us keep our prayers in our heats and MCU business in the light.

The committee has "justified" the why and how we do what we are doing to regulators, as evidenced by our last report.

We have been and are better then this. What we are achieving should not be tainted by a database that has not been updated.

A data base security and fraud or the committee had anything to do with.

Respectfully
Joseph
6463411478


Joseph A Guagliardo, Ed.M/CFE/CCEP/CSE/CCD/CFS
Chair Security & Fraud of the Supervisory Comm.
Municipal Credit
(646) 341-1478<tel:(646)%20341-1478> Cell
(212) 238 -3597<tel:(212)%20238%20-3597> office
(212) 238-2380<tel:(212)%20238-2380> main
(212) 416- 7037<tel:(212)%20416-%207037> fax


http://www.nymcu.org/index.aspx


NOTICE: This electronic mail message and any files transmitted with it are intended exclusively for the individual or entity to which it is addressed. The message, together with any attachment, may contain confidential and/or privileged information. Any unauthorized review, use, printing, saving, copying, disclosure or distribution is strictly prohibited. If you have received this message in error, please immediately advise the sender by reply email and delete all copies.

On Sep 28, 2015, at 00:54, Richard Wagner <rwagner@nymcu.org<mailto:rwagner@nymcu.org><mailto:rwagner@nymcu.org>> wrote:

I have read MCU's latest examination report, and I saw no comment about concern in the Security & Fraud area. Director Brantley's concern was heard by the Board and the Chair of the Supervisory Committee. I am sure it will be resolved properly . Richard Wagner

Sent from my iPad

On Sep 27, 2015, at 5:02 PM, Mark Brantley <mbrantley@nymcu.org<mailto:mbrantley@nymcu.org><mailto:mbrantley@nymcu.org>> wrote:

Hi Madam Chair:

Please find attached an article related to a discussion we had during our Board meeting this past Thursday regarding the

I-11

vacancy of the Vice-President of Security and Fraud position.  I would like the Board meeting minutes to reflect that Director Brantley expressed his deep concern that said Security and Fraud position has been left vacant for over a year and the same has not been filled by the Supervisory Committee.

In addition, I would like to bring to your attention that MCU's Outlook address book (see below) still lists Michael Rosano as VP of Security and Fraud as well as a member of the Supervisory Committee also as VP of Security and Fraud.

| Bryant Olaya | bolaya | 2356 | Security and Fraud | Sr. Fraud Analys... | MCU |
| Joseph A. Guagliardo | jaguagliardo | 3597 | Security and Fraud | Vice President S... | MCU |
| Kevin Aquino | kaquino | | Security and Fraud | Admin Assistant | MCU |
| Marcos Otero | motero | 3515 | Security and Fraud | Assistant Vice P... | Municipal Credit... |
| Matthew Bustamante | mbustamante | 2398 | Security and Fraud | Security and Fra... | MCU |
| Michael Dalmeto | mdalmeto | 2369 | Security and Fraud | Security and Fra... | MCU |
| Michael Rosano | mrosano | | Security and Fraud | VP/Security and ... | Municipal Credit... |

As you well know, MCU is a $2.1 billion asset sized institution and as such is vulnerable to fraud risk internally and externally if preventive measures are not in place.  According to our policy manual (also attached), the President/CEO delegated security responsibility into the hands of the VP of Security and Fraud as well as the Manager of General Services (facilities).  Presently, we do not have a VP of Security and Fraud; this is the basis of my concern.  I have included on this email the Board, Kam, and Tom Siciliano.  Thank you.

Mark


Mark S. Brantley, Esq.
Director
Municipal Credit Union
22 Cortlandt Street, 27th Floor
New York, N.Y. 10007
(347) 835-2047
<MCU BOARD'S ROLE AND FRAUD RISK.pdf>
<MCU SECURITY POLICY 2014.pdf>

I-12



**MCU**
**MUNICIPAL CREDIT UNION**
22 Cortlandt Street
New York, New York 10007-3107

Date:      **10**/15/2015

To:        Janice Simmons, Sr. Manager, Training

Cc:        Kim Thompson, SVP, Human Resources Department
           Giovanni Porcelli, Chairman of the Supervisory Committee
           Philip Veltre, Deputy General Counsel
           Marcos Otero, AVP, Security and Fraud
           Cecily Moore, BSA Investigator
           Juan Morales, Manager, Human Resources Department

From:      Joseph A Guagliardo, VP, Security and Fraud
           Timothy Wheeler, BSA Officer

Subject:   **Bank Secrecy Act / Security& Fraud Training 2014**

Listed below are the courses that are being administered this year for the annual **Bank Secrecy Act and Security and Fraud Training for 2014. The** course and identification number are listed followed by the departments required to take these training sessions. The time captions the length of the session.
**All training must be completed prior to December 31, 2014, there are no exceptions. If an employee has vacation scheduled or already know that they will not be present for an extended period of time (example: maternity leave), they must take the training session prior to their vacation or leave.**

**FCRA and FACT Act game show (20401C_15309)**
*All MCU Employees*
45 Minutes

**Member Service: Telephone Excellence (20120C_15309)**
*All MCU Employees*
30 Minutes

**Embezzlement: The Inside Story (8538VID_15309)**
*Assistant Managers and Above*
24 Minutes

BSA/S&F-2014-10                          1                          I-13-

**New Account Security (20089C-15309)**
*New Accounts Department and Member Service Representatives and Business Development*
90 Minutes

**Check Fraud Prevention (20310_15309)**
*Tellers, Mail Banking and ATM Proofing*
30 Minutes

**Elder Financial Abuse: Detection and Prevention (20208C_15309)**
*Tellers, Member Service Representatives, Contact Center Representatives, and Home Banking Contact Center Representatives*
30 Minutes

**BSA: Transaction Procedures for Tellers (20204TELC_15309)**
*Tellers*
30 Minutes

**BSA: Money Laundering Awareness (1257 VID-15309)**
*Tellers, Member Service Representatives*
*24 Minutes*

**BSA/AML: The Basic (00467500)**
*All MCU Employees*
*45 Minutes*

We have reviewed many of the previous classes given and find them to be outdated with obsolete rules and regulations.

We have determined at this point to assign training quarterly to reflect needs of MCU as well as Compliance issues rather than give classes to fall into compliance. Therefore, we will come out with the next quarterly training in January 2015. We will be looking for more MCU related classes and them spread out throughout the year.

BSA/S&F-2014-10

1

I-14

# EXHIBIT J

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493311000314 |
|---|---|---|

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

► Do not enter Social Security numbers on this form as it may be made public  By law, the IRS generally cannot redact the information on the form

► Information about Form 990 and its instructions is at www.IRS.gov/form990

Department of the Treasury
Internal Revenue Service

**2013**

Open to Public Inspection

**A** For the 2013 calendar year, or tax year beginning 01-01-2013   , 2013, and ending 12-31-2013

| **B** Check if applicable | **C** Name of organization MUNICIPAL CREDIT UNION | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 13-5261470 |
| ☐ Name change | Doing Business As | |
| ☐ Initial return | Number and street (or P O  box if mail is not delivered to street address)  Room/suite 22 CORTLANDT ST 26TH FLOOR Suite | **E** Telephone number (212) 238-3336 |
| ☐ Terminated | | |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code NEW YORK, NY  10007 | |
| ☐ Application pending | | **G** Gross receipts $ 127,165,605 |

| **F** Name and address of principal officer KAM WONG 22 CORTLANDT STREET NEW YORK, NY 10007 | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No If "No," attach a list  (see instructions) |
| **I** Tax-exempt status   ☐ 501(c)(3)  ☑ 501(c) ( 14 ) ◄ (insert no )  ☐ 4947(a)(1) or  ☐ 527 | |
| **J** Website: ► WWW NYMCU ORG | **H(c)** Group exemption number ► |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ► | **L** Year of formation 1916 | **M** State of legal domicile NY |

