UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK S. BRANTLEY,<br><br>                         Plaintiff,<br><br>                         -v.-<br><br>MUNICIPAL CREDIT UNION, THE NATIONAL<br>CREDIT UNION ADMINISTRATION, *as Conservator*<br>*of the Municipal Credit Union*, EISNERAMPER LLP,<br>MARIA T. VULLO, *individually and in her official*<br>*capacity as Superintendent of the New York*<br>*Department of Financial Services*, and LINDA A.<br>LACEWELL, *individually and in her official capacity*<br>*as Superintendent of the New York Department of*<br>*Financial Services*,<br><br>                         Defendants. | 19 Civ. 10994 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Mark Brantley, an attorney proceeding *pro se*, is a former
member of the Board of Directors (the "Board") of the Municipal Credit Union
("MCU"). On June 22, 2018, the New York Department of Financial Services
("DFS"), the agency responsible for enforcing New York's banking laws, removed
the entirety of the Board — including Plaintiff — because of wide-ranging
mismanagement that culminated in the indictment of MCU's former CEO.

Plaintiff brings this suit against MCU; Maria T. Vullo, the former
Superintendent of DFS, in her individual and official capacities; Linda A.
Lacewell, the current Superintendent of DFS, in her individual and official
capacities (together with Vullo, the "DFS Defendants"); EisnerAmper LLP
("EisnerAmper"), MCU's outside auditor; and the National Credit Union
Association ("NCUA"), which DFS appointed conservator of MCU in May 2019.

In broad summary, Plaintiff asserts four claims in his Second Amended Complaint (the "SAC"):

    i.    MCU violated 26 U.S.C. § 7434 by filing tax documents that Plaintiff claims overstate compensation he received as a member of the Board ("Claim 1");

    ii.    MCU and Lacewell committed libel and/or libel *per se* against Plaintiff by publishing a press release regarding DFS's removal of the Board ("Claim 2");

    iii.    EisnerAmper committed professional malpractice and/or was negligent in discharging its duty as MCU's external auditor, thereby harming Plaintiff ("Claim 3"); and

    iv.    MCU and the DFS Defendants violated Plaintiff's constitutional rights by removing him from the Board without adequate process ("Claim 4").

Defendants Vullo, Lacewell, and EisnerAmper (collectively, the "Moving Defendants") now move to dismiss Claims 2, 3, and 4 for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), or in the alternative, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth in the remainder of this Opinion, the Court grants the Moving Defendants' motion to dismiss in full.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

Plaintiff is an attorney and resident of Arizona who was elected by MCU's members to serve as an unpaid, volunteer member of the Board from 2005 until his removal on or about June 22, 2018.  (SAC ¶¶ 3, 10; *see also* DFS Reply 1 n.1).  Plaintiff had been reelected to the Board in 2017 to serve another three-year term during the events at issue in this litigation.  (SAC ¶ 3).  Separate and apart from his service on the Board, Plaintiff had been employed by the New York State Unified Court system from 1985 until 2015.  (*Id.* at ¶ 4).

MCU is a not-for-profit, member-owned, state-chartered credit union in New York State.  (SAC ¶ 5).  Plaintiff alleges that MCU is one of the oldest and largest credit unions in New York.  (*Id.*).  At the time that Plaintiff served on the Board, it was composed of twelve voluntary directors elected by MCU's shareholders to staggered, three-year terms.  (*Id.* at ¶ 10).  MCU also had a Supervisory Committee ("SC"), a body independent from the Board that had

---

[1]   This Opinion draws its facts from Plaintiff's Second Amended Complaint ("SAC" (Dkt. #60)), the well-pleaded allegations of which are taken as true for purposes of this motion.  The Court also draws facts from the Declaration of Leo V. Gagion in Support of Defendants Lacewell's and Vullo's Joint Motion to Dismiss, and the exhibits attached thereto.  ("Gagion Decl., Ex. [ ]" (Dkt. #67-1)).

For convenience, the Court refers to Defendants Lacewell's and Vullo's Memorandum of Law in Support of Their Joint Motion to Dismiss as "DFS Br." (Dkt. #67-8); Defendant EisnerAmper's Memorandum of Law in Support of Its Motion to Dismiss as "Eisner Br." (Dkt. #68-1); Plaintiff's Memorandum of Law in Opposition to Vullo's and Lacewell's Joint Motion to Dismiss as "Pl. DFS Opp."  (Dkt. #69); Plaintiff's Memorandum of Law in Opposition to EisnerAmper's Motion to Dismiss as "Pl. Eisner Opp." (Dkt. #70); Defendants Lacewell's and Vullo's Reply Memorandum of Law in Further Support of Their Joint Motion to Dismiss as "DFS Reply" (Dkt. #71); and Defendant EisnerAmper's Reply Memorandum of Law in Further Support of Its Motion to Dismiss as "Eisner Reply" (Dkt. #73).

"auditing and internal control responsibilities." (*Id.* at ¶ 11). *See also* N.Y. Banking Law ("NYBL") § 475 (detailing the duties and responsibilities of credit unions' supervisory committees under the NYBL). As relevant here, one of the SC's duties was to "conduct audits of [MCU] and prepare and submit reports on those audits to the Board." (SAC ¶ 12). *See also* NYBL § 475(2)(d). In furtherance of that duty, the SC supervised a team of internal auditors and engaged MCU's external auditor, Defendant EisnerAmper. (SAC ¶ 13). Although Plaintiff was a member of the Board, he was not a member of the SC. (*See generally id.*).

Defendant EisnerAmper was engaged by the SC to serve as MCU's "outside accounting auditor to perform the independent audits of [MCU's] financial statements and operations[.]" (SAC ¶ 14). MCU received services from EisnerAmper for more than a decade, and as part of those services, EisnerAmper "prepared [MCU's] federal Form 990s that contained the compensation for all Defendant MCU's officers." (*Id.*). Plaintiff alleges that EisnerAmper maintains its principal place of business in New York. (*Id.* at ¶ 9).

Defendant Maria T. Vullo served as Superintendent of DFS from February 2016 until approximately February 1, 2019. (*See* SAC ¶ 7). Defendant Linda A. Lacewell was nominated to be Superintendent of DFS on or about February 4, 2019, and was confirmed to the position on or about June 21, 2019. (*Id.* at ¶ 8). Plaintiff has sued Vullo and Lacewell both individually and in their official capacities as current and former Superintendents of DFS, respectively. (*See id.* at p. 28).

4

Defendant NCUA is the agency of the United States that is responsible for administering the Federal Credit Union Act, regulating and supervising federal credit unions, and insuring the deposits of all insured credit unions. (SAC ¶ 6).  DFS appointed NCUA as conservator of MCU on or about May 17, 2019.  (*Id.*).

### 2.    The Regulation of Credit Unions in New York State

DFS is a state agency that regulates and supervises financial services institutions in New York, including all state-chartered banking organizations, such as credit unions.  (SAC ¶ 7).  In her capacity as the head of DFS, the Superintendent is responsible for enforcing New York's banking, insurance, and financial services laws.  *See* N.Y. Fin. Serv. Law ("NYFSL") § 301.  As such, the Superintendent is empowered to take any action she "believes necessary to ... ensure the continued solvency, safety, soundness[,] and prudent conduct of the providers of financial products and services"; "protect users of financial products and services from financially impaired or insolvent providers of such services"; and "eliminate financial fraud, other criminal abuse[,] and unethical conduct in the industry."  *Id.* § 201(b); *see also id.* § 301(c)(1).  In carrying out this mandate, the Superintendent is empowered to investigate and examine all records of banking institutions at any time.  *See* NYBL § 36.