## Part I   Summary

**1** Briefly describe the organization's mission or most significant activities
BUILD LIFETIME FINANCIAL RLATIONSHIPS WITH EACH MEMBER PROVIDING COMPETITIVE PRODUCTS AND EXCELLENT SERVICES

**2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 18 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 18 |
| **5** Total number of individuals employed in calendar year 2013 (Part V, line 2a) | **5** | 749 |
| **6** Total number of volunteers (estimate if necessary) | **6** | 23 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 4,620,664 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 1,470,138 |

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| **9** | Program service revenue (Part VIII, line 2g) | 121,581,482 | 125,983,105 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 1,039,984 | 1,182,500 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 122,621,466 | 127,165,605 |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 213,141 | 237,289 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 54,735,813 | 58,803,062 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ►0 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 63,126,167 | 65,082,504 |
| **18** | Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 118,075,121 | 124,122,855 |
| **19** | Revenue less expenses  Subtract line 18 from line 12 | 4,546,345 | 3,042,750 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 1,792,352,887 | 1,954,679,441 |
| **21** | Total liabilities (Part X, line 26) | 1,664,451,510 | 1,825,297,926 |
| **22** | Net assets or fund balances  Subtract line 21 from line 20 | 127,901,377 | 129,381,515 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2014-10-15 Date |
|---|---|---|
| | LINDA LAMBERT  VP/ACCOUNTING Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name MARIE ARRIGO | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00058583 |
|---|---|---|---|---|---|
| | Firm's name ► EISNERAMPER LLP | | | Firm's EIN ► | |
| | Firm's address ► 750 THIRD AVENUE NEW YORK, NY  100172703 | | | Phone no (212) 238-3334 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . .  ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.        Cat No 11282Y        Form **990** (2013)

J-1

Form 990 (2013)

Page **7**

**Part VII**  **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**
Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . ⌐

### Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organization's tax year

♦ List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation  Enter -0- in columns (D), (E), and (F) if no compensation was paid

♦ List all of the organization's **current** key employees, if any  See instructions for definition of "key employee"

♦ List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

♦ List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

♦ List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

⌐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) MARK S BRANTLEY  CHAIRMAN | 2 0 | X | | | | | | 2,295 | 0 | 0 |
| (2) SYLVIA ASH  1ST VICE CHAIR | 2 0 | X | | | | | | 5,237 | 0 | 0 |
| (3) C RICHARD WAGNER  2ND VICE CHAIR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (4) THOMAS E DIANA  DIRECTOR EMERITUS | 2 0 | X | | | | | | 0 | 0 | 0 |
| (5) SHIRLEY JENKINS  SECRETARY | 2 0 | X | | | | | | 0 | 0 | 0 |
| (6) S NANA OSEI-BONSU  TREASURER | 2 0 | X | | | | | | 5,464 | 0 | 0 |
| (7) JOY SCHWARTZ  ASSISTANT SECRETARY | 2 0 | X | | | | | | 1,041 | 0 | 0 |
| (8) JAMES DURRAH  ASSISTANT TREASURER | 2 0 | X | | | | | | 0 | 0 | 0 |
| (9) MARIO MATOS  DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (10) ANGEL AUDIFFRED  DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (11) BERYL MAJOR  DIRECTOR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (12) TESSA HACKETT-VIEIRA  DIRECTOR | 2 0 | X | | | | | | 2,291 | 0 | 0 |
| (13) LORETTA JONES  DIRECTOR | 2 0 | X | | | | | | 1,597 | 0 | 0 |
| (14) CAROLL DUNCANSON  3RD VICE CHAIR | 2 0 | X | | | | | | 0 | 0 | 0 |
| (15) GIOVANNI PORCELLI  SUPERVISORY CHAIRMAN | 2 0 | X | | | | | | 0 | 0 | 0 |
| (16) KAREN LUCAS  SUPERVISORY SECRETARY | 1 0 | X | | | | | | 0 | 0 | 0 |
| (17) JOSEPH GAGLIARDO  SUPERVISORY MEMBER | 1 0 | X | | | | | | 0 | 0 | 0 |

Form **990** (2013)

J-2

Page **8**

Form 990 (2013)

**Part VII**  Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W- 2/1099-MISC) | (E) Reportable compensation from related organizations (W- 2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (18) CHERYL WRIGHT — SUPERVISORY MEMBER | 1 0 | X | | | | | | 0 | 0 | 0 |
| (19) ALMETA COAXUM — SUPERVISORY MEMBER | 1 0 | X | | | | | | 0 | 0 | 0 |
| (20) KAM WONG — PRESIDENT/CEO | 60 0 | | | X | | | | 1,675,830 | 0 | 135,365 |
| (21) ANA PUELLO — EXECUTIVE VP/CFO | 60 0 | | | X | | | | 498,454 | 0 | 143,548 |
| (22) NORMAN KOHN — SVP/CHIEF CREDIT OFFICER | 40 0 | | | | X | | | 531,833 | 0 | 32,000 |
| (23) CAROLE PORTER — SVP/RETAIL BANKING | 40 0 | | | | X | | | 340,653 | 0 | 133,238 |
| (24) RICHARD CASAMASSA — SVP/MEMBER SERVICE OPERATIONS | 40 0 | | | | X | | | 336,584 | 0 | 226,780 |
| (25) THOMAS SICILIANO — GENERAL COUNSEL | 40 0 | | | | X | | | 501,626 | 0 | 155,607 |
| (26) JANET PERKINS — VP/CHIEF TECHNOLOGY | 40 0 | | | | | X | | 329,980 | 0 | 86,285 |
| (27) PHILIP VELTRE — DEPUTY GENERAL COUNSEL | 40 0 | | | | | X | | 248,676 | 0 | 152,058 |
| (28) AHMED CAMPBELL — VP/LOAN OPERATIONS | 40 0 | | | | | X | | 222,219 | 0 | 76,687 |
| (29) KIM THOMPSON — VP/HUMAN RESOURCES | 40 0 | | | | | X | | 278,526 | | 60,360 |
| (30) AMY KONG — VP/RISK DEPARTMENT | 40 0 | | | | | X | | 209,666 | | 130,028 |

| | | | | |
|---|---|---|---|---|
| **1b** Sub-Total . . . . . . . . ▶ | | | | |
| **c** Total from continuation sheets to Part VII, Section A . . ▶ | 5,191,972 | 0 | 1,331,956 |
| **d** Total (add lines 1b and 1c) . . . . ▶ | | | |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization▶48

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any *former* officer, director or trustee, key employee, or highest compensated employee on line 1a? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . | **3** | | No |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . | **4** | Yes | |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? If "Yes," complete Schedule J for such person . . . . . | **5** | | No |

**Section B. Independent Contractors**

**1**  Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization  Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| MAYORE ESTATES LLC,   1177 AVENUE OF THE AMERICAS NEW YORK NY 10036 | OFFICE LEASING | 4,599,692 |
| OCD MEDIA LLC,   8 EAST 36TH STREET NEW YORK NY 10016 | ADVERTISING | 3,642,405 |
| BROOKLYN BASEBALL CO LLC,   1904 SURF AVENUE BROOKLYN NY 11224 | OFFICE LEASING | 827,471 |
| EISNERAMPER LLP,   750 THIRD AVENUE NEW YORK NY 10017 | AUDITING FIRM | 505,015 |
| BROOKLYN RENAISSANCE PLAZA LLC,   118-35 QUEENS BLVD FOREST HILLS NY 11375 | OFFICE LEASING | 466,361 |