In the event that the Superintendent finds that any "director, trustee[,] or officer" of a banking institution "has violated any law or duly enacted regulation[,]" the NYBL specifies a procedure for removing the official from office, whereby the official is provided notice and "a reasonable opportunity to

be heard" before removal.  *See* NYBL § 41(a).  However, and as relevant to the instant litigation, the Superintendent may also "make variations from the requirements of" the NYBL — including its provisions regarding the removal of directors, trustees, or officers — in the event of "unusual and extraordinary circumstances."  *Id.* § 14(1)(p).  The Superintendent may also, "in h[er] discretion, forthwith take possession of the business and property of any banking organization" if she finds that the organization, *inter alia*, "[h]as violated any law; [i]s conducting its business in an unauthorized or unsafe manner; [i]s in an unsound or unsafe condition to transact its business; [or c]annot with safety and expediency continue business[.]"  *Id.* § 606(1)(a)-(d).  In the event that the Superintendent takes control of a banking organization, that organization may apply to the New York State Supreme Court for a post-deprivation order.  *Id.* § 607.  No pre-deprivation hearing is required.  *Id.*

Pursuant to the NYBL, the board of directors of a credit union is responsible for the general management of the organization's "affairs, funds[,] and records."  NYBL § 470(1).  (*See also* SAC ¶ 10 ("The Board was responsible for the general management of the affairs, funds and records of [MCU], and established policies for [MCU].")).  Section 471 of the NYBL further provides that directors and officers of credit unions "shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which a prudent person would exercise under similar circumstances in like positions."  *Id.* § 471(1).  They are empowered to rely on, *inter alia*, reports prepared by the credit union's auditors and/or supervisory committee in

discharging these statutory duties.  *Id.*  Significantly, however, members of the boards of credit unions are prohibited by law from "receiv[ing] any compensation for [their] services as a member of the board."  *Id.* § 470(1).

### 3.  The Misconduct at MCU and the Dismissal of Its Board

In May 2018, Kam Wong ("Wong"), MCU's CEO and President, was arrested and charged with fraud, embezzlement, and aggravated identity theft offenses related to defrauding MCU in a multi-million dollar scheme.  (SAC ¶ 19).  Wong subsequently pleaded guilty and was sentenced to five and a half years in prison.  (*Id.*).  In or about June 2018, Wong was terminated from his position as MCU's CEO.  (*Id.* at ¶ 21).  After an investigation, by Order dated June 22, 2018, Vullo, acting as Superintendent, removed all twelve members of MCU's board, including Plaintiff, for violations of NYBL §§ 470 and 471.  (*Id.* at ¶ 22; *see also* SAC, Ex. L (the "DFS Removal Order")).

In relevant part, the DFS Removal Order recounted that DFS had discovered "severe deficiencies and weaknesses in … [MCU's] internal control and in its Board of Directors' … oversight of the management of the affairs, funds, and records of MCU, in a manner that raises significant concerns regarding the oversight of MCU's operations and protection of its membership." (DFS Removal Order).  Citing DFS's finding that members of the Board had violated NYBL §§ 470 and 471, Vullo "determined that prompt action [was] necessary to address these significant supervisory concerns" and accordingly, removed the Board pursuant to NYBL §§ 14(1)(p), 41, and NYFSL §§ 301, 303. (*Id.*).  Vullo additionally appointed an independent administrator to oversee

MCU.  (*Id.*).  On or about May 17, 2019, DFS took possession of MCU pursuant to NYBL § 606, and thereafter appointed NCUA to be MCU's conservator.  (SAC ¶ 26).

### 4. The State Court Proceedings[2]

On or about August 16, 2018, Plaintiff and six other former members of the Board (collectively, "Petitioners"), commenced a proceeding in the Supreme Court of the State of New York, County of New York, pursuant to N.Y. C.P.L.R. Article 78 (the "Article 78 Proceeding"), to "vacate and annul the [DFS Removal] Order, reinstate Plaintiff and fellow petitioners-directors as board members, and enjoin Defendant MCU from taking any action to conduct or hold an election."  (SAC ¶ 23).  Petitioners named MCU, DFS, and Vullo — in her official capacity as Superintendent — as Respondents in the Article 78 Proceeding. (*See* Art. 78 Pet.).  Petitioners alleged that Respondents had "acted arbitrarily and capriciously, and clearly abused their discretion in violating the statutorily and constitutionally protected rights of Petitioners as duly elected Directors of the credit union," by removing the Board without a pre-deprivation hearing. (*Id.* at ¶ 68; *see also id.* at ¶ 3).  They further asserted that they did not violate NYBL §§ 470 and 471, and that they did not receive "unlawful compensation." (*See* SAC ¶ 50).  Petitioners sought an order: (i) "[e]njoining and restraining

---

[2]    For ease of reference, the Court refers to documents from the Article 78 Proceeding as follows: the Verified Petition is referred to as "Art. 78 Pet." (Gagion Decl., Ex. A); DFS's and Vullo's memorandum of law in support of their cross-motion to dismiss the complaint is referred to as "Art. 78 DFS Br." (*id.*, Ex. B); Petitioners' memorandum of law in opposition to the motion to dismiss is referred to as "Art. 78 Pet. Opp." (*id.*, Ex. C); and the decision of the state trial court is referred to as "Art. 78 Decision" or the "Article 78 Decision" (*id.*, Ex. D).  For convenience, citations to these documents utilize the pagination assigned by the Court's Electronic Case Filing ("ECF") system.

Respondents from taking any action to convene or conduct an election for a new Board of Directors of [MCU]"; (ii) "[v]acating and annulling the [DFS Removal Order]"; (iii) "[r]einstating Petitioners as members of the Board of Directors of [MCU]"; and (iv) such other relief the trial court deemed just and proper.  (Art. 78 Pet. 25-26).

DFS and Vullo filed a cross-motion to dismiss the Article 78 Proceeding on October 1, 2018.  They argued that the DFS Removal Order was not arbitrary and capricious, and that Petitioners had failed to state a due process claim.  (*See* Art. 78 DFS Br.).  As relevant here, DFS and Vullo contended that — given the serious threat both to MCU and to the state's banking system posed by the conduct that DFS had uncovered in its investigation — due process did not require that Petitioners be afforded a hearing prior to their removal from the Board.  (*Id.* at 33-36).  Instead, they argued that the Article 78 Proceeding itself provided sufficient process.  (*Id.* at 36-37).  In their opposition to the cross-motion, Petitioners argued, *inter alia*, that they were entitled to a pre-deprivation hearing and that DFS's failure to provide one constituted a due process violation.  (Art. 78 Pet. Opp. 24-25).

On October 25, 2018, after oral argument, the state trial court granted DFS's and Vullo's cross-motion to dismiss the Article 78 Petition.  (Art. 78 Decision; *see also* SAC ¶ 24).  The court held that it was not arbitrary or capricious for DFS to have removed Petitioners from the Board before providing them a pre-deprivation hearing.  (Art. 78 Decision 34).  In particular, the trial court explained that, "given the need to act quickly to protect the banking

system, there just is no 'arbitrary and capricious' here." (*Id.* at 35).  The court also found it persuasive that "[t]here seem[ed] to be a serious misuse of funds ... by ... Mr. Wong ... [a]nd the Board just let it happen." (*Id.* at 34-35).[3]

On or about March 19, 2019, Petitioners appealed the trial court's decision to the Appellate Division, First Department. (SAC ¶ 24).  While the appeal was pending, on May 17, 2019, DFS took possession of MCU and appointed NCUA as conservator.  (*Id.* at ¶ 25).  Because a conservator, by operation of law, replaced the Board, the Appellate Division dismissed the appeal as moot by order dated September 24, 2019.  (*See* Gagion Decl., Ex. F (citing NYBL § 634); *see also* SAC ¶ 30).

### 5.    Plaintiff's Allegations

Plaintiff asserts three claims that are implicated by the instant motions.[4] *First*, in Claim 2, Plaintiff alleges that Lacewell and MCU committed libel and/or libel *per se* in connection with a press release that DFS issued.  (*See* SAC ¶¶ 54-68).  Concurrent with DFS's possession of MCU and appointment of NCUA as conservator, on May 17, 2019, DFS had published a press release on its website stating that "[i]n 2017 DFS had uncovered deficiencies in board oversight that had facilitated the multi-million-dollar embezzlement by the former CEO, Kam Wong." (*Id.* at ¶ 28; *see also* Gagion Decl., Ex. E (the "DFS

---

[3]    The state trial court also found dismissal warranted on a completely independent ground because Petitioners had their MCU cell phones "wiped ... after the superintendent [of DFS] asked them to preserve evidence."  (Art. 78 Decision 35).

[4]    Claim 1, for a violation of 26 U.S.C. § 7434, is brought only against MCU (*see* SAC ¶¶ 40-53), which has not filed a motion to dismiss (*see* Dkt. #57).  Plaintiff does not assert any of his four claims against NCUA, although NCUA is named as a Defendant only in its capacity as conservator of MCU.  (*See generally* SAC).  NCUA also has not filed a motion to dismiss.  (*See* Dkt. #53).