**2**  Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶28

Form **990** (2013)

J-3

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493317082205 |
|---|---|---|

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public
▶ Information about Form 990 and its instructions is at *www.IRS.gov/form990*

**2014**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2014 calendar year, or tax year beginning 01-01-2014 , and ending 12-31-2014

| B Check if applicable | C Name of organization | D Employer identification number |
|---|---|---|
| ☐ Address change | MUNICIPAL CREDIT UNION | 13-5261470 |
| ☐ Name change | % MUNICIPAL CREDIT UNION | |
| ☐ Initial return | Doing business as | |
| ☐ Final return/terminated | Number and street (or P O box if mail is not delivered to street address)  Room/suite  22 CORTLANDT ST 26TH FLOOR | E Telephone number |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code  NEW YORK, NY  10007 | G Gross receipts $ 133,551,051 |
| ☐ Application pending | | |

| F  Name and address of principal officer  KAM WONG  22 CORTLANDT STREET  NEW YORK,NY  10007 | H(a) Is this a group return for subordinates?  ☐ Yes  ☑ No |
|---|---|
| | H(b) Are all subordinates included?  ☐ Yes ☐ No  If "No," attach a list  (see instructions) |

**I** Tax-exempt status:  ☐ 501(c)(3)  ☑ 501(c) ( 14 ) ◀ (insert no )  ☐ 4947(a)(1) or  ☐ 527

**J** Website: ▶ WWW.NYMCU.ORG

H(c)  Group exemption number ▶

**K** Form of organization  ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶     **L** Year of formation 1916  **M** State of legal domicile  NY

## Part I  Summary

**1** Briefly describe the organization's mission or most significant activities
BUILD LIFETIME FINANCIAL RELATIONSHIPS WITH EACH MEMBER PROVIDING COMPETITIVE PRODUCTS AND EXCELLENT SERVICES

**2** Check this box ▶☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a)  . . . . . | **3** | 17 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 17 |
| **5** Total number of individuals employed in calendar year 2014 (Part V, line 2a) | **5** | 794 |
| **6** Total number of volunteers (estimate if necessary)  . . . . . . . . | **6** | 22 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12  . . . | **7a** | 4,979,664 |
| **b** Net unrelated business taxable income from Form 990-T, line 34  . . . . . | **7b** | 1,516,982 |

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h)  . . . . . . . . | 0 | 0 |
| **9** | Program service revenue (Part VIII, line 2g)  . . . . . . . . | 125,983,105 | 131,297,513 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d )  . . . | 1,182,500 | 2,253,538 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12)  . . . . . . . . . . . . . . | 127,165,605 | 133,551,051 |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3 )  . . | 237,289 | 162,319 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4)  . . . | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 58,803,062 | 63,135,845 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e)  . . . | 0 | 0 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e)  . . | 65,082,504 | 68,353,331 |
| **18** | Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 124,122,855 | 131,651,495 |
| **19** | Revenue less expenses  Subtract line 18 from line 12  . . . . . | 3,042,750 | 1,899,556 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16)  . . . . . . . . . . . . | 1,954,679,441 | 2,096,409,712 |
| **21** | Total liabilities (Part X, line 26)  . . . . . . . . . . . | 1,825,297,926 | 1,988,186,866 |
| **22** | Net assets or fund balances  Subtract line 21 from line 20  . . . . | 129,381,515 | 108,222,846 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2015-11-02 Date |
|---|---|---|
| | LINDA LAMBERT  SVP/CFO  Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name  MARIE ARRIGO | Preparer's signature  MARIE ARRIGO | Date  2015-11-02 | Check ☐ if self-employed | PTIN  P00058583 |
|---|---|---|---|---|---|
| | Firm's name ▶ EISNERAMPER LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 750 THIRD AVENUE  NEW YORK, NY  100172703 | | | Phone no (212) 949-8700 | |

May the IRS discuss this return with the preparer shown above? (see instructions)  . . . . . . . . . . . .  ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.         Cat No 11282Y         Form **990** (2014)

J-4

**Additional Data**

Software ID:
Software Version:
EIN: 13-5261470
Name: MUNICIPAL CREDIT UNION

**Form 990, Part VII - Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) MARK S BRANTLEY CHAIRMAN | 6 0 / 0 0 | X | | | | | | 6,824 | 0 | 0 |
| (1) SYLVIA ASH 1ST VICE CHAIR | 6 0 / 0 0 | X | | | | | | 2,664 | 0 | 0 |
| (2) C RICHARD WAGNER 2ND VICE CHAIR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (3) THOMAS E DIANA DIRECTOR EMERITUS | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (4) SHIRLEY JENKINS SECRETARY | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (5) S NANA OSEI-BONSU TREASURER | 6 0 / 0 0 | X | | | | | | 6,568 | 0 | 0 |
| (6) JOY SCHWARTZ DIRECTOR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (7) JAMES DURRAH ASSISTANT TREASURER | 6 0 / 0 0 | X | | | | | | 4,828 | 0 | 0 |
| (8) MARIO MATOS ASSISTANT SECRETARY | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (9) BERYL MAJOR DIRECTOR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (10) TESSA HACKETT-VIEIRA DIRECTOR | 6 0 / 0 0 | X | | | | | | 1,286 | 0 | 0 |
| (11) LORETTA JONES DIRECTOR | 6 0 / 0 0 | X | | | | | | 655 | 0 | 0 |
| (12) CAROLL DUNCANSON DIRECTOR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (13) GIOVANNI PORCELLI SUPERVISORY CHAIRMAN | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (14) JOSEPH GUAGLIARDO SUPERVISORY MEMBER | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (15) CHERYL WRIGHT SUPERVISORY MEMBER | 10 0 / 0 0 | X | | | | | | 2,782 | 0 | 0 |
| (16) ALMETA COAXUM SUPERVISORY MEMBER | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (17) KAREN LUCAS SUPERVISORY SECRETARY | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| (18) KAM WONG PRESIDENT/CEO | 60 0 / 0 0 | | | X | | | | 1,864,163 | 0 | 127,955 |
| (19) ANA PUELLO EXECUTIVE VP/CFO | 60 0 / 0 0 | | | X | | | | 253,624 | 0 | 13,869 |
| (20) NORMAN KOHN SVP/CHIEF CREDIT OFFICER | 40 0 / 0 0 | | | | | X | | 544,852 | 0 | 33,845 |
| (21) CAROLE PORTER SVP/RETAIL BANKING | 40 0 / 0 0 | | | | | X | | 356,462 | 0 | 145,118 |
| (22) RICHARD CASAMASSA SVP/MEMBER SERVICE OPERATIONS | 40 0 / 0 0 | | | | | X | | 401,708 | 0 | 251,120 |
| (23) THOMAS SICILIANO GENERAL COUNSEL | 40 0 / 0 0 | | | | | X | | 544,745 | 0 | 137,889 |
| (24) KIM THOMPSON SVP/HUMAN RESOURCES | 40 0 / 0 0 | | | | | X | | 327,499 | 0 | 65,482 |

J-5

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493278011086 |
|---|---|---|