Case 1:19-cv-10994-KPF   Document 74   Filed 03/16/21   Page 11 of 44

Press Release")).  Plaintiff alleges that this sentence constitutes a "defamatory statement."  (SAC ¶ 28).  Worse yet, Plaintiff claims, NCUA's conservatorship published the same press release on its website as well.  (*Id.*; *see also id.* at ¶¶ 54-68).  The DFS Press Release contains a pull-quote from Lacewell, who was Acting Superintendent of DFS at the time.  (*See* DFS Press Release).  Plaintiff accordingly asserts Claim 2 against both MCU and Lacewell.

*Second*, in Claim 3, Plaintiff alleges that EisnerAmper "breached the duty of professional case owed to ... MCU," and in so doing committed professional malpractice or gross negligence, causing Plaintiff damages in the form of "board removal, defamation, emotional distress, litigation costs and attorney fees in this action, the state proceedings, as well as other losses."  (SAC ¶¶ 70, 80; *see generally id.* at ¶¶ 69-80).  Specifically, Plaintiff contends that because EisnerAmper failed to detect malfeasance at MCU perpetrated by Wong and other top managers, and because Plaintiff relied on EisnerAmper's audits and reporting to fulfill his own fiduciary duty of care as a director, Plaintiff was unfairly found to be in violation of NYBL § 471.  (*See id.* at ¶ 73; *see also* Pl. Eisner Opp. 2).  Plaintiff also alleges that EisnerAmper "failed to detect inconsistencies in several Form 990s it prepared that incorrectly listed Plaintiff's excludable reimbursements including guest travel as compensation[,] but did so correctly for other directors."  (SAC ¶ 72).  Plaintiff suggests that this misrepresentation caused DFS to believe that Plaintiff had improperly received compensation in violation of NYBL § 470.  (*See* Pl. Eisner Opp. 2).

11

*Third*, in Claim 4, Plaintiff alleges that Vullo, Lacewell, and MCU violated Plaintiff's constitutional rights by "determin[ing] in conclusory fashion, [that] Plaintiff violated" NYBL §§ 470 and 471 "without due process" and by removing him from the Board.  (SAC ¶ 81; *see also id.* at ¶¶ 81-107).  Specifically, Plaintiff faults Vullo for "not provid[ing] Plaintiff proper notice, a pre-deprivation hearing and an opportunity to address the aforementioned charges of misconduct before his removal from the board of directors."  (*Id.* at ¶ 82).  Plaintiff also alleges that Vullo and Lacewell deprived Plaintiff of a "property interest in his position as director[,]" as well as "damaged [Plaintiff's] good name, reputation, and integrity[,]" in violation of Plaintiff's constitutional rights through operation of the DFS Removal Order and DFS Press Release.  (*Id.* at ¶ 87).  Plaintiff argues that Vullo, Lacewell, MCU, and various other actors violated Plaintiff's due process rights by knowingly making false accusations against Plaintiff, and/or failing to provide evidence to clear Plaintiff's name during the Article 78 Proceeding.  (*See, e.g.*, *id.* at ¶¶ 88-98).  Through this claim under 42 U.S.C. § 1983 ("Section 1983"), Plaintiff seeks damages and "declaratory relief to clear his name and reputation that he did not violate NYBL [§§] 470 and 471, and that he did not facilitate a multi-million dollar embezzlement."  (*Id.* at ¶ 102).

## B.   Procedural Background

Plaintiff initiated this suit on November 27, 2019, by filing his original complaint.  (Dkt. #1).  The Court issued an Order of Service on December 9, 2019 (Dkt. #4), and two days later Plaintiff filed an Amended Complaint (Dkt.

#6).  By Order dated December 26, 2019, the Court granted Plaintiff's request to file a Second Amended Complaint (Dkt. #8), which Plaintiff filed on January 3, 2020 (Dkt. #9; *see also* Dkt. #60 (copy of SAC with sensitive personal information redacted)).

Lacewell filed a pre-motion letter seeking to pursue a motion to dismiss on February 12, 2020, and Vullo joined that letter on March 12, 2020.  (*See* Dkt. #22, 33).  EisnerAmper filed a pre-motion letter requesting permission to file a motion to dismiss on February 14, 2020.  (Dkt. #25).  The Court deferred addressing the parties' pre-motion letters until all Defendants had received an opportunity to respond to the SAC.  (*See* Dkt. #28).  MCU answered the SAC on March 16, 2020, and NCUA answered on April 23, 2020.  (Dkt. #34, 47).  Thereafter, on May 5, 2020, the parties attended a telephonic pre-motion conference with the Court to discuss the contemplated motions to dismiss, as well as several ancillary matters.  (*See* Minute Entry of May 5, 2020).  The same day, the Court issued an Order setting a briefing schedule on the Moving Defendants' anticipated motions.  (*See* Dkt. #63).

By Order dated May 29, 2020, the Court granted the DFS Defendants' motion to file certain documents related to the Article 78 Proceeding under seal in connection with the anticipated motion to dismiss, because the underlying state court suit remained under seal.  (*See* Dkt. #65).  The Moving Defendants filed their motions to dismiss and supporting documents on June 5, 2020 (Dkt. #66-68), Plaintiff filed his opposition briefs on July 16, 2020 (Dkt. #69-70), and the Moving Defendants filed their replies on July 31, 2020 (Dkt. #71-73).

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

The instant motions implicate both the Court's jurisdiction and the adequacy of Plaintiff's pleadings, and so the Court outlines the applicable legal standards for both types of challenges.  Under Rule 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions challenging subject matter jurisdiction: facial motions and fact-based motions.  *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017).  A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  *Carter*, 822 F.3d at 56.  A plaintiff opposing such a motion bears "no evidentiary burden."  *Id.*  Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction.  *Id.*  (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  And to make

14

that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks omitted) (quoting *Lunney* v. *United States*, 319 F.3d 550, 554 (2d Cir. 2003)).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading." *Carter*, 822 F.3d at 57. "In opposition to such a motion, plaintiffs must 'come forward with evidence of their own to controvert that presented by the defendant,' or may instead 'rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.'" *Katz*, 872 F.3d at 119 (alteration in original) (quoting *Carter*, 822 F.3d at 57). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

### 2. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a defendant is permitted to move that the plaintiff's action be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584

F.3d 82, 88 (2d Cir. 2009)); see also *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)). In the present matter, in addition to considering the allegations in the SAC and documents attached to the SAC, the Court considers the exhibits to the Declaration of Leo V. Gagion, including court filings from the Article 78 Proceeding and the DFS Press Release.

Plaintiff is a licensed attorney who is proceeding *pro se*.  Although the pleadings of *pro se* parties are typically "held to less stringent standards than formal pleadings drafted by lawyers," *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted), the law is clear that "*pro se* attorneys ... 'cannot claim [this] special consideration,'" *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak* v. *County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)); *see also Tracy* v. *Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (collecting cases supporting the proposition that "a lawyer representing himself ordinarily receives no [special] solicitude"); *Abraham* v. *Leigh*, 471 F. Supp. 3d 540, 553 (S.D.N.Y. 2020), *reconsideration denied*, No. 17 Civ. 5429 (KPF), 2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020).

## B.    Analysis

### 1.    Plaintiff's Claims Against Vullo and Lacewell in Their Official Capacities Are Barred by Sovereign Immunity

Plaintiff asserts Claim 2 against Lacewell, and Claim 4 against Vullo and Lacewell, in both their official and individual capacities.  The two DFS Defendants argue that this Court lacks jurisdiction to consider Plaintiff's claims against them in their official capacities (*i.e.*, as former and current Superintendent of DFS) due to sovereign immunity.  (DFS Br. 9-10).  They move under Rule 12(b)(1), which as noted permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).

The Eleventh Amendment "render[s] states and their agencies immune from suits brought by private parties in federal court."  *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004).  As relevant here, "[t]he Eleventh

Amendment bars damages actions in federal court against a state and against state officials acting in their official capacities, unless the state waives sovereign immunity or Congress abrogates it." *Chris H.* v. *New York*, 740 F. App'x 740, 741 (2d Cir. 2018) (summary order); *see also Ying Jing Gan* v. *City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).

Here, Plaintiff points to no waiver of sovereign immunity. Rather, Plaintiff argues that his claims against Vullo and Lacewell in their official capacities are permissible pursuant to *Ex Parte Young*, 209 U.S. 123 (1908), which allows a suit against a state officer in her official capacity when a plaintiff seeks only prospective equitable relief for an ongoing violation of federal law. (*See* Pl. DFS Opp. 6-7). *See generally Pennhurst State Sch. & Hosp.* v. *Halderman*, 465 U.S. 89 (1984) (discussing the circumstances in which *Ex Parte Young* applies); *see also Puerto Rico Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). In point of fact, *Ex Parte Young* fails to save any of Plaintiff's official capacity claims.