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

► Do not enter social security numbers on this form as it may be made public

► Information about Form 990 and its instructions is at *www.IRS.gov/form990*

**2015**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2015 calendar year, or tax year beginning 01-01-2015 , and ending 12-31-2015

| **B** Check if applicable | **C** Name of organization MUNICIPAL CREDIT UNION | **D** Employer identification number |
|---|---|---|
| ☐ Address change | % MUNICIPAL CREDIT UNION | 13-5261470 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address)  Room/suite 22 CORTLANDT ST 26TH FLOOR | **E** Telephone number (212) 238-3334 |
| ☐ Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code NEW YORK, NY 10007 | **G** Gross receipts $ 149,284,312 |
| ☐ Amended return | | |
| ☐ Application pending | | |

| **F** Name and address of principal officer KAM WONG 22 CORTLANDT STREET NEWYORK,NY 10007 | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No |
| | If "No," attach a list (see instructions) |

**I** Tax-exempt status  ☐ 501(c)(3)  ☑ 501(c) ( 14 ) ◄ (insert no )  ☐ 4947(a)(1) or  ☐ 527

**J** Website: ► WWW NYMCU ORG

**H(c)** Group exemption number ►

**K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ►     **L** Year of formation 1916  **M** State of legal domicile NY

### Part I   Summary

**1** Briefly describe the organization's mission or most significant activities
BUILD LIFETIME FINANCIAL RELATIONSHIPS WITH EACH MEMBER PROVIDING COMPETITIVE PRODUCTS AND EXCELLENT SERVICES

**2** Check this box ►☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 17 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 17 |
| **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) | **5** | 846 |
| **6** Total number of volunteers (estimate if necessary) | **6** | 23 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 5,135,999 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 1,569,274 |

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| **9** Program service revenue (Part VIII, line 2g) | 131,297,513 | 144,589,629 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 2,253,538 | 4,694,683 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 133,551,051 | 149,284,312 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 162,319 | 136,344 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 63,135,845 | 72,378,508 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ►0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 68,353,331 | 71,538,579 |
| **18** Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 131,651,495 | 144,053,431 |
| **19** Revenue less expenses Subtract line 18 from line 12 | 1,899,556 | 5,230,881 |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) | 2,096,409,712 | 2,290,023,130 |
| **21** Total liabilities (Part X, line 26) | 1,988,186,866 | 2,177,317,922 |
| **22** Net assets or fund balances Subtract line 21 from line 20 | 108,222,846 | 112,705,208 |

### Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| **Sign Here** | ******  Signature of officer | 2016-09-15  Date |
|---|---|---|
| | LINDA LAMBERT SVP/CFO  Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name MARIE ARRIGO | Preparer's signature MARIE ARRIGO | Date | Check ☐ if self-employed | PTIN P00058583 |
|---|---|---|---|---|---|
| | Firm's name ► EISNERAMPER LLP | | | Firm's EIN ► | |
| | Firm's address ► 750 THIRD AVENUE  NEW YORK, NY 100172703 | | | Phone no (212) 949-8700 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.     Cat No 11282Y     Form **990** (2015)

J-6

**Additional Data**

Software ID:
Software Version:
EIN: 13-5261470
Name: MUNICIPAL CREDIT UNION

### Form 990, Part VII - Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| SYLVIA ASH / CHAIRMAN | 10 0 / 0 0 | X | | | | | | 8,779 | 0 | 0 |
| JAMES DURRAH / 1ST VICE CHAIR | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| C RICHARD WAGNER / 2ND VICE CHAIR | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| LORETTA JONES / 3RD VICE CHAIR | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| SHIRLEY JENKINS / SECRETARY | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| S NANA OSEI-BONSU / TREASURER | 10 0 / 0 0 | X | | | | | | 1,288 | 0 | 0 |
| MARIO MATOS JR / ASSISTANT TREASURER | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| CAROLL DUNCANSON / ASSISTANT SECRETARY | 10 0 / 0 0 | X | | | | | | 742 | 0 | 0 |
| MARK S BRANTLEY / DIRECTOR | 10 0 / 0 0 | X | | | | | | 3,860 | 0 | 0 |
| JOY S SCHWARTZ / DIRECTOR | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| TESSA I HACKETT-VIEIRA / DIRECTOR | 10 0 / 0 0 | X | | | | | | 893 | 0 | 0 |
| BERYL MAJOR / DIRECTOR | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| THOMAS E DIANA / DIRECTOR EMERITUS | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| GIOVANNI PORCELLI / SUPERVISORY CHAIRMAN | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| KAREN LUCAS / SUPERVISORY SECRETARY | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| CHERYL WRIGHT / SUPERVISORY MEMBER | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| JOSEPH GUAGLIARDO / SUPERVISORY MEMBER | 30 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| ALMETA COAXUM / SUPERVISORY MEMBER | 10 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| KAM WONG / PRESIDENT/CEO | 60 0 / 0 0 | | | X | | | | 3,422,403 | 0 | 151,769 |
| NORMAN KOHN / EVP/CHIEF CREDIT OFFICER | 40 0 / 0 0 | | | X | | | | 580,725 | 0 | 40,546 |
| RICHARD CASAMASSA / EVP/CHIEF MEMBER SERVICE OPERA | 40 0 / 0 0 | | | X | | | | 442,556 | 0 | 40,546 |
| THOMAS SICILIANO / GENERAL COUNSEL | 40 0 / 0 0 | | | | | X | | 720,260 | 0 | 103,737 |
| KIM THOMPSON / SVP/CHIEF OFFICER OF HR/LR | 40 0 / 0 0 | | | | | X | | 404,030 | 0 | 93,241 |
| CAROLE PORTER / SVP/CHIEF RETAIL BANKING OPERA | 40 0 / 0 0 | | | | | X | | 393,872 | 0 | 157,647 |
| LINDA LAMBERT / SVP/CHIEF FINANCIAL OFFICER | 50 0 / 0 0 | | | | | X | | 308,659 | 0 | 84,398 |

J-7

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493311020297

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | **2016** |
| Department of the Treasury Internal Revenue Service | ▶ Do not enter social security numbers on this form as it may be made public ▶ Information about Form 990 and its instructions is at *www IRS gov/form990* | Open to Public Inspection |

**A** For the 2016 calendar year, or tax year beginning 01-01-2016 , and ending 12-31-2016

| **B** Check if applicable | **C** Name of organization MUNICIPAL CREDIT UNION | **D** Employer identification number |
|---|---|---|
| ☐ Address change | % MUNICIPAL CREDIT UNION | 13-5261470 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final Return/terminated | Number and street (or P O box if mail is not delivered to street address) Room/suite 22 CORTLANDT ST 26TH FLOOR | **E** Telephone number (212) 238-3334 |
| ☐ Amended return | | |
| ☐ Application pending | City or town, state or province, country, and ZIP or foreign postal code NEW YORK, NY  10007 | **G** Gross receipts $ 167,229,977 |

| **F** Name and address of principal officer KAM WONG 22 CORTLANDT STREET NEW YORK, NY  10007 | **H(a)** Is this a group return for subordinates? ☐ Yes ☒ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status ☐ 501(c)(3) ☒ 501(c) ( 14 ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | **H(c)** Group exemption number ▶ |
| **J** Website: ▶ WWW NYMCU ORG | |
| **K** Form of organization ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 1916 **M** State of legal domicile NY |