*First*, Claim 2 against Lacewell in her official capacity is barred by sovereign immunity because libel is a state law claim and *Ex Parte Young* applies only to ongoing violations of *federal* law. *See Pennhurst*, 465 U.S. at 106 (holding that *Ex Parte Young* is "inapplicable in a suit against state officials on the basis of state law"). *Second*, *Ex Parte Young* does not preserve Plaintiff's official-capacity claims under Section 1983, because Plaintiff points to no *ongoing* violation of federal law. Plaintiff alleges that the purported constitutional violation occurred in 2018 when Plaintiff was removed from the

18

Board without a pre-deprivation hearing.  (*See* SAC ¶¶ 81-102).  As such, sovereign immunity also bars Claim 4 as against the DFS Defendants in their official capacities.  *Accord Green* v. *Mansour*, 474 U.S. 64, 71-72 (1985).[5]

### 2.    Claim 2 Must Be Dismissed on Privilege and Pleading Grounds

Plaintiff's claims against Vullo and Lacewell in their individual capacities also fail, but for different reasons.  To begin, Plaintiff alleges that Lacewell defamed him by publishing a purportedly defamatory statement in the DFS Press Release to the effect that "[i]n 2017 DFS had uncovered deficiencies in board oversight that had facilitated the multi-million-dollar embezzlement by the former CEO, Kam Wong."  (SAC ¶ 54).  On this point, Lacewell argues that she enjoys an absolute privilege from any defamation claim because the allegedly libelous statement was made in discharge of her official responsibilities concerning matters that came within the ambit of those duties. (DFS Br. 11 (citing *Stukuls* v. *New York*, 42 N.Y.2d 272, 278 (1997))).  Even if the privilege were found not to apply, Lacewell claims that Plaintiff has failed to state a claim for defamation.  (*Id.* at 14-18).  The Court agrees on both grounds.

---

[5]    Furthermore, as the DFS Defendants note in their brief (*see* DFS Br. 9 n.9), when a public officer "ceases to hold office while the action is pending," the "officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  As such, official capacity claims cannot be lodged against former officials.  *Townsend* v. *State of N.Y.  Div. of State Police*, No. 95 Civ. 0807 (RSP), 1997 WL 116790, at *6 (N.D.N.Y. Mar. 13, 1997) (Pooler, J.).  Defendant Vullo ceased serving as Superintendent of DFS on February 1, 2019; therefore, Plaintiff cannot maintain any claims against Vullo in her official capacity.  His claims against Vullo in her official capacity must be dismissed for this independent reason.

"'Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander.'" *Lan Sang* v. *Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) (quoting *Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)).  Under New York law, a plaintiff must show "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander *per se*, and (vii) not protected by privilege." *Albert* v. *Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001) (internal quotation marks and footnote omitted) (citing *Dillon* v. *City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)).[6]  Whether a statement is defamatory is a legal question that may be resolved by a court in the first instance.  *See Lan Sang*, 951 F. Supp. 2d at 517.  "Special harm" is the "loss of something having economic or pecuniary value." *Liberman* v. *Gelstein*, 80 N.Y.2d 429, 434-35 (1992). Among the bases for defamation *per se* is a statement that "charge[s] the plaintiff with a serious crime." *Albert*, 239 F.3d at 271.

---

[6]     No party suggests that the Court should apply the law of a state other than New York. (*See generally* DFS Br.; Eisner Br.; Pl. DFS Opp.; Pl. Eisner Opp.).  New York courts apply an "interest analysis" to choice of law issues involving torts, which analysis seeks "to effect the law of the jurisdiction having the greatest interest in resolving the particular issue[.]" *Cooney* v. *Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).  Plaintiff's removal from the Board occurred in New York and was effectuated pursuant to New York law, and the offending press release was published in New York by a New York State agency.  Additionally, the Article 78 Proceeding took place in, and most of the relevant parties are located in, New York.  Thus, New York is the jurisdiction with the greatest interest in the matter, and the Court will apply New York law to Claims 2 and 3, both of which allege state law torts.

Plaintiff fails to state a claim for defamation against Lacewell for myriad reasons.  *First*, there is no mention of Plaintiff in the purportedly defamatory statement.  (*See* SAC ¶ 54 ("'In 2017 DFS had uncovered deficiencies in board oversight that had facilitated the multi-million-dollar embezzlement by the former CEO, Kam Wong.'" (quoting DFS Press Release))).  Indeed, there is no specific mention of Plaintiff in the DFS Press Release.  (*See generally* DFS Press Release).  Undaunted, Plaintiff alleges that as the "most visible" member of the Board, any reference to the Board necessarily is "of and concerning" Plaintiff.  (*See* Pl. DFS Opp. 14).  But such a conclusory assertion is not enough to plausibly allege that the defamatory statement is "of and concerning Plaintiff." *See Abramson* v. *Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) (holding that "an individual plaintiff must be clearly identifiable" to satisfy the "of and concerning" requirement).  The offending sentence refers to the entire Board — comprising at least 12 members — and is fairly read to encompass former Board members as well; thus, Plaintiff has not established that the DFS Press Release "particularly referenced Plaintiff" or that he is "clearly identifiable" from among this large group.  *Accord Abramson*, 278 F.3d at 102 ("[A] defamation claim is 'insufficient if the allegedly defamatory statements referenced the plaintiff solely as a member of a group[.]'" (quoting *Church of Scientology Int'l* v. *Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), *aff'd*, 238 F.3d 168 (2d Cir. 2001))).

*Second*, "truth is an absolute, unqualified defense to a civil defamation action."  *Biro*, 883 F. Supp. 2d at 458 (quoting *Guccione* v. *Hustler Magazine,*

*Inc.*, 800 F.2d 298, 301 (2d Cir. 1986)).  DFS found that "deficiencies in [MCU's] board oversight … facilitated the multi-million-dollar embezzlement by the former CEO" (SAC ¶ 28), and Plaintiff provides no evidence to the contrary.[7] Indeed, this statement mirrors DFS's official findings as to the Board's conduct, as stated in the DFS Removal Order.  (DFS Removal Order; *see also* Art. 78 Decision 34-35 ("There seem[ed] to be a serious misuse of funds … by … Mr. Wong … [a]nd the Board just let it happen.")).

*Third*, Plaintiff fails to plead "special damages," and his argument that Lacewell committed "libel *per se*" is flawed.  Plaintiff claims that the purportedly defamatory sentence accuses him of committing the crime of "criminal facilitation" (*see* SAC ¶ 55), and thus satisfies the requirements of libel *per se*, *see Albert*, 239 F.3d at 271 (noting that a statement that "charge[s] the plaintiff with a serious crime" is among the bases for libel *per se*).  But the DFS Press Release does not accuse *any* member of the Board, much less Plaintiff, with criminal facilitation.  (*See* DFS Press Release).  And no rational reader would equate the description of the Board's deficiencies in oversight (even a description that includes the word "facilitate") with the state law crime of criminal facilitation.  Plaintiff also fails to plead "special damages" because loss of reputation — the harm Plaintiff's purportedly suffered as a result of this defamatory statement (*see* SAC ¶ 68) — without more, is not "something having economic or pecuniary value[,]" *Liberman*, 80 N.Y.2d at 434-35.

---

[7]     Plaintiff suggests that the statement is false because the SC also was purportedly deficient in its oversight.  (*See* Pl. DFS Opp. 9).  Plaintiff's argument is inapposite because the Board had an independent obligation to oversee MCU.  *See* NYBL § 471(1).

*Fourth*, Plaintiff fails to establish that the defamatory sentence is attributable to Lacewell in her individual capacity.  The DFS Release was issued by DFS, not Lacewell, and the defamatory sentence is not specifically attributed to her.  Plaintiff argues that because (i) the release contains a single quote attributed to Lacewell and (ii) Lacewell was the acting Superintendent of DFS when the release was issued, this Court should find that the entire release, including the defamatory sentence, is attributed to her.  (Pl. DFS Opp. 10-11).  The Court declines the invitation.  Instead, the Court agrees with Lacewell that "[f]or Plaintiff then to claim that Defendant Lacewell remains responsible *in her individual capacity* for an alleged defamatory statement issued *by DFS* is simply an attempt to assert a claim against her *as Superintendent of DFS*.  That official capacity claim, however, is barred by the Eleventh Amendment."  (DFS Reply 3).[8]  Accordingly, the purportedly defamatory statement is not attributable to Lacewell in her individual capacity.