### Part I    Summary

| | | | |
|---|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities BUILD LIFETIME FINANCIAL RELATIONSHIPS WITH EACH MEMBER PROVIDING COMPETITIVE PRODUCTS AND EXCELLENT SERVICES | | |
| 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | **3** | 18 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 18 |
| 5 | Total number of individuals employed in calendar year 2016 (Part V, line 2a) | **5** | 845 |
| 6 | Total number of volunteers (estimate if necessary) | **6** | 23 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 5,330,851 |
| b | Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 1,484,602 |

| | | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | 8 Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 Program service revenue (Part VIII, line 2g) | 144,589,629 | 161,444,492 |
| | 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 4,694,683 | 5,785,485 |
| | 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | 12 Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 149,284,312 | 167,229,977 |
| **Expenses** | 13 Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 136,344 | 259,182 |
| | 14 Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 72,378,508 | 79,495,727 |
| | 16a Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | 17 Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 71,538,579 | 77,776,036 |
| | 18 Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 144,053,431 | 157,530,945 |
| | 19 Revenue less expenses Subtract line 18 from line 12 | 5,230,881 | 9,699,032 |

| **Net Assets or Fund Balances** | | Beginning of Current Year | End of Year |
|---|---|---|---|
| | 20 Total assets (Part X, line 16) | 2,290,023,130 | 2,482,536,207 |
| | 21 Total liabilities (Part X, line 26) | 2,177,317,922 | 2,368,472,943 |
| | 22 Net assets or fund balances Subtract line 21 from line 20 | 112,705,208 | 114,063,264 |

### Part II    Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2017-11-15 Date |
|---|---|---|
| | LINDA LAMBERT SVP/CFO Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name MARIE ARRIGO | Preparer's signature MARIE ARRIGO | Date 2017-11-15 | Check ☐ if self-employed | PTIN P00058583 |
|---|---|---|---|---|---|
| | Firm's name ▶ EISNERAMPER LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 750 THIRD AVENUE NEW YORK, NY  100172703 | | | Phone no (212) 949-8700 | |

May the IRS discuss this return with the preparer shown above? (see instructions)   ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.      Cat No 11282Y      Form **990** (2016)

J-8

**Form 990, Part VII - Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| SYLVIA ASH CHAIRMAN | 4 0 / 0 0 | X | | | | | | 4,253 | 0 | 0 |
| JAMES DURRAH 1ST VICE CHAIR | 6 0 / 0 0 | X | | | | | | 4,509 | 0 | 0 |
| C RICHARD WAGNER 2ND VICE CHAIR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| LORETTA JONES 3RD VICE CHAIR | 6 0 / 0 0 | X | | | | | | 5,451 | 0 | 0 |
| SHIRLEY JENKINS SECRETARY | 3 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| S NANA OSEI-BONSU TREASURER | 5 0 / 0 0 | X | | | | | | 2,752 | 0 | 0 |
| MARIO MATOS JR ASSISTANT TREASURER | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |
| CAROLL DUNCANSON ASSISTANT SECRETARY | 5 0 / 0 0 | X | | | | | | 901 | 0 | 0 |
| MARK S BRANTLEY DIRECTOR | 4 0 / 0 0 | X | | | | | | 1,860 | 0 | 0 |
| JOY S SCHWARTZ DIRECTOR | 6 0 / 0 0 | X | | | | | | 0 | 0 | 0 |

J-9

# Form 990, Part VII - Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| TESSA I HACKETT-VIEIRA / DIRECTOR | 6.0 / 0.0 | X | | | | | | | 0 | 0 |
| BERYL MAJOR / DIRECTOR | 5.0 / 0.0 | X | | | | | | | 0 | 0 |
| tony abdallah / director | 3.0 / 0.0 | X | | | | | | | 0 | 0 |
| THOMAS E DIANA / DIRECTOR EMERITUS | 1.0 / 0.0 | X | | | | | | | 0 | 0 |
| GIOVANNI PORCELLI / SUPERVISORY CHAIRMAN | 3.0 / 0.0 | X | | | | | | | 0 | 0 |
| KAREN LUCAS / SUPERVISORY SECRETARY | 3.0 / 0.0 | X | | | | | | | 0 | 0 |
| JOSEPH GUAGLIARDO / SUPERVISORY MEMBER | 33.0 / 0.0 | X | | | | | | | 0 | 0 |
| CHERYL WRIGHT / SUPERVISORY MEMBER | 3.0 / 0.0 | X | | | | | | | 0 | 0 |
| ALMETA COAXUM / SUPERVISORY MEMBER | 3.0 / 0.0 | X | | | | | | | 0 | 0 |
| KAM WONG / PRESIDENT/CEO | 60.0 / 0.0 | | | X | | | | 5,882,891 | 0 | 116,105 |

J-10

# Form 990, Part VII - Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| NORMAN KOHN EVP/CHIEF CREDIT OFFICER | 40 0 / 0 0 | | | X | | | | 655,012 | 0 | 40,186 |
| RICHARD CASAMASSA EVP/CHIEF MEMBER SERVICE OPERA | 40 0 / 0 0 | | | X | | | | 493,715 | 0 | 40,186 |
| KIM THOMPSON EVP/CHIEF OFFICER OF HR/LR | 40 0 / 0 0 | | | X | | | | 622,658 | 0 | 70,927 |
| THOMAS SICILIANO GENERAL COUNSEL | 40 0 / 0 0 | | | | X | | | 611,609 | 0 | 40,186 |
| CAROLE PORTER SVP/CHIEF RETAIL BANKING OPERA | 40 0 / 0 0 | | | | X | | | 399,545 | 0 | 125,724 |
| LINDA LAMBERT SVP/CHIEF FINANCIAL OFFICER | 50 0 / 0 0 | | | | X | | | 389,123 | 0 | 113,539 |
| JANET PERKINS SVP/CHIEF INNOVATION OFFICER | 40 0 / 0 0 | | | | X | | | 261,204 | 0 | 113,943 |
| PHILIP VELTRE DEPUTY COUNSEL | 40 0 / 0 0 | | | | | X | | 291,598 | 0 | 179,459 |
| ROBERT SOLOWAY VP/IT | 40 0 / 0 0 | | | | | X | | 277,492 | 0 | 72,734 |
| AMY KONG VP/ERM | 40 0 / 0 0 | | | | | X | | 265,810 | 0 | 120,873 |

J-11

**Form 990, Part VII - Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W- 2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W- 2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| AHMED CAMPBELL<br>VP OF LOAN OPERATIONS | 40 0<br>0 0 | | | | | X | | 259,542 | 0 | 125,322 |
| MONIQUE SMITH<br>EXECUTIVE OFFICE MANAGER | 40 0<br>0 0 | | | | | X | | 255,970 | 0 | 62,010 |

J-12

# EXHIBIT K



# 2017
## ANNUAL REPORT



**Strong
Trusted
Growing**

Federally insured by NCUA

K-1

www.nymcu.org

# INDEPENDENT
# AUDITOR'S REPORT



EisnerAmper LLP
750 Third Avenue
New York, NY 10017-2703
T 212.949.8700
F 212.891.4100
www.eisneramper.com

## INDEPENDENT AUDITOR'S REPORT

We have audited, in accordance with auditing standards generally accepted in the United States of America, the statements of financial condition of Municipal Credit Union (the "Credit Union") as of December 31, 2017 and 2016, and the related statements of income, comprehensive income, changes in members' equity and cash flows for each of the years in the two-year period ended December 31, 2017 (not presented herein), and have issued our report thereon dated April 11, 2018.

A copy of the Credit Union's financial statements and our report thereon may be obtained directly from the Credit Union. In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Municipal Credit Union as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2017 in accordance with accounting principles generally accepted in the United States of America.