*Finally*, the Court finds that New York's absolute privilege bars this defamation claim.  "Some communications are privileged and, even if they are defamatory, may not be the basis for a defamation action."  *Kuczinski* v. *City of New York*, 352 F. Supp. 3d 314, 325 (S.D.N.Y. 2019) (citing *Boice* v. *Unisys Corp.*, 50 F.3d 1145, 1149 (2d Cir. 1995)).  In this context, courts recognize two types of privileges: absolute and qualified.  *See id.*  "The holder of a qualified privilege may be sued for defamation if he published the statements with

---

[8]     As explained *supra*, sovereign immunity bars claims against Lacewell in her official capacity.

malice" while "[o]ne who enjoys the absolute privilege ... may not be sued no matter how malicious his state of mind." *Boice*, 50 F.3d at 1149.

The absolute privilege is given to an official who is "a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension," *Stukuls*, 42 N.Y.2d at 278, and is "limited to the speaker's official participation in the processes of government[,]" *Park Knoll Assocs.* v. *Schmidt*, 59 N.Y.2d 205, 209 (1983). Lacewell is clearly a principal executive of a state government institution because she is the Superintendent of DFS. Furthermore, the issuance of the DFS Press Release was squarely within her official participation in the process of government, because, as Lacewell succinctly explains, it "goes to the core of DFS' mandate: the regulation and supervision of New York state-chartered credit unions." (DFS Reply 2-3 (citing SAC ¶ 7)). *See also Cummings* v. *City of New York*, No. 19 Civ. 7723 (CM), 2020 WL 882335, at *25 (S.D.N.Y. Feb. 24, 2020) (collecting cases and holding that mayor's statements to the press are protected by absolute privilege and were made in the official participation in the process of government); *Gautsche* v. *New York*, 415 N.Y.S.2d 280, 281-82 (3d Dep't 1979) (holding that defamation suit based on press release issued by attorney general about legal action was barred by absolute privilege). Plaintiff counters that the privilege should not apply because the defamatory statement was "unwarranted, unfounded, untrue, and served no public purpose to improve the service of government." (Pl. DFS Opp. 12). But this conclusory allegation is insufficient to overcome the clear

proof provided by Plaintiff's own SAC that Lacewell was acting as "a principal executive" carrying out her "official participation in the process of government[,]" *Park Knoll Assocs.*, 59 N.Y.2d 209, by executing DFS's mandate in "regulat[ing] and supervis[ing] ... financial services institutions" in New York (SAC ¶ 7).

### 3.    The Article 78 Proceeding Precludes Claim 4

Plaintiff also mounts constitutional claims under 42 U.S.C. § 1983 against the DFS Defendants, alleging in particular that Vullo violated his due process rights by removing him from the Board without a pre-deprivation hearing, and that Lacewell violated his due process rights by issuing the ostensibly defamatory press release. (*See* SAC ¶¶ 81-99). As relief, Plaintiff seeks damages and a declaratory judgment that he did not violate NYBL §§ 470 and 471. (*See id.* at ¶¶ 100-03). The DFS Defendants rejoin that Plaintiff's Article 78 Proceeding precludes Claim 4 under the doctrines of collateral estoppel and *res judicata*. (*See* DFS Br. 18-22; DFS Reply 5-6).

The preclusive effect of a prior judgment is dictated by the doctrines of claim preclusion (sometimes referred to as *res judicata*) and issue preclusion (sometimes referred to as collateral estoppel). *See Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008). "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,'" claim preclusion and issue preclusion "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* at 892 (alterations

in *Taylor*) (quoting *Montana* v. *United States*, 440 U.S. 147, 153-54 (1979)); *see also Marvel Characters, Inc.* v. *Simon*, 310 F.3d 280, 286 (2d Cir. 2002) ("These related but distinct doctrines operate to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits."). Federal courts sitting in New York apply New York law to determine whether a state court judgment has preclusive effect on claims or issues. *See Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) ("[I]n order to determine the preclusive effect of a state-court decision, a federal court must look to the law of that state and should not give the state-court decision any greater preclusive effect than the courts of that state would give it[.]"); *see also Owens* v. *Treder*, 873 F.2d 604, 607 (2d Cir. 1989) ("The federal court must ... apply the collateral estoppel rules of the state which rendered the judgment."). The Court agrees with the DFS Defendants that the Article 78 Proceeding forecloses Plaintiff's Section 1983 claims against them in their individual capacities, and accordingly dismisses Claim 4.[9]

### a.    Plaintiff's Section 1983 Claims for Declaratory Relief Are Barred by *Res Judicata*

The doctrine of *res judicata*, also known as claim preclusion, provides that "'[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Maharaj* v. *Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997)

---

[9]    The Court has already held that sovereign immunity bars suit against Vullo and Lacewell in their official capacities.

(alteration in *Maharaj*) (quoting *Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981)).  In other words, "the doctrine states that once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning 'the transaction, or series of connected transactions, out of which the [first] action arose.'"  *Id.* (alteration in *Maharaj*) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982)); *see generally Soules* v. *Conn. Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 55 (2d Cir. 2018).

The Second Circuit has instructed that "the first judgment will preclude a second suit only when it involves the same 'transaction' or connected series of transactions as the earlier suit; that is to say, the second cause of action requires the same evidence to support it and is based on facts that were also present in the first."  *Maharaj*, 128 F.3d at 97.  Four requirements are necessary for *res judicata* to apply to a later litigation.  The earlier decision must have been "'[i] a final judgment on the merits, [ii] by a court of competent jurisdiction, [iii] in a case involving the same parties or their privies, and [iv] involving the same cause of action.'"  *Hecht* v. *United Collection Bureau, Inc.*, 691 F.3d 218, 221-22 (2d Cir. 2012) (quoting *In re Adelphia Recovery Tr.*, 634 F.3d 678, 694 (2d Cir. 2011)).  "Under New York's transactional approach to the rule, 'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'"  *Josey* v. *Goord*,

27

9 N.Y.3d 386, 389-90 (2007) (quoting *O'Brien* v. *City of Syracuse*, 54 N.Y.2d 353, 357 (1981)).

Plaintiff seeks as relief for the purported due process violation of his removal from the Board a declaration from this Court that he did not violate NYBL §§ 470 and 471.  (*See* SAC ¶¶ 100, 102; *see also* Pl. DFS Opp. 19).  The DFS Defendants argue that Plaintiff's claims in the instant action are precluded by the adverse judgment in the Article 78 Proceeding.  (DFS Br. 19). In determining whether Plaintiff is foreclosed from bringing his current claims, the Court must give the same preclusive effect to the state court judgment as would be given in New York, the state in which it was rendered.  *See Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  In consequence, the Court applies New York's broad transactional approach to *res judicata*.  *See Davidson* v. *Capuano*, 792 F.2d 275, 278 (2d Cir. 1986).  It begins with the proposition that a state court judgment in an Article 78 proceeding has preclusive effect on subsequent federal claims for declaratory and injunctive relief when those claims are predicated on the same transaction out of which the first state action arose.  *See id.*

The parties do not dispute that Plaintiff's Article 78 proceeding and the present action are based on the same underlying facts.  In both actions, Plaintiff sought relief based on the allegation that his removal from the Board without a pre-deprivation hearing violated his due process rights.  Indeed, Plaintiff's due process claim was at the heart of the Article 78 Petition (*see, e.g.*, Art. 78 Pet. ¶ 3), and Plaintiff raised the same due process arguments (and

cited the same caselaw) in the Article 78 Proceeding as here.  (*See* Art. 78 Pet. Opp. 22-25; Pl. DFS Opp. 15-18).  Despite the obvious overlap, Plaintiff nonetheless contends that *res judicata* is inappropriate because he seeks different relief here — a declaratory judgment — than he sought in the Article 78 Proceeding.[10]  But, as noted above, *res judicata* bars "'all … claims arising out of the same transaction or series of transactions … even if based upon different theories or if seeking a different remedy.'"  *Josey*, 9 N.Y.3d at 389-90 (quoting *O'Brien*, 54 N.Y.2d at 357).