*EisnerAmper LLP*

New York, New York
April 11, 2018

New York  |  New Jersey  |  Pennsylvania  |  California  |  Cayman Islands
*EisnerAmper is an independent member of PKF International Limited*



# EXHIBIT L

# *New York State*
# *Department of Financial Services*

**WHEREAS**, as a result of examination and other supervisory information, it has come to the attention of the New York State Department of Financial Services (the "Department") that there are severe deficiencies and weaknesses in Municipal Credit Union ("MCU")'s internal controls and in its Board of Directors' (the "Board") oversight of the management of the affairs, funds, and records of MCU, in a manner that raises significant concerns regarding the oversight of MCU's operations and protection of its membership; and

**WHEREAS**, the Superintendent of Financial Services of the State of New York (the "Superintendent") has determined that prompt action is necessary to address these significant supervisory concerns;

**NOW, THEREFORE, IT IS HEREBY ORDERED** that, pursuant to Sections 41 and 14(1)(p) of the New York Banking Law (the "Banking Law") and Sections 301 and 303 of the New York Financial Services Law (the "Financial Services Law"), the current members of the Board of MCU are hereby REMOVED for violations of Sections 470 and 471 of the Banking Law.

**IT IS FURTHER ORDERED** that the removed members of the Board produce to MCU all items issued by, belonging to, or relating to MCU, including, but not limited to, documents, data, electronic devices and keys, and shall not discard or destroy any documents or other materials relating to MCU.

**IT IS FURTHER ORDERED** that, pursuant to Sections 14(1)(p), 36(1) and 39(5) of the Banking Law, and Sections 206(c), 301 and 303 of the Financial Services Law, MCU shall



immediately submit to and pay for an independent, on-premises administrator of the Department's selection (the "Administrator") to oversee the general management of the affairs, funds, and books and records of MCU and report to the Superintendent all matters coming before the Administrator in such capacity. The Administrator shall perform such duties until the Superintendent determines that elections for new members of the Board of Directors of MCU may be properly arranged pursuant to the Banking Law and MCU's By-Laws, and for such time period thereafter to ensure the proper oversight of MCU for the protection of its members.

I hereby designate Stella M. Mendes of FTI Consulting as Administrator as herein provided.

This Order shall remain in effect until stayed, modified, suspended or terminated by the Superintendent.

*Witness*, my hand and official seal of the Department of Financial Services at the City of New York, this 22nd day of June in the Year two thousand and eighteen.

*Maria T. Vullo*
*Superintendent of Financial Services*

L-2

# EXHIBIT M



**Policy Manual**

14.10

3.   Eligible employees who are being considered for layoff due to a reduction in work force in their present position or job elimination.

Transferring employees will be placed on three (3) months probation. At the end of three (3) months, the supervisor will prepare a written evaluation of the employee's job performance. The evaluation should include a recommendation granting the employee regular status. Copies of the evaluation will be forwarded to the department head and the Human Resources Department.

Unsatisfactory performance will be a cause for returning a transferred employee to his/her former job, if available, or layoff status.

Transferred employees will retain their former job seniority until satisfactorily completing their probationary period.

An employee transferred to a comparable paying job will continue to receive his/her existing rate of pay.

An employee transferred to a higher paying job will be paid at the higher rate effective the official date of the transfer.

An employee transferred to a lower paying job at the initiative of management may continue to be paid at his/her former job rate.

Involuntary unilateral transfer (transfer directed by management, not including promotion) of any employee who is unable to perform satisfactorily during or at the end of their probation period will, if practical, be returned to their original job.   If the employee's former position is not available, he/she will be placed in an available position.

An employee who requests a transfer to a lower paying job will be paid at the lower rate upon commencing the new job. A three (3) month probation period will be enforced.

Non-exempt job openings which management intends to fill from within will be posted on the Human Resources Department intranet site.

## 14.21  NEPOTISM POLICY

The Credit Union may employ a relative of an employee, elected official, or appointed official of the Credit Union, provided the individual possesses the necessary qualifications for the position available. However, no favoritism will be shown based on the fact that the individual is a relative of an employee, elected official, or appointed official. Those persons will not be given work assignments, which require one to direct, review or process the work of the other.

However, regardless of the above, a prospective applicant will be required to disclose on his or her employment application, whether or not his or her spouse (or other individual

M-1



**Policy Manual**

living in the same household in a spousal type relationship), child, father, mother, grandparent, grandchild, sister, brother, or spouse of any of these relatives, is presently an employee, elected official, or appointed official of MCU. Furthermore, any employee, elected official, or appointed official of MCU, upon learning that his or her spouse (or other individual living in the same household in a spousal type relationship), child, father, mother, grandparent, grandchild, sister, brother, or spouse of any of these relatives, has applied for employment within, or is employed by, the Credit Union, will immediately disclose that fact to the Human Resources Department.

Executive Management shall be notified by the Human Resources Department and must approve of any individuals who fall within the above referred to classes.   In the case where the relationship is to executive management, the Board Secretary shall be notified by the Human Resources Department and will present such names to the Board at its next regularly scheduled meeting.

Any breach of this policy may result in immediate disciplinary action including termination of employment.

## 14.22  EMPLOYEE COUNSELING

The Credit Union will provide employees with counseling and referral services to aid them in career planning, coping with and solving personal problems.  All employees counseling will be confidential.

Personal difficulties such as marital, family, emotional, psychological, interpersonal, medical, financial, legal, or alcohol and drug abuse, can adversely affect the employee job performance. Employees experiencing these or similar problems are encouraged to seek assistance from their supervisors or from the Human Resources Department.

If an employee receives less than satisfactory performance evaluations, the supervisor will conduct a performance review, which will include counseling the employee as to the actions required to improve performance.

If an employee is subject to disciplinary action for minor or first time infractions of Credit Union rules and regulations or standards of conduct, the supervisor will counsel the employee on the necessary steps to correct the misbehavior.

## 14.23  GRIEVANCE POLICY

The Credit Union encourages employees to bring to the attention of management their complaints about work related situations through a formal grievance procedure.

Grievances will be resolved fairly and promptly and will be held in the strictest confidence.

M-2

# EXHIBIT N


# NCUA Board Chairman McWatters to Address ACUMA Fall Conference

August 7, 2017   News



NCUA Board Chairman J. Mark McWatters will address a general session of the ACUMA Fall Conference on its opening day, Monday, September 25, in Las Vegas.

McWatters, who has served on the NCUA Board since 2014 and as chairman since earlier this year, will provide insights into what NCUA's priorities will be as we move into 2018 and beyond.

Previously, McWatters served as the Assistant Dean for Graduate Programs and as a Professor of Practice at Southern Methodist University's Dedman School of Law, and as an Adjunct Professor at the university's Cox School of Business. He also served on the Governing Board of the Texas Department of Housing and Community Affairs and the Advisory Committee of the Texas Emerging Technology Fund.

As announced speakers, J. Mark McWatters joins Jessica Lautz, the Director of Survey Research and Communications for the National Association of Realtors (NAR); Steve Williams, co-founder of Cornerstone Advisors and an expert on banking operations and delivery syst Kristin Messerli, an expert on developing strategies to recruit and retain young talent; and Luke Williams, one of the world's leading busir thinkers on innovation strategy and business disruptors.

The ACUMA Conference will be held at the Bellagio Resort and Casino on the colorful Las Vegas Strip. The event begins with an opening reception on Sunday night, September 24, and ends its final session about 3 p.m. on Wednesday, September 27. The conference features "digital" focus on new technology and disruptors to the traditional mortgage pipeline

Conference registration is open.  Once registered, you can follow the link to hotel registration for the dates you need. Early registration assures you of room reservations at the conference site and allows you to get the best air fares by booking ahead.