Plaintiff's claim, while styled as a request for a declaratory judgment, is quite obviously a collateral attack on the Article 78 Proceeding.  In an apparent feint, Plaintiff focuses his arguments before this Court on purported stigmatic harms caused by the DFS Removal Order, the DFS Press Release, and his removal from the Board.  However, such harms are mere restatements of Plaintiff's central claim: that he was entitled to a pre-deprivation hearing to clear his name, and that had he been given such a hearing, he could have avoided the harm caused by the DFS Removal Order, the DFS Press Release, and his removal from the Board.[11]  At base, Plaintiff asks this Court to vacate

---

[10]     Plaintiff also argues that an Article 78 Proceeding does not preclude his Section 1983 claim because damages are not available as relief in an Article 78 proceeding.  (Pl. DFS. Opp. 19).  But the DFS Defendants do not seek the application of *res judicata* to Plaintiff's request for damages under Claim 4.  (*See* DFS Reply 5-6).  Thus, the Court need not address this argument.

[11]     This is why, although Lacewell was not a party to the Article 78 Proceeding, Plaintiff's Section 1983 claim against her arises from the same facts and raises the same legal issues that were the subject of the Article 78 Proceeding: namely, that Plaintiff was removed from the Board prior to receiving a pre-deprivation hearing.  Thus, it is irrelevant to the instant motion that Plaintiff couches his claim against Lacewell as a due process violation arising out of the publication of a purportedly defamatory statement about his removal prior to receiving a pre-deprivation hearing.

or invalidate the DFS Removal Order, which order caused Plaintiff to lose his Board membership and found that members of the Board were in violation of NYBL §§ 470 and 471.  But an Article 78 proceeding is the proper procedural vehicle to vacate or invalidate such an administrative order.  And Plaintiff pursued an Article 78 proceeding to challenge the DFS Removal Order — and lost — on the precise grounds he raises here.  What is more, in the Article 78 Proceeding, the state court considered this exact question — whether Plaintiff was entitled to a pre-deprivation hearing before his removal from the Board, which hearing would have addressed Plaintiff's underlying concerns with DFS's determination that he violated NYBL §§ 470 and 471 — and answered that question in the negative.  (*See* Art. 78 Decision 34-35; *see also* Art. 78 DFS Br. 24-29; Art. 78 Pet. Opp. 21-24).  Plaintiff's claim is thus precluded by *res judicata.*

Plaintiff also tries to avoid the application of *res judicata* by arguing that the Article 78 Decision decided only whether DFS's action was arbitrary and capricious, and it thus: (i) was not a final decision on the merits, and (ii) did not give Plaintiff a full and fair opportunity to litigate the issue of whether he violated NYBL §§ 470 and 471.  (Pl. DFS Opp. 18-20).[12]  But this is essentially

---

In any event, even if Plaintiff's Section 1983 claim against Lacewell in her individual capacity were not precluded, Plaintiff fails to allege any constitutionally protected interest that Lacewell violated.  To the extent Plaintiff alleges the violation of a liberty interest pursuant to a so-called "stigma plus" claim (*see* Pl. DFS Opp. 17-18), the Court has already held that the DFS Press Release is not defamatory.  Accordingly, Plaintiff fails to establish a "stigma" and, by extension, fails to plead that that Lacewell violated his constitutional rights.  Plaintiff's Section 1983 claim against Lacewell must be dismissed for this independent reason.

[12]  Plaintiff does not argue that the First Department's dismissal as moot of Petitioners' appeal of the Article 78 Decision means that the Article 78 Decision was not a final

a restatement of Plaintiff's first argument. As noted above, the Article 78 Proceeding squarely addressed Plaintiff's claim — that he was denied due process by DFS in its determination to remove him from the Board. And in deciding the Article 78 Proceeding, the state court necessarily determined that DFS had a rational basis for removing Plaintiff from the Board without a pre-deprivation hearing, precisely because DFS had "the need to act quickly to protect the banking system" after finding that the Board violated NYBL §§ 470 and 471. (*See* Art. 78 Decision 35; *see also* DFS Removal Order). Accordingly, Plaintiff's Claim 4 is barred by *res judicata* insofar as it seeks equitable relief in the form of a declaratory judgment that Plaintiff did not violate NYBL §§ 470 and 471.[13]

_____

decision on the merits and/or prevented Petitioners from fully and fairly litigating their claims. (*See generally* Pl. DFS Opp.). The Court notes that the First Department's dismissal of the appeal did not vacate or otherwise undermine the factual findings in the Article 78 Decision.

[13] Additionally, courts in this District regularly find declaratory judgment to be inappropriate where a party has already invoked its right to a coercive remedy. *See, e.g.*, *Sec. & Exch. Comm'n* v. *Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 388-89 (S.D.N.Y. 2010), *adhered to* (Sept. 30, 2010), *judgment entered*, No. 99 Civ. 11395 (RJS), 2011 WL 497775 (S.D.N.Y. Feb. 10, 2011); *Piven* v. *Wolf Haldenstein Adler Freeman & Herz LLP*, No. 08 Civ. 10578 (RJS), 2010 WL 1257326, at *11 (S.D.N.Y. Mar. 12, 2010); *Am. Auto. Ins. Co.* v. *Advest, Inc.*, No. 08 Civ. 6488 (LAK), 2009 WL 3490060, at *1 (S.D.N.Y. Oct. 28, 2009); *Great Am. Ins. Co.* v. *Houston Gen. Ins. Co.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990). So too here. Plaintiff has already sought this relief through the vehicle of the Article 78 Proceeding.

Courts have similarly found a declaratory judgment "seek[ing] to adjudicate past conduct" to be generally inappropriate. *Credit Bancorp, Ltd.*, 738 F. Supp. 2d at 388-89. In other words, the declaratory judgment must provide prospective relief. *See Mariah Re Ltd.* v. *Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 623 (S.D.N.Y. 2014), *aff'd sub nom. Maria Re Ltd. ex rel. Varga* v. *Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015) (summary order). Here, Plaintiff claims he seeks prospective relief in the form of clearing his "good name." (*See* SAC ¶ 102). But Plaintiff's purportedly prospective relief really just reframes his request to have this Court relitigate the Article 78 Proceeding. Accordingly, Plaintiff's claim for declaratory relief must be dismissed on these additional, independent grounds.

### b. Plaintiff's Section 1983 Claims for Damages Are Barred by Collateral Estoppel

While Plaintiff's request for declaratory relief is barred by claim preclusion, his request for damages is barred by issue preclusion. "In New York, collateral estoppel has two essential elements. 'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'" *Jenkins* v. *City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (quoting *Juan C.* v. *Cortines*, 89 N.Y.2d 659, 667 (1997)). Collateral estoppel forecloses "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor*, 553 U.S. at 892 (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 748-49 (2001)); *see generally Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322, 326 (1979); *Simmons* v. *Trans Express Inc.*, 955 F.3d 325, 328 (2d Cir. 2020), *certified question accepted*, 35 N.Y.3d 966 (2020); *Sec. & Exch. Comm'n* v. *Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999).

"'The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues ... whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue.'" *Evans* v. *Ottimo*, 469 F.3d 278, 281-82 (2d Cir. 2006) (alteration in *Evans*) (quoting *Kaufman* v. *Eli Lilly & Co.*, 65 N.Y.2d 449, 456 (1985)). In assessing these requirements, however, a court

32

must be mindful that "[d]espite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results."  *Remington Rand Corp.* v. *Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).

Plaintiff seeks money "damages for stigma plus due process violations[,]" pursuant to Section 1983, caused by DFS's removal of Plaintiff from the Board without a pre-deprivation hearing.  (Pl. DFS Opp. 19).  Plaintiff's arguments against the application of collateral estoppel largely mirror his arguments against the application of *res judicata* (*see id.* at 21 (arguing that decision on arbitrary and capricious grounds means that Article 78 Proceeding did not adjudicate due process claim on the merits)), and the Court rejects them for the same reasons.  In short, although Plaintiff now claims to seek different relief and points to the DFS Press Release and DFS Removal Order as "new" sources of harm, Plaintiff's central argument remains that he was entitled to a pre-deprivation hearing before removal from the Board.  And, as explained *supra*, the Article 78 Proceeding squarely addressed that issue.  Indeed, that issue was necessarily decided in the Article 78 Proceeding, as it was at the core of the Petition.  (*See* Art. 78 Pet. ¶ 3).  Finally, as already explained, Plaintiff fails to establish a viable stigma-plus due process claim.  *See supra* note 11.