REGISTER NOW

We've just posted the agenda, which features the latest information on critical mortgage-lending topics with nationally known speakers, a as special events, such as the inaugural Digital Mortgage Showcase where you can learn more about the latest in digital solutions at live demos. For updated information visit the ACUMA website here.

## REGISTRATION REQUEST FORM

ACUMA offers a fillable "Request to Attend" the conference document on our website here. It provides details about the conference, including topics, speakers, dates, location and registration cost. It's a great way to help your manager understand the benefits the confer provides.

The ACUMA Conference brings together the nation's top mortgage-lending credit unions and the industry's leading experts for three day: learning and networking. We hope to see you in Las Vegas in September.



*Bob Dorsa is the president of ACUMA, the American Credit Union Mortgage Association. Contact him at bob.dorsa@acuma.org or (877) 442-2862.*

ג-1

11/7/2019                                  Matz: Aging Membership Challenges Future Of Many CUs

Search          Q                    LOGIN   CONTACT US   ABOUT US   COLLABORATORS   THE GIG   ADVERTISE

THURSDAY                                                                        SIGN UP FOR FREE!
NOVEMBER 7, 2019                                                                to receive CU Today
                                            today                               Daily News Bulletins
                                    CU EVERYTHING TODAY | TOMORROW

≡

# Matz: Aging Membership Challenges Future Of Many CUs

                                        10/07/2015 08:45 pm

in Share      Like 0      Share 498           Tweet

ALEXANDRIA, Va.—Credit unions face
many challenges ahead, and board
members need to ask their managers
tough questions to make sure they are
ready to face those challenges—so the
CU survives—NCUA Board Chairman
Debbie Matz said Tuesday.

Speaking to the National Directors
Roundtable Conference in Las Vegas,
Matz said America's demographics are
changing and younger people are
becoming a larger force in the
economy, so credit unions need to
attract these new consumers in order
to stay in business.

"If the trend of aging credit union
membership continues," Matz said,
"many credit unions may have no
future. A credit union cannot survive
without lending, but the average age of
credit union members is over 47. This
is critical, because the peak borrowing
years are between ages 25 and 44,
which means the average member is
already past those peak years.



NCUA Chairman Debbie Matz

"Young demographics are huge potential markets," Matz said. "Thirty-three
percent of the U.S. population is under age 20, yet young demographics are
underserved by credit unions. Members between ages 18 and 24 account for just
nine percent of credit union membership."

Offering the latest technology and promoting credit unions through new media are
essential to reaching younger audiences, Matz said, and she posed four questions

N-2

# Newsroom

‹ Back to the Newsroom

**JULY 21, 2014**

# NAFCU Annual Conference kicks off in Las Vegas

July 22, 2014 – Credit unions from around the country have joined association staff at the NAFCU Annual Conference and Solutions Expo, which begins today at The Venetian Las Vegas Casino, Hotel & Resort.

During this week, credit unions will hear from senior staff at NCUA, including Board Chairman Debbie Matz; Fannie Mae Senior Vice President and Chief Economist Doug Duncan; and "Waiting for 'Superman'" figure Geoffrey Canada.

Today's program also includes a "private conversation" for conference attendees with NAFCU President and CEO Dan Berger and staff.

"This year's program, with its dynamic speakers and numerous networking opportunities, will help attendees improve their credit union operations and bottom line," Berger said.

Also today at the conference, attendees will hear from Holly Petraeus, the assistant director of CFPB's Office of Servicemember Affairs, at the Defense Credit Union Summit. Joyce Raezer, the executive director of the National Military Family Association and Vice Admiral Norbert Ryan, the president and CEO of the Military Officers Association of America, will also speak.

Tomorrow's speakers include Matz, Duncan, and ProfitStars' Director of Strategic Insight Lee Wetherington.

NAFCU will keep credit unions updated of the week's activities. For up-to-the-minute information on the conference, download the NAFCU Annual Conference app.

**SHARE THIS**    f    🐦    in

# Credit Union Times

**NOT FOR REPRINT**

🖶 Click to print or Select **'Print'** in your browser menu to print this document.

Page printed from: *https://www.cutimes.com/2009/2009/05/11/ncua-officials-to-keynote-aacuc-conference/*

# NCUA Officials to Keynote AACUC Conference

Among the speakers at the African American Credit Union Coalition's annual conference in August are NCUA Chairman Michael Fryzel and NCUA Board Member Gigi Hyland

By **Michelle A. Samaad** | May 11, 2009

Among the speakers at the African American Credit Union Coalition's annual conference in August are NCUA Chairman Michael Fryzel and NCUA Board Member Gigi Hyland.

Alonzo Swann, NCUA's region III director, will also speak. Swann's region covers federal credit unions in Alabama, Florida, Georgia, Indiana, Kentucky, Mississippi, North Carolina, Puerto Rico, Ohio, South Carolina, Tennessee and the Virgin Islands.

The AACUC's conference will take place Aug. 5-8 at the Harrah's Las Vegas Hotel and Casino.

Copyright 2019. ALM Media Properties, LLC. All rights reserved.

N-4

Search the Site...          Search

# NCUA Board Member Gigi Hyland Addresses NACUSO Annual Conference Attendees

**Las Vegas, Nev. (April 29, 2008)** – As part of their 2008 Annual Conference held at the Wynn Las Vegas Hotel, Tuesday, April 29, The National Association of Credit Union Service Organizations (NACUSO) convened general sessions for the 400-plus attendees highlighted by keynote speakers Gigi Hyland, NCUA Board Member, and Dennis Dollar, former Chairman of the NCUA Board. Dollar is now principal partner at Dollar Associates, LLC, Birmingham, Alabama.

NACUSO president/CEO Thomas C. Davis opened the morning session by encouraging attendees to focus on the positive. "There is a need for CUSO members to drive credit union success," Davis noted. "That's why we are in business."

Summarizing the current projects, activities, and focus of NACUSO's National Center for Collaboration and Innovation, Davis highlighted NACUSO's enhanced Web site featuring its new blog. "The National Center continues to serve as a primary resource of information for connecting credit unions and CUSOs to help you collaborate, "Davis said. "Our online NACUSOMatch Directory of CUSOs and the new blog journal are two current resources available to anyone interested in collaboration, or considering CUSO solutions to fill a credit union need."

Speaking next at the morning general session, NCUA Board Member Gigi Hyland addressed key regulatory issues, including the NCUA's letter on third-party relationship evaluation. Hyland related the letter as saying, in effect, there's no doubt credit unions need third-party vendors to deliver products and services to members; the reality is to focus on what your credit union needs to meet strategic goals when using third-parties. She also encouraged credit unions to improve strategic planning, ensure balance in third-party contracts and to perform due diligence, along with ongoing reviews and monitoring. As for CUSOs, Hyland recommended they create a working process of knowledge for regulators to understand both what CUSOs do, and perhaps more importantly, what CUSOs don't do for credit unions.

Capping the morning general assembly, keynote speaker Dennis Dollar, who is also working with NACUSO to develop a political action agenda and regulatory advocacy program, provided insights into where he believes the credit union industry will be in the year 2020. Looking into the future, Dollar predicts that credit unions will be the dominant community-based financial institutions, in most communities, because bank merger mania will create more nationwide "mega-banks" leading to an increased disconnect with local citizens who seek a more personal touch. Credit unions, specifically those with geographic FOMs, will fill the gaps and meet the needs of the community.