In addition to the arguments already raised in his opposition to application of *res judicata*, Plaintiff tries to sidestep the application of collateral estoppel by arguing that he was falsely accused of wiping his MCU phone in the Article 78 Proceeding, and that "[s]aid false allegation provided a basis for

denying Plaintiff and the petitioners the requested relief and a name clearing hearing."  (Pl. DFS Opp. 20 (citing Art. 78 Decision 37)).  However, Plaintiff misconstrues the state court's decision in the Article 78 Proceeding.  The state court held that the evidence of this destruction of evidence constituted *independent* grounds for dismissal (Art. 78 Decision 36-37), and thus Plaintiff's argument does not defeat the application of collateral estoppel.  Because the Court has already determined that Claim 4 should be dismissed in its entirety pursuant to the doctrines of *res judicata* and collateral estoppel, it need not analyze whether Plaintiff has stated a claim for which relief can be granted, or whether Vullo and Lacewell are shielded from liability by qualified immunity.[14]

---

[14]   The DFS Defendants argue in their opening brief that the *Rooker-Feldman* doctrine also bars the Court from considering Plaintiff's due process claims (*see* DFS Br. 22-23), although they appear to have abandoned this ground in their reply brief (*see generally* DFS Reply).  Nevertheless, in the interest of completeness, the Court notes briefly that the *Rooker-Feldman* doctrine does not bar Plaintiff's due process claims here.

The *Rooker-Feldman* doctrine bars a losing party in state court "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  *Johnson* v. *De Grandy*, 512 U.S. 997, 1005-06 (1994).  The doctrine occupies "narrow ground," *Exxon Mobil Corp.* v. *Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005), and has been limited to cases satisfying a four-part test: (i) the federal-court plaintiff lost in state court; (ii) the plaintiff "must complain of injuries caused by a state-court judgment"; (iii) the plaintiff "must invite district court review and rejection of that judgment"; and (iv) "the state-court judgment must have been rendered before the district court proceedings commenced[.]"  *Green* v. *Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) (alteration, citations, and internal quotation marks omitted) (quoting *Hoblock* v. *Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005)).  Here, the Court does not understand Plaintiff to be complaining of injuries *caused by* the Article 78 Proceeding.  Rather, the Court understands Plaintiff to be challenging a violation of his due process rights that occurred when Plaintiff was removed from the Board, which harm was compounded by the publication of the DFS Press Release, and which harm the Article 78 Proceeding failed to relieve.  Accordingly, the second element required for the application of the *Rooker-Feldman* doctrine is not present here.

### 4.    Plaintiff Fails to State a Claim Against EisnerAmper LLP

The Court now turns to Claim 3, the only claim asserted against EisnerAmper.  In the SAC, Plaintiff frames this claim at various points as one for professional malpractice, negligence, or gross negligence.  (*See* SAC ¶¶ 69-80).  As pleaded here, these three claims are essentially different formulations of a professional malpractice claim, which under New York law "is a species of negligence."  *Hydro Invs., Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000).  The Court addresses all three of these closely related claims below and determines that Plaintiff fails to state a claim under each of these theories of liability.[15]  Before so doing, the Court considers and rejects EisnerAmper's antecedent argument that the Court lacks subject matter jurisdiction to hear Claim 3.

---

[15]    In his opposition, Plaintiff raises a completely new claim that he believes he has pleaded against EisnerAmper: negligent misrepresentation.  (*See* Pl. Eisner Opp. 9-11).  Because this claim is raised for the first time in Plaintiff's opposition brief, and because Plaintiff does not include a claim for negligent misrepresentation in the SAC or otherwise mention misrepresentation in the SAC, the Court need not consider Plaintiff's arguments on this claim.

Plaintiff argues that the Court should consider his negligent misrepresentation claim because he is proceeding *pro se* and he raised this claim in a pre-motion letter.  (Pl. Eisner Opp. 9 (citing *Pahuja* v. *Am. Univ. of Antigua*, No. 11 Civ. 4607 (PAE), 2012 WL 6592116, at *1 (S.D.N.Y. Dec. 18, 2012))).  As noted previously, Plaintiff is an attorney, and is not entitled to special solicitude normally shown a *pro se* plaintiff.  *See Abraham* v. *Leigh*, 471 F. Supp. 3d 540, 553 (S.D.N.Y. 2020), *reconsideration denied*, No. 17 Civ. 5429 (KPF), 2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020).  But even if the Court were to consider this claim, Plaintiff would fail to state a claim for negligent misrepresentation for the same reasons he fails to state a claim for professional malpractice, discussed *infra*: Plaintiff fails to establish that his relationship with EisnerAmper was so close as to be the functional equivalent of privity.  *Accord Parrott* v. *Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 483 (2000) ("[B]efore a party may recover ... as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity[.]" (citation omitted)).

a.    **The Court Exercises Supplemental Jurisdiction Over Claim 3**

EisnerAmper contends that the Court lacks subject matter jurisdiction to consider Plaintiff's claims against it.  The Court disagrees.  When a district court has original jurisdiction in a civil action, it also "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Claims are part of the same case or controversy if they derive from a common nucleus of operative fact.  *See, e.g.*, *Achtman* v. *Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006).

In brief, Claim 3 alleges that EisnerAmper's purported deficiencies in auditing and/or overseeing MCU's finances as MCU's outside auditor were responsible for Plaintiff's removal from the Board for breach of fiduciary duty and for improperly receiving compensation.  (*See* SAC ¶¶ 69-80).  EisnerAmper concedes that Claim 3 arises out of the same common nucleus of operative fact as Claim 4, but argues that if the Court dismisses Claim 4, then Claim 3 should be dismissed because it does not arise out of the same common nucleus of operative fact as Claim 1, which would then be the only remaining federal claim.  (*See* Eisner Br. 11-12; Eisner Reply 9-10).  As it happens, the Court does not dismiss Claim 4 in its entirety because Plaintiff has asserted Claim 4 against MCU, and MCU has not moved to dismiss.  Therefore, a live federal question remains in the case arising out of the same common nucleus of operative fact as Claim 3.  Accordingly, the Court exercises supplemental

jurisdiction over Plaintiff's claims against EisnerAmper and addresses the merits of its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[16]

### b.   Plaintiff Fails to State a Claim for Professional Malpractice and/or Negligence

Plaintiff asserts claims for negligence, gross negligence, and professional malpractice against EisnerAmper.  (*See* SAC ¶¶ 69-80).  "Under New York law, a prima facie case of negligence, gross negligence, or professional malpractice requires the plaintiff to show: [i] a duty to the plaintiff; [ii] a breach of duty; [iii] a reasonably close causal connection between the contact and the resulting injury; and [iv] actual loss, harm or damage."  *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 495 (S.D.N.Y. 2001) (internal quotation marks omitted) (quoting *Integrated Waste Servs., Inc.* v. *Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299 (2d Cir. 1997)).  To constitute gross negligence, "'the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care,'" as gross negligence "'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'"  *Id.* (quoting *Curley* v. *AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)).

Here, Plaintiff's claim fails because he cannot establish that EisnerAmper owed him a duty.  "New York law limits professional negligence claims," such

---

[16]     EisnerAmper also argues that the Court cannot exercise diversity jurisdiction over Claim 3 because Plaintiff fails to plausibly allege that his damages against EisnerAmper satisfy the amount-in-controversy requirement in 28 U.S.C. § 1332.  (*See* Eisner Br. 8-11).  The Court need not consider this argument because, as discussed *supra*, the Court exercises supplemental jurisdiction over Plaintiff's claims against EisnerAmper pursuant to 28 U.S.C. § 1367.

as those asserted here, "to situations where the relationship between plaintiffs and defendant is either [i] privity of contract or [ii] a bond between them so close as to be the functional equivalent of privity." *Media Glow Digital, LLC* v. *Panasonic Corp. of N. Am.*, No. 16 Civ. 7907 (JFK) (HBP), 2019 WL 2281375, at *4 (S.D.N.Y. May 29, 2019) (collecting cases) (citing *Stapleton* v. *Barrett Crane Design & Eng'g*, 725 F. App'x 28, 31 (2d Cir. 2018) (summary order)), *reconsideration denied*, No. 16 Civ. 7907 (PGG), 2020 WL 1435176 (S.D.N.Y. Mar. 24, 2020).  It is undisputed that EisnerAmper and Plaintiff had no contractual relationship.  (*See generally* SAC; Pl. Eisner Opp.; *see also* Eisner Br. 16-17).  Thus, Plaintiff must establish that his relationship with EisnerAmper was the "'functional equivalent of privity.'"  *Ossining Union Free Sch. Dist.* v. *Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419 (1989); *see also Katz* v. *Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2008 WL 4840880, at *8 (S.D.N.Y. Nov. 4, 2008) ("Under New York law, an accountant owes a duty of care only to those parties with whom it is in a relationship of privity or 'near privity.'" (quoting *DaPuzzo* v. *Reznick Fedder & Silverman*, 788 N.Y.S.2d 69, 71 (1st Dep't 2005)).