N-5

# EXHIBIT O

August 18, 2011

Patricia O' Connell
Quartararo & Lois, PLLC
1399 Route 52, Suite 101
Fishkill, NY 12524

Re:  Hudson Valley FCU Volunteer Service Award Policy

Dear Ms. O'Connell:

Thank you for your letter to the General Counsel of July 23, 2011, seeking our opinion on whether Hudson Valley FCU's policy of giving a Volunteer Service Award of a $250 Visa gift card is permissible under NCUA's rule limiting compensation of officials, 12 C.F.R. 701.33 ("the Rule").  The policy provides for such awards "at the end of each five-year period of service" to volunteers who may include members of the credit union's board of directors ("BOD") and committees.  As explained below, our opinion is that a Volunteer Service Award recognizing an individual director's or committee member's substantial length of service is permissible under the Rule so long as the award is nominal in value in proportion to the period of service it covers.

The Rule provides that "only one board officer, if any, may be compensated as an officer of the board" and that "[n]o other official may receive compensation for performing the duties or responsibilities of the board or committee position" he or she holds.  *Id.* §701.33(b)(1); 12 U.S.C. 1761a.  The Rule defines an "official" as a member of the BOD, credit committee or supervisory committee, or other volunteer committee established by the BOD.  12 C.F.R. 701.33(a).  "Compensation" excludes reimbursement of necessary and appropriate costs of official business (*e.g.,* travel expenses) and reasonable health, accident and related personal insurance; it does not expressly address or exclude awards.  *Id.* §701.33(b)(2).

Our view is that a monetary award to individually recognize an official's multiple years of volunteer service—as opposed to an award periodically given (e.g., annually or bi-annually) to all volunteers or to a class of volunteers (e.g., all directors) then-serving—would constitute an incentive to volunteerism, rather than proscribed "compensation," provided that the amount per year of service is nominal.  Based on our prior opinions,"

O-1

Patricia O' Connell
August 18, 2011
Page 2

and adjusted for inflation, we would consider a maximum of $50 per year of service to be "nominal."

Sincerely,

/s/

Hattie M. Ulan
Associate General Counsel

OGC/SWW: bhs
OGC No. 11-0805

O-2

# EXHIBIT P

11/7/2019
Case 1:19-cv-10994-KPF   Document 6   Filed 12/11/19   Page 137 of 142
A $450 dinner, $45 whisky: Political appointee, aide ring up the expenses - The Washington Post

# The Washington Post

*Democracy Dies in Darkness*

# A $450 dinner, $45 whisky: Political appointee, aide ring up the expenses

By **Robert O'Harrow Jr.**

Jan. 19, 2019 at 12:33 p.m. MST

They are federal financial regulators who filed for expenses like corporate CEOs, seeking reimbursement for limos, deluxe air travel and meals in posh restaurants.

There was an UberBlack ride from the District to neighboring Alexandria, Va., for $250, according to internal records obtained by The Washington Post. Two airline tickets to a meeting in Vienna came in at more than $11,000 each, even as a staffer found a way to the same event for a fraction of the price. A meal for three at Joe's Seafood near the White House cost $450 — including $45 for a dish of Dover sole and $43 for halibut, according to receipts for the meal.

J. Mark McWatters, head of the National Credit Union Administration, and his chief of staff, Sarah Vega, and their guests also showed a fondness for wine and top-shelf liquor, including, in one instance, a $45 glass of 18-year-old single-malt whisky, records show. In 2016 and 2017, they expensed more than $2,500 worth of alcoholic beverages — most of it under Vega's account — despite a written policy prohibiting reimbursement for the purchase of alcohol.

P-1

AD

"They have expensive taste," John Kutchey, deputy executive director of the NCUA, explained to agency investigators who asked about the spending last year.

The expense reports might have never come to light had an anonymous whistleblower not complained to the agency's inspector general about "extravagant" spending, triggering a months-long investigation in 2017 and last year, according to investigative reports and other records obtained through Freedom of Information Act requests.

The investigation, which has not been previously reported, offers an unusually detailed look at a federal regulator's expense account and serves as a reminder that perquisites far beyond the reach of most Americans are an accepted part of governance in some quarters of the nation's capital.

AD

P. 2

The NCUA is an independent agency that oversees and insures the deposits of credit unions, which operate as nonprofit financial institutions owned by members. There are more than 5,500 federally insured credit unions, with 111 million members.

NCUA operations are funded by fees from credit unions, and the agency's board is made up of members appointed from both political parties. Because the agency does not receive appropriations from Congress, it has many of its own rules for operations. It has remained open during the government shutdown.

Lavish as it appears on paper, most of the spending by McWatters and Vega appears to be permitted under its rules, according to agency officials and the inspector general's probe. That includes more than $60,000 in additional funding that was moved from one account to another in 2017 to cover McWatters's travel, lodging and per-diem expenses, the records show.

AD

The NCUA issued statements to The Post strongly defending the pair, saying McWatters and Vega did nothing wrong.

P-3

"The claims for reimbursement were within the parameters of agency policy," the agency said. "There being no violation of the law, rule or regulation, no disciplinary action was warranted."

McWatters, Vega, Kutchey and other NCUA officials did not respond to interview requests. A White House spokeswoman declined to comment.

But the IG investigators raised serious questions about the reimbursements for alcoholic beverages.

"Kutchey said that he has told McWatters and Vega and prior Board chairs and their staff at different times that the NCUA cannot pay for alcohol, and that they should make sure not to claim for alcohol," the report said.

AD

Last March, the inspector general passed on the findings about McWatters to the White House for review and referred both cases to the Justice Department's U.S. attorney for the Eastern District of Virginia, alleging "unauthorized receipt of expenses," according to the investigative reports.

P-4

# MARK S. BRANTLEY
4880 S Robins Way
Chandler, AZ 85249
480-869-4914

December 6, 2019

Pro Se Intake Unit
40 Foley Square
Room 105
New York, New York 10007

**Re:     Amended Civil Complaint
        Mark S. Brantley v. Municipal Credit Union, et al.
        Civil Case No.: 1:19-cv-10994**

( *K PF* )

To Whom It May Concern:

Please find enclosed an Amended Original Complaint and two (2) copies for the pro se filing of a
civil complaint.  This amended complaint is to replace the one previously filed.  The filing fee
was already submitted with the prior document.

Thank you in advance.

Very truly yours,

Mark S. Brantley
Pro Se Plaintiff

Enclosures



RECEIVED
DEC 1 1 2019
PRO SE OFFICE



USPS.COM/PICKUP

To schedule free Package Pickup,
scan the QR code.

PRIORITY
MAIL

UNITED POSTAL

P

UNITED STATES
POSTAL SERVICE.

Retail

US POSTAGE PAID
$14.35

Origin: 85248
12/07/19
0314820221-6

PRIORITY MAIL 2-DAY ®

5 Lb 2.60 Oz

1004

C014

EXPECTED DELIVERY DAY: 12/10/19

SHIP
TO:
40 FOLEY SQ
NEW YORK NY 10007-1502

USPS TRACKING® NUMBER

9505 5134 0901 9341 4915 40

M FLAT RATE BOX
★ ANY WEIGHT

PRIORITY
★ MAIL ★

FROM:
MARK S. BRANTL
4880 S ROBINS W
CHANDLER AZ

TO:
PRO SE INTAKE
U.S) DISTRICT COU
40 FOLEY SQUARE
NEW YORK, NY

Label 228, March 2016

FOR DOMESTIC