Under New York law, the functional equivalent of privity exists where a plaintiff can establish that "[i] the defendant had an awareness that its work was to be used for a particular purpose; [ii] there was reliance by a third party known to the defendant in furtherance of that purpose; and [iii] there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance." *Fin. Guar. Ins. Co.*

38

v. *Putnam Advisory Co., LLC*, 783 F.3d 395, 405-06 (2d Cir. 2015).  *Accord Credit All. Corp.* v. *Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985) ("*Credit Alliance*") ("Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: [i] the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; [ii] in the furtherance of which a known party or parties was intended to rely; and [iii] there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.").  Here, Claim 3 must be dismissed because Plaintiff fails to establish that his relationship with EisnerAmper was the "functional equivalent of privity."

In determining whether Plaintiff has sufficiently alleged a duty of care on the part of EisnerAmper, the Court finds the analysis of the New York Court of Appeals in *Credit Alliance* to be instructive.  *Credit Alliance* consolidated two appeals, both of which raised the issue of an accountant's duty of care to a non-client.  In the first appeal ("*Credit Alliance*"), the facts as alleged demonstrated that the defendant accountant's client had sought to induce the plaintiff to extend credit to it, in part by showing the plaintiff the accountant's reports *with the intention* that the plaintiff would rely on them.  493 N.Y.S.2d at 553.  The plaintiff also alleged that the accountant either knew or should have known that the plaintiff was being shown the reports for the purpose of inducing the plaintiff's reliance on them.  *Id.*  However, despite these

allegations, the court still held that a relationship approaching privity had not been shown, because "no claim [was] made that [the accountant] was being employed to prepare the reports with *that particular purpose* [*i.e.*, inducing the plaintiff's reliance] *in mind*." *Id.* at 553-54 (emphasis added). The court also cited the lack of any allegation that the accountant "had any direct dealings with plaintiffs.... [T]here is simply no allegation of any word or action on the part of [the accountant] *directed to* plaintiffs." *Id.* (emphasis added).

In the second appeal ("*European American*"), the plaintiff alleged similar facts, with the exception that the defendant accountant had been "*well aware* that a *primary, if not the exclusive, end and aim* of auditing its client ... was to provide [the plaintiff lender] with the financial information it required." *Credit Alliance*, 65 N.Y.2d at 554 (emphasis added). In holding that a relationship approaching privity between the plaintiff and the accountant had been adequately alleged, the court explained that "direct communication" had taken place between the parties "for the very purpose of discussing [the client's] financial condition and [the plaintiff's] need for [the accountant's] evaluation." *Id.* The court concluded: "The parties' direct communications and personal meetings resulted in a nexus between them sufficiently approaching privity ... to permit [the plaintiff's] causes of action." *Id.*

Put simply, Plaintiff fails to satisfy all three prongs of the *Credit Alliance* test. He does not allege that EisnerAmper was retained specifically for the "primary, if not the exclusive, ... aim of" providing reports and/or audits to Plaintiff or even to the Board. *Credit Alliance*, 65 N.Y.2d at 554. (*See generally*

SAC).  At best, Plaintiff alleges that EisnerAmper might have been retained specifically for providing such reports to the SC.  (*See id.* at ¶¶ 11-14).  But Plaintiff does not allege he was ever a member of the SC.  (*See generally id.*).  Nor does Plaintiff plead that EisnerAmper created any reports or other purportedly false documents with the intent of inducing Plaintiff or the Board into relying on them, or that EisnerAmper "knew or should have known that the plaintiff was being shown the reports for the purpose of inducing the plaintiff's reliance," as in *Credit Alliance.*  65 N.Y.2d at 553-54.  And unlike in *European American*, Plaintiff does not allege that EisnerAmper was "well aware that a primary, if not the exclusive, end and aim of auditing [MCU] ... was to provide" Plaintiff individually, or even the Board as a group, with reports to induce their reliance.  *Id.* at 554.  Rather, as pleaded in the SAC, at best, EisnerAmper provided such reports to the SC, not to Plaintiff or the Board.  (SAC ¶¶ 11-14).[17]  Finally, Plaintiff fails to establish the third prong — some conduct evincing EisnerAmper's understanding of Plaintiff's reliance — because Plaintiff does not allege that EisnerAmper had any interaction with Plaintiff individually or as a member of the Board.  (*See generally* SAC).

---

[17]     In his opposition brief, Plaintiff argues that EisnerAmper knew that the Board "rel[ied] upon the Annual report and Form 990s" prepared by EisnerAmper, and that therefore, "as a matter of law, Plaintiff had a special or privity-like relationship with Defendant Eisner[.]"  (Pl. Eisner Opp. 10).  For starters, this allegation is directly contradicted by the SAC, which recites that "MCU *via its SC* engaged Defendant Eisner as its outside accounting auditor" to prepare Form 990s and other reports (SAC ¶ 14 (emphasis added)), and that the SC was "an independent body that functioned separately from the Board[.]  While the Board was charged with the general management of the affairs, funds[,] and records of the corporation, the SC had the auditing and internal control responsibilities for the institution" (*id.* at ¶ 11).  Yet even accepting Plaintiff's allegation as true, it would only establish the first prong of the *Credit Alliance* test, and would not remedy Plaintiff's pleading deficiencies with respect to the second and third prongs.

In his opposition brief, Plaintiff argues that EisnerAmper's reports were "presented to Plaintiff as Chairman of the Board and as a director" in MCU Annual Reports. (Pl. Eisner Opp. 11). But this fails to demonstrate that EisnerAmper engaged in any "linking conduct" and instead just demonstrates that Plaintiff received its work. *Cf. Katz*, 2008 WL 4840880, at *9 (finding no linking conduct where Plaintiff failed to allege auditor "discussed, acknowledged, or understood" that Plaintiff was to rely on auditor's report in deciding whether to become CEO of audited company). (*See also* SAC ¶ 14). In sum, Plaintiff fails to establish any of the three requirements needed to establish the functional equivalent of privity.

In a last-ditch effort to forestall dismissal, Plaintiff attempts to reverse-engineer a duty, arguing that NYBL § 471(1) imposes a duty of care on EisnerAmper vis-à-vis Plaintiff. (SAC ¶ 71; Pl. Eisner Opp. 11). This argument, however, suffers from a key flaw in logic. NYBL § 471(1) allows Plaintiff, *inter alia*, to rely on external auditors — instead of personally undertaking an independent personal audit of MCU's finances — without breaching his fiduciary duty as a member of the Board. *See* NYBL § 471. But NYBL § 471 does *not* allow Plaintiff to abdicate his fiduciary duty as a member of the Board by foisting his own obligations onto the Board's external auditor. Plaintiff's reliance does not, without more, impose a duty, for the same reasons just discussed: Plaintiff fails to demonstrate that EisnerAmper: (i) was aware of Plaintiff's individual reliance, (ii) created any document with the knowledge or intent of Plaintiff's reliance, or (iii) engaged in any "linking conduct" to

demonstrate understanding of that reliance.  Accordingly, Plaintiff cannot salvage Claim 3 by attempting to shift his own responsibilities under NYBL § 471 to EisnerAmper.  Perhaps a member of the SC could do so, and perhaps MCU as an entity might have such a claim — the Court need not opine further on those hypotheticals here — but Plaintiff surely does not.

## C.    Leave to Amend Is Denied

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'"  *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'"  *Id.* (alteration in *Gorman*) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  Nonetheless, "it remains 'proper to deny leave to replead where ... amendment would be futile.'"  *Id.* (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Plaintiff has twice amended his complaint, has received several rounds of pre-motion letters from the Moving Defendants, has had the benefit of a conference with the Court at which he discussed his theory of liability, and has still failed to adequately state a claim for which relief can be granted each time. *Cf. Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second

43

amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration, footnote, and internal quotation marks omitted)); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020)).  Accordingly, the Court finds that leave to amend would be futile and the SAC is dismissed with prejudice as to the Moving Defendants.

## CONCLUSION

For the reasons set forth in this Opinion, the Moving Defendants' motion to dismiss is GRANTED with prejudice.  Accordingly, Defendants Lacewell, Vullo, and EisnerAmper are terminated from this case.  On or before **April 19, 2021**, the remaining parties — Plaintiff, MCU, and NCUA — shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.  The Clerk of Court is directed to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:   March 16, 2021
         New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

44